IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:24-cr-20523-BB-1

UNITED STATES OF AMERICA,

      Plaintiff,                  February 6, 2026
                                 10:32 a.m.

      vs.

HARUN ABDUL-HAMID YENER,

      Defendant.                Pages 1 THROUGH 73

_____

TRANSCRIPT OF MOTION HEARING
DAY 1
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE

Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                     AJAY ALEXANDER, AUSA
                     MARC S. ANTON, AUSA
                     500 East Broward Boulevard, Suite 700
                     Fort Lauderdale, Florida 33394

FOR THE DEFENDANT:  FEDERAL PUBLIC DEFENDER'S OFFICE
                     VICTOR VAN DYKE, FPD
                     ABIGAIL E. BECKER, FPD
                     150 West Flagler Street, Suite 1700
                     Miami, Florida 33130

COURT REPORTER:     Yvette Hernandez
                     U.S. District Court
                     400 North Miami Avenue, Room 10-2
                     Miami, Florida 33128
                     yvette_hernandez@flsd.uscourts.gov

2

**I N D E X**

Certificate.................................          73


**W   I   T   N   E   S   S**

**ON BEHALF OF THE GOVERNMENT:**                         PAGE

HARRY HEISLER
DIRECT EXAMINATION BY MR. ALEXANDER                        4
CROSS-EXAMINATION BY MR. VAN DYKE                         13

DETECTIVE DANIEL POWERS
DIRECT EXAMINATION BY MR. ALEXANDER                       22
CROSS-EXAMINATION BY MS. BECKER                           31
REDIRECT EXAMINATION BY MR. ALEXANDER                     39

DETECTIVE THOMAS FAIOLA
DIRECT EXAMINATION BY MR. ALEXANDER                       40
CROSS-EXAMINATION BY MS. BECKER                           53


**E   X   H   I   B   I   T   S**

**GOVERNMENT'S EX. NO.:**                       OFFERED   ADMITTED
  1 - 2                                           4          4
  3A- 3D                                          4          4
  4 - 8                                           4          4

(Call to order of the Court, 10:32 a.m.)

COURTROOM DEPUTY:  Calling Criminal Case Number 24-20523, United States of America v. Harun Abdul-Hamid Yener.

Counsel, please state your appearances for the record.

MR. ALEXANDER:  Good morning, Your Honor.  Assistant US Attorney Ajay Alexander and Marc Anton on behalf of the United States.  With us is FBI Special Agent Garrett Bowman.

THE COURT:  Hi.  Good morning.

MR. VAN DYKE:  Good morning, Your Honor.  Victor Van Dyke from the Federal Defender's for Harun Abdul-Hamid Yener, who is present.

MS. BECKER:  Good morning, Your Honor.  Abigail Becker, also on behalf of Mr. Yener.

THE COURT:  Good morning to each of you as well.

Before the Court for an evidentiary hearing is Docket Entry 62, the Defendant's Motion to Suppress.

Are both sides ready to proceed?

MR. ALEXANDER:  Yes, Your Honor.

THE COURT:  Are there any issues we need to address before we address the motion?

MR. ALEXANDER:  No, Your Honor.

THE COURT:  All right.  And are there witnesses to be called at this time, Mr. Alexander?

MR. ALEXANDER:  Yes, Your Honor.

THE COURT:  All right.  Let's proceed.

MR. ALEXANDER:  Your Honor, at this time, the Government calls Harry Heisler.

Your Honor, I would note that I had provided the Court with an exhibit list.  I have spoken with the Defense, and they have no objection to the introduction of the exhibits listed on that.  So, at this time, I would move to admit Government's Exhibit 1, 2, 3A through 3D, 4, 5, 6, 7 and 8 into evidence.

THE COURT:  Is that correct, Mr. Van Dyke?  There's no objection?

MR. VAN DYKE:  That's correct, Your Honor.

THE COURT:  All admitted into evidence.

(Government's Exhibits 1, 2, 3A through 3D, 4, 5, 6, 7, and 8 received into evidence.)

MR. ALEXANDER:  Thank you, Judge.

THE COURT:  All right, sir.  If you'll remain standing.  Raise your right hand to be placed under oath.

HARRY HEISLER, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Would you please state your name and also spell it for the record.

THE WITNESS:  Harry Heisler.  H-E-I-S-L-E-R.

COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. ALEXANDER:

Q.  Good morning, Mr. Heisler.

A.   Good morning.

Q.   Sir, what is your current occupation?

A.   I work part-time light maintenance in Coral Springs at a storage unit.

Q.   Is that the Coral Springs Mini Storage?

A.   Yes, sir.

Q.   And how long have you worked there part-time?

A.   I guess it's going on four years.

Q.   And what are your duties and responsibilities in this capacity?

A.   For the most part, four days a week I do light maintenance, where I go out and change -- if a light bulb is out or a ballast is blown, or on top of that I go around the grounds and I pick up any debris, so forth and so on.  And one of my duties is to open every unlocked storage unit inside and out and make sure that everything is okay in those units.

Q.   And what is the basis for you opening unlocked lockers at the storage unit?

A.   Just to make sure there's -- a lot of time people leave and they leave things in there.  But the other thing is that I go and check, make sure there's no dead animals or insects or -- you know, or paraphernalia that shouldn't be there, you know, such as gasoline or whatever.

Q.   And Mr. Heisler, are you familiar with the lease agreements that individuals would have with the Mini Storage?

6

A.   Yes.

Q.   And are you familiar with the language within the lease agreement that talks about the right to inspect these storage units?

A.   Yes.

Q.   And were you aware of this -- that language prior to February 2024?

A.   Yes.

Q.   Mr. Heisler, I'm going to show you what's been admitted as Government's Exhibit 1.

A.   Okay.

Q.   It's Paragraph 11.

A.   Uh-huh.

Q.   And this is the paragraph that reads:  "Tenant agrees that landlord and landlord's agents and other representatives, including police, and fire departments, and other governmental authorities, shall have the right to enter into and upon the premises, or any part thereof, at all reasonable hours for the purpose of examining the same, or making such repairs or alterations therein, in taking such action as may be necessary for the safety and preservation thereof or the facility and to secure compliance with applicable law."

     You are familiar with this provision; is that correct?

A.   Yes.

Q.   And Mr. Heisler, I'm going to draw your attention to

February 2024.  Do you remember inspecting an unlocked unit belonging to Harun Yener?

A.  Yes.

Q.  And can you describe what you observed when you first saw this unlocked unit.

A.  The first time I opened it up, I noticed that it had three backpacks in there, and that was it.

Q.  Please -- please continue.

A.  No.  Just the three backpacks.

Q.  And did you do anything when you saw those three backpacks?

A.  The only thing I did at that time was I closed the unit back up.  And when I got back to the office, I reported that there were three backpacks, which I thought was unusual for such a big unit, and that it was unlocked, you know, and that they should contact whoever it was and tell them that they need to put a lock on it.

Q.  And putting a lock on the unit, is that a requirement of the storage unit?

A.  Yes.

Q.  And then when was the next time you made contact with that unit?

A.  Every day.  You know, I mean, I work Tuesday through Saturday.  And so every morning when I make my rounds, you know, I open all the unlocks.  And so it was the next day.

Q.  And was it still unlocked?

A.   Yes.

Q.   And did you go into the unit again?

A.   I opened it up.  I didn't go into it.  I just opened it up.

Q.   At what point did you enter the unit?

A.   I don't recall the exact day.  You know, it may have been a week later.  I'm not sure.  But I opened it up the one day and I saw that the backpacks were opened and there was a bunch of things strewn around in the unit.

Q.   And when you saw that these backpacks were open, and things were strewn around, what did you do?

A.   At first, I just looked at it.  And then, when I looked down, I saw the notebook and I saw a drawing of a -- what I assumed was an AK-47.  I said:  "Oh.  Well, that's unusual." So I looked down and I picked it up, and that's when I went through it just to see what else was there.

Q.   And did you document what you observed?

A.   Yes, I did.

Q.   How did you document it?

A.   I took my phone out and I took pictures of what I thought were pertinent findings.

Q.   I'm going to show you, Mr. Heisler, what's been admitted as Government's Exhibit 2.

     Are these some of the images that you had photographed?

A.   Yes.  Yes, they are.

Q.   And so, what I'm showing you right now, can you describe

what's being depicted here.

A.   Right now are the backpacks that are opened with the notebook laying there and it looks like a phone or whatever. And I didn't go through all the backpacks at all.  I just, you know, pretty much stuck to the notebook.

Q.   And was there handwritten text in some of these notebooks?

A.   The one that you're showing there is the bottom.  There was another page that I think I took a picture of.  But it -- the page said that -- it was handwritten, and it said something about "A war was coming, brother," you know, and things like that -- to that effect.

Q.   And for the record, this particular entry says:  "The time has come for the world to meet its" -- and there's an illegible word -- "for years war and history have written."

A.   Yeah.

Q.   And what are we looking at in this next image?

A.   That's the gun that caught my attention.

     (Court reporter interruption.)

          (Pause in proceedings.)

BY MR. ALEXANDER:

Q.   So Mr. Heisler, we'll move on from Exhibit 2.  But the photographs that you took, how did you feel when you observed the writings and these drawings?

          MR. VAN DYKE:  Objection as to relevance.

          THE COURT:  Sustained.

BY MR. ALEXANDER:

Q. What was going through your mind when you observed these images?

MR. VAN DYKE: Same objection.

THE COURT: Sustained. Let's sharpen the question, please.

MR. ALEXANDER: Okay.

BY MR. ALEXANDER:

Q. So Mr. Heisler, after seeing these images and writings, what did you do?

A. The first -- well, like I said, I took the pictures. And at first I didn't do anything because I was getting ready to leave work and make a deposit for the facility.

So while I was at the bank, I called my boss and I told him what I had found, and I said: "I think the authorities should be notified," and he agreed.

Q. And at that point, what did you do?

A. After I got home, I guess I talked to the woman I live with and then a call was made to the Coral Springs Police Department. And they called me and they talked to me about it. And then, after that, I made a call to the FBI.

Q. And did you provide these photographs to anyone?

A. Yes. I sent -- I sent -- the photographs I had when I talked to the agent, I sent the photographs to her.

Q. And you say "agent." Is that with the FBI?

A.   Yes.

Q.   And Mr. Heisler, when you entered the unit each time, was that at the direction of any law enforcement entity?

A.   No.

Q.   Was that at the direction of any government entity?

A.   No.

Q.   Did anyone, law enforcement or Government, direct you to take photographs of the unit?

A.   No.

Q.   Did anyone ask you to go back into the unit and take photographs or otherwise search the unit?

A.   No.

Q.   Was the decision to enter the unit each time and ultimately photograph it -- was that your decision?

A.   Yes.

Q.   And after you provided this information, the photographs and what you observed, to the FBI and Coral Springs Police Department, what happened?

A.   Nothing for a while.  And then the FBI called me, you know, and we talked and everything.  Then -- I don't know the exact chronology of it, but shortly thereafter, or some time thereafter, that unit was investigated by Coral Springs PD and the FBI.

Q.   And was that on or about March 1st with Mr. Yener?

A.   I believe so.  I mean, I won't say exactly, but I believe

so. And to be honest, when I sent the pictures and everything, I had no idea if it was -- anything was going to come to fruition. I just saw the diagrams and I thought what they looked like, but I didn't have any idea that it was actually, you know, of substance.

MR. ALEXANDER: One moment, Your Honor.

THE COURT: Certainly.

(Pause in proceedings.)

MR. ALEXANDER: Your Honor, with the Court's permission, if I may have access to the ELMO.

THE COURT: Of course.

BY MR. ALEXANDER:

Q. And Mr. Heisler, I had previously shown you Government's Exhibit 1, which is the rental agreement in question.

A. Right.

Q. What is the name in the top left corner?

A. Yener Harun.

Q. And is this lease agreement signed at the bottom?

A. Yes.

MR. ALEXANDER: Thank you, Mr. Heisler.

I have no further questions, but I believe Defense counsel will have some questions for you.

THE WITNESS: All right.

THE COURT: Cross-examination.

MR. VAN DYKE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. VAN DYKE:

Q.   Good morning, Mr. Heisler.

A.   Good morning.

Q.   My name is Victor Van Dyke, and I just have a few questions for you today.  All right?

A.   Sure.

Q.   For how long have you known Mr. Harun Yener?

A.   Have I known him?  I don't know him at all.

Q.   Have you had any interactions -- or did you have any interactions with him before February 14th?

A.   No, sir.

Q.   You mentioned on direct examination that you entered the unit a number of times.  And you stated that one of your duties at Coral Springs Mini Storage is to open unlocked storage units; is that right?

A.   Correct.

Q.   Is that laid out in your employment agreement?

A.   Yes.

Q.   And you mentioned that you spoke to your boss before entering the unit.  What's your boss's name, sir?

A.   John Shev.  S-H-E-V.

Q.   And you stated that the purpose of entering these unlocked units is to look for dead animals, insects, or other paraphernalia, correct?

14

A.   Yes.  Well, whatever is left behind, make sure the unit is clean and operable so somebody else can rent it.

Q.   So that is the purpose for which you're entering the unit, to make sure it's clean and operable?

A.   Yes.

Q.   And if there are things in the unit, it is not clean and operable; is that fair?

A.   Correct.  And, you know, if there's any substances in there that shouldn't be there.

Q.   Substances?

A.   Well, substances, any sort of material.

Q.   So other than dead animals, insects, paraphernalia, and substances, what are you looking for when you unlock these units?

A.   See if there's any damage, you know.

Q.   Anything else?

A.   Just basic stuff.  You know, I mean, I'm not -- when I opened that one, I was very surprised.  You know, I -- but I just look at them and see what's inside.  That's all.

Q.   And the rental agreement that you reviewed, it has the same direction, essentially to inspect the premises inside the storage unit, correct?

A.   Yes.

Q.   You would agree with me that the rental agreement does not state that you have permission to rifle through belongings; is

that fair?

A.   I would say that's fair.

Q.   Thank you, sir.

So you said you didn't have any interactions with Mr. Yener before February 14th, correct?

A.   Correct.

Q.   Did you know -- well, let me ask this:  How many times did you enter the unit in total, would you say?

A.   Enter?  Just the one time.

Q.   I thought you stated on direct that you had opened it a number of times.

A.   I opened it, but I didn't enter it.

Q.   Okay.  Apologies.  How many times did you open it?

A.   Every day until, you know -- as I stated previously, it's what I do every day.

Q.   So did the unit ever have a lock on it?

A.   No.

Q.   So you opened that particular storage unit every day that you worked?

A.   I open every unit that doesn't have a lock on it every day.

Q.   Okay.  So how many times would you say you had opened it before you contacted the FBI?

A.   I can't really tell you because I'm not sure the exact date that I first opened it and when I contacted the FBI.  They would have probably the date that I called them.  So whatever

it was.  But I don't know the exact date because it may have been a week from the first time to two weeks before I actually called them.  Because every day I opened it that it didn't have a lock on, I told the front office:  "There's no lock on this unit."

Q.  When you spoke to the front office about there not being a lock on the unit, what was the front office's directive to you?

A.  There wasn't any directive.  They said they would contact Mr. Harun and tell him he needs to put a lock on it.

Q.  So after you opened it the first time, you were aware that the unit was rented, correct?

A.  Yes.

Q.  And you were aware that it had a lease?

A.  Yes.

Q.  Were you aware when the lease expired?

A.  No, I wasn't.

Q.  Okay.

A.  It's a -- our agreements are month to month.  So I would assume -- you know, I don't know when it started, but I assume, you know, it's a month-to-month agreement.

Q.  So is it fair to say at the time you went in and actually looked through the belongings you were aware that the unit was rented?

A.  Yes.

Q.  Okay.  And you stated that it was hours after you entered

the unit and looked through it that you contacted authorities, correct?

A. Yes.

Q. And you contacted Coral Springs Police Department first?

A. Yes.

Q. Did they tell you to contact the FBI?

A. No.

Q. You did that on your own?

A. Yes.

Q. Do you remember who you spoke to at the FBI?

A. I have no idea. I guess it was a main contact point. I had no idea how the FBI works.

Q. Okay. And you discussed with the prosecutor kind of the -- what the conversation consisted of. Could you tell us what you spoke to the FBI about when you first contacted them.

A. I just said I -- from what I can recall -- it was a few years ago. I said -- I told them where I work, and what I do, and what I found. And, you know, I thought it was important enough to report it.

Q. Did the FBI indicate that there would be a further investigation after your phone call?

A. They said they would have an agent contact me.

Q. And an agent did contact you over text, correct?

A. Yes.

Q. Just a few days after?

18

A.   It was actually that day.  I got a phone call.

Q.   And do you remember who that was from?

A.   From Agent Sutherland.

Q.   Okay.  Now, you stated that entering the unit is part of your duties.  Could I just ask --

          MR. VAN DYKE:  And for the record, this is Government Exhibit 2, Your Honor.

          Could I have the ELMO, please.

BY MR. VAN DYKE:

Q.   Is this kind of the scene when you opened the unit before you looked through the notebook?

A.   No.  When I first opened the unit, all the backpacks were sealed.

Q.   I'm talking the day you actually went into the unit.

A.   Yeah.  The day -- well, I don't know if that's the exact -- I would say it has to be because that's when I took the picture.

Q.   Okay.  Can I just ask:  What made you open the notebook?

A.   Like I said, I just saw it laying there.  And the fact that the backpacks were open, I thought it was strange.  So I saw the notebook laying there and I opened it up.

Q.   So it was curiosity that led you to open the notebook?

A.   Well, curiosity I guess is a good word for it.  But, I mean, concern.

Q.   Why were you concerned?

A.   Because for somebody to rent a unit, put three backpacks in there, and then not put a lock on it to safeguard it, you know, and then opening it up and seeing things were strewn about, you know, I -- it just concerned me.

Q.   Would it be fair to say that opening the notebook was not part of your duties to inspect the premises?

A.   Probably.

Q.   Thank you, sir.

A.   But the other thing is, according to the agreement --

Q.   I'm not asking you to --

A.   Okay.

Q.   -- characterize the agreement.  I appreciate your answer, sir.

Were you ultimately let go from Coral Springs Mini Storage as a result of this conduct?

A.   No.  I wasn't let go.  I had a strong discourse with my boss and I quit.

Q.   And then you were ultimately rehired?

A.   Yes.

Q.   But it's your testimony that you quit.  You were not fired by --

A.   I wasn't fired.  I quit.

Q.   Okay.  And that was with Mr. Shev?

A.   Yes.

Q.   Okay.  What was the disagreement about?

A.  The disagreement was about -- when I told him what I found, and I said:  "I think the authorities need to be contacted," he said:  "I agree."  And so I took that to mean that, yes, go ahead and contact the authorities.  When, I guess, they came or whatever, he was upset because he thought I should have gone in and met with all of them -- you know, my two other coworkers and him, and they would discuss what to do.  You know, and I said:  "No.  That's not what you said," you know.

Q.  Understood.  So just one more question.  It's fair to say that you ended up -- you stopped working at Coral Springs Mini Storage due to your conduct with Mr. Yener's storage unit?  Fair?

A.  For two or three days.

Q.  Thank you.

        MR. VAN DYKE:  Just one moment, Your Honor.

        THE COURT:  All right.  Certainly.

        (Pause in proceedings.)

        MR. VAN DYKE:  Just one more question, sir.  I apologize.

        THE WITNESS:  Sure.

BY MR. VAN DYKE:

Q.  During your discussions with the FBI, before they searched the unit, did the FBI ask you to contact them if you ever saw Mr. Yener?

A.  No.

Q.   Did any police officer ask you to contact them if you ever saw Mr. Yener on premises again?

A.   No.

Q.   Okay.  Thank you.

MR. VAN DYKE:  No further questions, Your Honor.

THE COURT:  All right.  Any redirect?

MR. ALEXANDER:  No redirect, Your Honor.

THE COURT:  All right.  Is Mr. Heisler excused?

MR. ALEXANDER:  Yes, please.

THE COURT:  Mr. Van Dyke?

MR. VAN DYKE:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.  You are excused.

(Witness excused.)

THE COURT:  And the Government's next witness, please.

MR. ALEXANDER:  Your Honor, at this time, the Government calls Daniel Powers.

(Pause in proceedings.)

THE COURT:  Good morning, sir.

THE WITNESS:  Good morning.

THE COURT:  Sir, if you'll remain standing.  Raise your right hand to be placed under oath.

DETECTIVE DANIEL POWERS, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY:  Thank you.

Have a seat.

THE WITNESS:  Thank you.

COURTROOM DEPUTY:  Would you please state your name and also spell it for the record.

THE WITNESS:  Daniel Powers.  D-A-N-I-E-L.  Last name's P-O-W-E-R-S.

COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. ALEXANDER:

Q.  Sir, what is your current title?

A.  Detective.

Q.  For what agency?

A.  Coral Springs Police.

Q.  And how long have you been a detective for the Coral Springs Police Department?

A.  About eight months.

Q.  And prior to being detective, what was your role with Coral Springs Police Department?

A.  Road patrol.

Q.  And how long were you in road patrol?

A.  Nine and a half years.

Q.  And as a detective, what are your duties and responsibilities?

A.  I investigate violent crimes.

Q.  And in addition to being a detective, are you also a member of a SWAT team?

23

A.   Yes.

Q.   How long have you been with the SWAT team?

A.   About seven years.

Q.   And Detective Powers, I'm going to draw your attention to March 1st, 2024.  You were a member of the SWAT team at that time; is that right?

A.   Yes.

Q.   But you were a road patrol?

A.   That was my full-time capacity.  Yes.

Q.   Okay.  Perfect.  And can you describe where you were that day.

A.   It was at a diner.

Q.   And which diner was that?

A.   Coral Springs Diner.

Q.   And is that located in Coral Springs, Florida, Broward County?

A.   Yes.

Q.   And while you were there, what did you notice?

A.   A gentleman matching a BOLO.

Q.   Okay.  So let's unpack that a little bit.  Why were you at the diner?

A.   We had just finished an operation.  So some of us were getting some breakfast.

Q.   And when you say "we," who are you referring to?

A.   Other members of the SWAT team.

24

Q.   So while you were having breakfast with other members of the SWAT team, you saw an individual that matched a BOLO.  What is a BOLO?

A.   A be-on-the-lookout flyer.

Q.   I'm going to show you what's been admitted as Government's Exhibit 8.  Is this the BOLO in question?

A.   Yes.

Q.   And what name is depicted -- or what individual is depicted in this BOLO?

A.   Harun Yener.

Q.   And prior to March 1st, 2024, had you had any interaction with Harun Yener?

A.   Yes.

Q.   In what capacity?

A.   He was sleeping in areas that he wasn't supposed to be sleeping.

Q.   And in those interactions, did you make contact with him?

A.   Yes.

Q.   So were you familiar with Harun Yener at the time that you received this BOLO?

A.   Yes.

Q.   And approximately how long before March 1st, 2024 did you receive this BOLO?

A.   Probably a week or so, maybe.

Q.   And while you were at the Coral Springs Diner, did you

observe Harun Yener at that place?

A.   In front of it.

Q.   Okay.  And did you immediately recognize him?

A.   Yes.

Q.   Do you see Harun Yener in this courtroom?

        THE COURT:  You may stand, sir, if you need to.

BY MR. ALEXANDER:

Q.   Could you please point and name an article of clothing that he's wearing.

A.   A tan jacket.

        MR. ALEXANDER:  Your Honor, may the record reflect the in-court identification of the Defendant Harun Yener.

        THE COURT:  It's not clear to the Court.  If we can identify by another article of clothing or any other distinguishing characteristics.

BY MR. ALEXANDER:

Q.   Can you describe what -- with the individual in question that you're identifying, can you describe facial appearance or anything that he's wearing.

A.   Glasses, longer hair.

        MR. ALEXANDER:  Your Honor, may the record reflect the in-court identification of Harun Yener.

        THE COURT:  It's noted.

        MR. ALEXANDER:  Thank you, Your Honor.

BY MR. ALEXANDER:

Q.  So Detective Powers, you saw Harun Yener outside of the Coral Springs Diner; is that correct?

A.  Yes.

Q.  And you were aware of the BOLO?

A.  Yes.

Q.  What did you do after that?

A.  I went outside and spoke with him.

Q.  And what was that interaction?

A.  It was telling him that we needed to speak to him, and I had him, I believe, sit down.

Q.  And did he cooperate?

A.  Yes.

Q.  And did you handcuff him?

A.  I don't recall.

Q.  Was he handcuffed?

A.  Yes.

Q.  Can you describe Mr. Yener's demeanor when you told him to sit down.

A.  Confused at first.

Q.  Was there an attempt at small talk or engaging with him?

A.  Yes.

Q.  And was he willing to engage?

A.  No.

Q.  At any point, Detective, when you were there, did you

27

interview Mr. Yener?

A.   No.

Q.   Did you Mirandize Mr. Yener?

A.   No.

Q.   Was your intent to have any involvement in terms of interviewing Mr. Yener?

A.   No.

Q.   What did you do when you saw Mr. Yener and had him sit down?

A.   Once he was secured, I contacted Detective Faiola.

Q.   And why did you contact Detective Faiola?

A.   Because the BOLO said:  "If located, please contact Detective Faiola."

THE COURT:  I'm sorry.  I'm not understanding what that means.  "Once he was secured."  If the detective can explain what he means by that.

MR. ALEXANDER:  Of course, Your Honor.

BY MR. ALEXANDER:

Q.   So Detective Powers, when you mentioned that, once Mr. Yener was secured, what does that mean?

A.   He was in handcuffs and a pat-down was conducted.

Q.   Okay.  And why was the pat-down conducted?

A.   The nature of the BOLO included some violent language.  So, for our safety, we wanted to make sure he didn't have any obvious weapons on him.

Q.   And did he have any weapons?

A.   Not that I can recall.

Q.   Okay.  And did Mr. Yener then sit down?

A.   Yes.

Q.   And you contacted Detective Faiola?

A.   Yes.

Q.   Were you able to make contact with him?

A.   Yes.

Q.   And did he ultimately come to the scene?

A.   Yes.

Q.   Detective, I'm going to play Government's Exhibit 3A, a portion of it that captures an interaction with you and the officer that was wearing a body cam.  Were you able to review this prior to today's testimony?

A.   Yes.

        MR. ALEXANDER:  Your Honor, with the Court's permission -- I had spoken with the court reporter -- because there is a transcript of this -- of these recordings, we would ask that the court reporter be excused from typing what is on this because we're going to be playing just small clips.

        THE COURT:  All right.  Mr. Van Dyke, you agree, sir?

        MR. VAN DYKE:  No objection, Your Honor.

        THE COURT:  All right, then.  Let's continue.

        (Video played.)

BY MR. ALEXANDER:

Q. In Government's Exhibit 3A, I am pausing at the 42-second mark. Detective Powers, do you see yourself in this video?

A. I do.

Q. And can you describe where you are in this video.

A. Looks like the person standing in front of the officer with the camera.

Q. And for purposes of identification, are you the one directly facing the officer with the cap?

A. I'm sorry?

Q. With the baseball cap?

A. Yes. I have a baseball cap on.

(Video played.)

MR. ALEXANDER: Your Honor, I would note that we lost volume on this.

(Video played.)

BY MR. ALEXANDER:

Q. So Detective, during this interaction, you made a statement that he doesn't want to talk. Did you hear that?

A. Yes.

Q. What was that in reference to?

A. Conversationally.

Q. In what capacity?

A. Just small talk that I mentioned before.

Q. Okay. And as I had asked you earlier, was that in any way

related to a potential interview or an attempt to interview him?

A. No.

Q. And until Detective Faiola arrived, was Mr. Yener just seated on this bench?

A. He might have been on a parking bumper at one point.

Q. Did you have an opportunity to review this recording prior to testifying today?

A. Yes.

Q. Okay.

A. I'm sorry. Are you saying from here on?

Q. Yes. From here until Detective Faiola arrived.

A. Yeah. I believe he stayed there.

Q. Okay. And during this time, did any law enforcement officers brandish firearms?

A. No.

Q. Did anyone threaten Mr. Yener?

A. No.

Q. Did anyone engage in any sort of coercive activity towards Mr. Yener?

A. I'm sorry. You said "coercive"?

Q. Coercive.

A. No.

Q. Was Mr. Yener allowed to be seated until Detective Faiola arrived?

A.   Yes.

MR. ALEXANDER:  Your Honor, if I may have a moment.

THE COURT:  All right.  Certainly.

MR. ALEXANDER:  All right.  Detective, those are all the questions I have, but I believe Defense counsel may have some questions for you.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. BECKER:

Q.   Good morning, Detective.

A.   Good morning.

Q.   So I have a few questions for you about this morning of March 1st, 2024.  Okay?

A.   (No verbal response.)

Q.   You said that you had just finished an operation with the SWAT team that morning, correct?

A.   Yes.

Q.   Okay.  So you were not working alone that day, right?  You work in a team?

A.   Yeah.

Q.   There are at least six officers who you were working with that morning?

A.   Yes.

Q.   Okay.  And so there were at least six officers at the Coral Springs Diner that morning of March 1st, correct?

A. I'm not sure if it was at least six. Yes, we operate as a team, but I don't know if at least six went to the diner. A couple of us went. It may be six.

Q. Okay. Now, you were seated inside the diner when you first noticed Mr. Yener?

A. Yes.

Q. Okay. So Mr. Yener was not sitting on that bench when you first encountered him, correct?

A. Correct.

Q. Okay. He was walking down the street?

A. No.

Q. Where was he?

A. In the parking lot.

Q. Okay. And you were inside the diner at that time?

A. Yes.

Q. Okay. Now, the reason you approached him was because of that BOLO that the prosecutor asked you about, correct?

A. Yes.

Q. Okay. And I'll put that -- oh. The be-on-the-lookout -- you mentioned that because of the nature of the BOLO, you patted Mr. Yener down. Do you remember stating that on direct?

A. Yes.

Q. Okay. Can you explain a little bit about what you mean.

A. Yes. The BOLO included some violent comments, which would be indicative of likely carrying weapons. So we patted him

down.

Q.   Okay.   So you were concerned that Mr. Yener might pose a danger?

A.   Yes.

Q.   Okay.   And you acted accordingly as a law enforcement officer, correct?

A.   Yes.

Q.   Okay.   So when you approached him, you didn't approach him on your own, correct?

A.   No.

Q.   There were multiple officers who first approached him?

A.   Yes.

Q.   You called him by name, correct?

A.   I don't recall.

Q.   Okay.   Do you recall how you stopped him or how you got his attention?

A.   Standard greeting.   Maybe like:   "Hey" -- I might have used his name, and I said:   "Hey, have a seat," identified myself as law enforcement, something generic.

Q.   Okay.   And you immediately told him to sit down, correct?

A.   It was pretty quickly.

Q.   Okay.   Because you wanted to control the situation?

A.   Yes.

Q.   Because you thought he could pose a danger, right?

A.   Yes.

Q.   Okay.   He was handcuffed before he sat down on the bench?

A.   I don't recall.

Q.   Okay.   But he was handcuffed within seconds of your encounter, correct?

A.   Early on.

Q.   Okay.   Again, because you needed to control the situation, right?

A.   Yes.

Q.   Okay.   All of the members of your team, they were in tactical gear, correct?

A.   Some.   Can you define tactical gear?

Q.   You were wearing the uniform that you wear as a SWAT -- a member of the SWAT team, right?

A.   Not a complete uniform.

Q.   Okay.   But you weren't in civilian clothing?

A.   No.

Q.   You were identified as law enforcement officers?

A.   Yes.

Q.   Okay.   And I think you just said you -- did you verbally identify yourself as a police officer to Mr. Yener as well?

A.   I may have.   I don't recall.

Q.   Okay.   You carry a firearm as a police officer, correct?

A.   Yes.

Q.   You certainly had your firearm on your person that day, correct?

35

A.   Yes.

Q.   Okay.  Now, Mr. Alexander asked if Mr. Yener was permitted to sit down.  He was ordered to sit down, correct?

A.   Likely.

Q.   Okay.  He didn't ask to sit on the bench?

A.   I don't recall.

Q.   Okay.  Given the nature of the encounter, sir, he was told to sit down, correct?

A.   I believe so.

Q.   Okay.  And your understanding from the BOLO is that you were to hold Mr. Yener until Detective Faiola could arrive on the scene, correct?

A.   Until I contacted him.

Q.   Until -- excuse me.  Until you contacted him.

Between the time that Mr. Yener was ordered to sit on the bench and you contacted Detective Faiola, Mr. Yener did not get up from the bench, correct?

A.   I'm not sure.

Q.   Would you like to review the body-worn camera?

A.   There was that body camera, yes.  But we had met him before that body camera went on.  So I don't know what happened before that body camera happened.  He may have.  Like I said before, I don't remember if he was originally on a parking bumper or the bench.

Q.   Okay.  He didn't leave that immediate area, correct?

A.  Correct.

Q.  After you handcuffed him, he stayed handcuffed until another detective arrived, correct?

A.  Yes.

Q.  Okay.  After he was ordered to sit down after he was handcuffed, he was never left alone, correct?

A.  Correct.

Q.  Okay.  At least one officer was with him at all times?

A.  Yes.

Q.  Okay.  And as we saw in the body-worn camera, there were four members of the SWAT team who were standing around Mr. Yener when the officer with the camera first approached, correct?

A.  Do you mind replaying the body camera?

Q.  Not at all.

          (Video played.)

BY MS. BECKER:

Q.  So -- and let's be clear.  The name of the officer wearing the body-worn camera, that was Officer D'Agostinis?

A.  Yes.

Q.  Okay.  So when he approaches, there are four members of the SWAT team standing around Mr. Yener, correct?

A.  Yes.

Q.  Okay.  Officer D'Agostinis, in fact, remarks upon the number of officers on scene, right?

A.   Yes.

MS. BECKER:  Going to continue playing just a few seconds here.

(Video played.)

BY MS. BECKER:

Q.   So if we need to look at the video again, we will, but maybe we can skip that because Mr. Alexander played those couple of seconds for you already.  So when Officer D'Agostinis approaches and first verbally makes contact with Mr. Yener, you tell Officer D'Agostinis he doesn't want to talk, right?

A.   Yes.

Q.   Okay.  Mr. Yener told you he didn't want to talk?

A.   No.  I think it was just his silence.

Q.   He was silent.  Okay.  And then he, in fact, asks: "What's" -- "Do you know what's going on?"  Do you remember that?

A.   From the video?

Q.   Yes.

A.   Yes.

Q.   Okay.  Officer D'Agostinis told him no, he didn't, right?

A.   I don't know if that was an exact quote.  But I think that was the sentiment, yes.

Q.   At which point Mr. Yener said:  "Then there's nothing to talk about," correct?

A.   Again, I don't know if that was the exact quote, but I

38

believe it was something similar.

Q. Okay. Detective Powers, after this interaction with Mr. Yener, have you had further involvement with this case?

A. Not that I can recall.

Q. Okay. Now, Officer D'Agostinis arrives at the Coral Springs Diner around 8:12, 8:13 a.m. that morning, right? We can see that on the body-worn camera timestamp?

A. Yes.

Q. About how long had you had Mr. Yener in custody before Officer D'Agostinis's arrival?

A. I don't think very long.

Q. Can you estimate in minutes.

A. I can tell you that, like I said, once he was secured, I immediately called Detective Faiola, and either I or somebody else got on the radio and requested a road patrol officer respond. So as quickly as it took for that to happen and Officer D'Agostinis to arrive.

Q. Okay. Ten minutes? Would you agree that that was fair?

A. I don't know.

Q. Okay. During that time, though, that you were waiting for road patrol to arrive -- and that's Officer D'Agostinis -- Mr. Yener was handcuffed the entire time, correct?

A. Pretty quickly into our interaction, yes.

Q. Okay. And from that moment that he was handcuffed until Officer D'Agostinis arrived, he remained handcuffed, correct?

A.   Yes.

Q.   Okay.

MS. BECKER:  Thank you.  Nothing further.

THE COURT:  All right.  Any redirect?

MR. ALEXANDER:  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. ALEXANDER:

Q.   Detective, during cross-examination, you were asked about Mr. Yener inquiring about why he was there, D'Agostinis responding that he didn't know, and then Mr. Yener responding that there's nothing to talk about.  Do you remember that interaction -- and again, I'm paraphrasing.

A.   Yes.

Q.   Was Mr. Yener's response about not wanting -- or there's nothing to talk about in reference to Mr. D'Agostinis -- or Officer D'Agostinis not having information about why he was there?

A.   I'm not sure.

Q.   Okay.

MR. ALEXANDER:  Thank you, Your Honor.  No further questions.

THE COURT:  All right.  Is Detective Powers excused?

MR. ALEXANDER:  Please, Your Honor.

THE COURT:  Mr. Van Dyke or --

MS. BECKER:  Yes.  Thank you, Your Honor.

40

THE COURT: -- Ms. Becker?

Okay. Sir, you are excused. Thank you.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: And the Government's next witness.

MR. ALEXANDER: Your Honor, at this time, the Government calls Thomas Faiola.

(Pause in proceedings.)

THE COURT: Hi. Good morning, sir.

If you'll step forward, sir. Remain standing. Raise your right hand to be placed under oath.

DETECTIVE THOMAS FAIOLA, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY: Have a seat.

Please state your name and also spell it for the record.

THE WITNESS: Thomas Faiola. T-H-O-M-A-S F-A-I-O-L-A.

COURTROOM DEPUTY: Thank you.

DIRECT EXAMINATION

BY MR. ALEXANDER:

Q. Sir, could you please state your occupation.

A. Detective with the City of Coral Springs Police Department.

Q. And how long have you served in that capacity?

A. Nineteen years.

Q. And what are your duties and responsibilities as a detective?

A.   Currently, I'm with the Threat Management Unit.  So we investigate anything -- mass threats.

Q.   So Detective, I'm going to draw your attention to February 2024.  Do you recall being notified about a situation that occurred at the Mini Storage in Coral Springs?

A.   Yes.

Q.   And what happened or what did you learn?

A.   So I received an email from one of our patrol officers that he had gone to the Mini Storage.  There was a call there about a storage unit that I guess an employee had entered and saw some notebooks.  And when he was looking through the notebooks, he saw some schematics of bombs and some writings that concerned the employee.

Q.   And what did you do in response?

A.   Well, it being February 14th, I did anything that day because that's the Stoneman Douglas Memorial Day.  So we were pretty busy.  But we eventually sent out an attempt-to-locate BOLO for other officers in the area to look for the subject because the storage facility didn't have a good address or phone number for the individual renting the stall.

Q.   And what was the purpose of the BOLO?

A.   Just that -- to locate the individual, identify him, and see if we could find out where he lived, phone number, anything like that.

          MR. ALEXANDER:  And, Your Honor, with the Court's

permission, if I may have access to the ELMO.

THE COURT:  Certainly.

BY MR. ALEXANDER:

Q.  Detective, I'm showing you what's been admitted as Government's Exhibit 8.  Do you recognize what I'm showing you?

A.  I do.

Q.  What is that?

A.  This is the attempt-to-locate BOLO that I had issued out for the Coral Springs Police Department.

Q.  And the information that's conveyed in here regarding prior interactions with law enforcement, threats that he had made, how did you learn about this information?

A.  So when I did get his name, I gave the name to our Real Time Crime Center, who then did a background research on him, and they provided the information.

Q.  And on this BOLO, if you look right above the photo of Mr. Yener, it states:  "There are no pending charges at this time"; is that correct?

A.  That's correct.

Q.  What was your purpose for wanting to locate him?

A.  Again, just that.  I mean, sure, it's very uncomfortable language.  But in my opinion, I didn't have enough just to arrest someone based off what someone else had seen without doing a thorough investigation.

Q.  And, Detective, so between February -- or from February

2024, which was February 14th, until March 1st, 2024, were there efforts to locate Mr. Yener?

A.  So again, we didn't have a good address or a good phone, so obviously our best attempt was to put out this locator BOLO. And we knew at some point -- he was in the area if he was renting a storage unit from our industrial park, so it would only be a matter of time before someone did come across him.

Q.  And on March 1st, 2024, did you become aware that Mr. Yener had been located?

A.  Yes.

Q.  What did you learn?

A.  I received a call from then Officer Powers.  I know he's a detective now, but at the time he was an officer.  He called me and said that he was at the Coral Springs Diner and had located Mr. Yener.

Q.  And did you go to the scene?

A.  Yes, I did.

Q.  And approximately how long did it take you from the time you received notification to arrive on scene?

A.  I would guess around eight to 10 minutes.

Q.  And upon arriving on scene, what did you do?

A.  Well, upon arriving on scene, I saw that Mr. Yener was in handcuffs.  So I immediately had him removed from those handcuffs.  And I introduced myself to him as Tom Faiola with the Coral Springs Police Department, and I told him why we were

44

speaking to him.

Q. Why did you remove the handcuffs?

A. Because, again, he was -- I didn't want him in custody. He wasn't under arrest. I wanted to be able to speak with him and, you know, build a relationship, build a rapport with him.

Q. And during your interaction with Mr. Yener, did you otherwise threaten, coerce him in any way?

A. No. I didn't use any command language with him. I didn't even ask for his government ID. He had property with him. I never asked to see his property. I never removed his property from him. He was even allowed to smoke cigarettes. It was just very conversational language used.

Q. And was Mr. Yener cooperative with you as you were asking questions?

A. Yes, he was.

MR. ALEXANDER: Your Honor, if I may have access to the laptop at this stand.

THE COURT: All right.

BY MR. ALEXANDER:

Q. Detective, there's a bit of a lag when it comes to the video, but I'm going to be playing Government's Exhibit A starting at seven minutes, 30 seconds.

(Video played.)

BY MR. ALEXANDER:

Q. Who are you seeing on screen right now?

A. This is Mr. Yener.

(Video played.)

BY MR. ALEXANDER:

Q. And at this time you had not arrived on scene; is that correct?

A. No, not yet.

Q. Who is the individual --

A. I'm sorry?

(Court reporter interruption.)

MR. ALEXANDER: All right. Hold on.

BY MR. ALEXANDER:

Q. So Detective, I'm going to pause at 11 minutes, 54 seconds of Government's Exhibit 3A. The recordings are approximately two hours -- well, a little more than two hours long; is that fair?

A. Yes.

Q. And have you had an opportunity to review this recording?

A. Yes.

Q. Your interactions with Mr. Yener, how would you describe how the conversation progressed?

A. Just as you see, respectful, candid. He seemed like a very intelligent individual, actually.

Q. And based upon the questions you were asking him, did he understand your questions?

A. Yes.

46

Q. And was he willing to engage?

A. Yes, he was.

Q. And based on the clip that we saw, you told him that he wasn't under arrest?

A. Correct.

Q. Was he going to be under arrest?

A. No.

Q. What was the purpose of telling him and reassuring him that he was not under arrest?

A. So just that. He knows he's not under arrest. He can speak to me if he wishes. He doesn't have to speak to me. Which, if you continue the video, you'll see at times he'll say: "I have no comments about that," or "I don't want to talk about that." So it was just making himself comfortable in speaking with me.

Q. In the times that he said -- Mr. Yener said: "No comment. I don't want to talk about that," how did you respond to that?

A. So probably soon after where you stopped here, he said: "I have no comment," when I think I brought up one of his schematics about a bomb or a mine, and he said: "Oh. I don't have a comment that." And I said: "You don't want to talk or you don't have a comment about that," and he said: "No. I just have no comment about that."

Q. There was a gentleman on scene prior to you interacting with Mr. Yener, heavier-set gentleman with a Polo. Who is

47

that?

A.   That is Detective Chad Whittington.

Q.   And during the course of your engagement with Mr. Yener, did FBI agents ultimately arrive on scene?

A.   Yes.

Q.   Did they also become involved in the conversation?

A.   Yes, they did.

Q.   And in the same manner, Detective -- or in the same manner of questions I've asked, was there ever a time where threats were made to Mr. Yener?

A.   No.

Q.   Was any sort of coercion exhibited toward Mr. Yener?

A.   No.

Q.   And was Mr. Yener willing to engage in communication even when the FBI agents came on scene?

A.   Yes, he was.

Q.   And while spending time at the Coral Springs Diner, ultimately, did you-all relocate to somewhere else?

A.   Yes.

Q.   Where did you go?

A.   To his storage unit at the Coral Springs Mini Storage.

Q.   And what was the purpose of going there?

A.   So at that point he had agreed to allow us to search the storage to see what else he had in there, what other drawings or writings or schematics he might have, in an attempt to

pretty much kind of put it all to bed, so to say, make sure that he wasn't a true danger to himself or to society at large.

Q. And did he ultimately agree?

A. He did.

Q. And how was he -- let me strike that.

So Mr. Yener, did he have any sort of vehicle or means of traveling to the storage unit by himself?

A. He did not.

Q. How was he taken to the storage unit?

A. Officer D'Agostinis, whose body camera that we're viewing here, transported him in his car.

Q. Was Mr. Yener in handcuffs?

A. He was not.

Q. Was Mr. Yener allowed to freely enter the vehicle and exit the vehicle with Officer D'Agostinis?

A. Yes.

Q. And upon arriving at the storage unit, was Mr. Yener provided a Consent to Search form?

A. Yes, he was.

Q. Did he sign it?

A. He did.

Q. Did you witness him signing it?

A. Yes.

Q. And did you witness the detectives signing it as witnesses on this form?

A.   Yeah.

MR. ALEXANDER:   Your Honor, with the Court's permission, if I may have access to the ELMO.

THE COURT:   Certainly.

BY MR. ALEXANDER:

Q.   Detective, I'm showing you what's been admitted as Government's Exhibit 5.   What is this?

A.   This is the Coral Springs Police Department Consent to Search Premise Form.

Q.   And is this the form that you witnessed Mr. Yener signing, as well as the detectives who witnessed that signature?

A.   Yes.

Q.   And what was the purpose of getting this written consent form?

A.   This is to make sure that Mr. Yener knows his rights.   He didn't have to let us search, but he had agreed to allow us to search.   So this is a protection for both himself and us.

Q.   And based upon your interactions with Mr. Yener, was he willing to consent to the search of the unit?

A.   Yes.

Q.   And after he consented to the search of the unit, did law enforcement then at that moment search the unit?

A.   Yes, we did.

Q.   And was that in the presence of Mr. Yener?

A.   Yes.

50

Q.  And while the search was being done, were questions asked of Mr. Yener?

A.  Yes.

Q.  And was he still cooperative?

A.  Yeah.  He was -- he actually at one point even said to me -- or he said to one of the agents:  "I'm surprised he hasn't looked in that book yet at his feet."  So he was pointing out what I should be looking at.

Q.  And did you feel that Mr. Yener was candid in opening up about the questions that you had?

A.  Very much so.

Q.  And based upon the questions that were being asked, was Mr. Yener divulging information that you were not otherwise aware of?

A.  Yes, he was.

Q.  Can you give me an example of what he was disclosing.

A.  Well, he started telling me that some of the writings were for his people out of the country.  And then he was getting into certainly individuals' ideologies.  And one point I even told him, I said:  "You're answering questions I haven't even asked you."  So...

Q.  Was he also providing information about different terrorist organizations?

A.  He was.  I'm not going to lie.  That's not my specialty. So I was allowing the agents to handle all that.

Q.   But you were present when this was happening?

A.   Yes.

Q.   And Mr. Yener was still cooperative?

A.   Correct.

Q.   Detective, could you do me a favor?  Could you please stand up and advise if you see Mr. Yener in this courtroom.

A.   You know, I meant to wear my glasses.  So I'm not going to lie.  I'm not seeing him.

THE COURT:  You're able to move about the courtroom, if you need --

THE WITNESS:  He's behind you at the desk.

BY MR. ALEXANDER:

Q.   Could you name an article of clothing that he's wearing.

A.   A cream/yellow shirt.

Q.   Can you describe any facial features, anything he's wearing.

A.   Glasses that I should probably be wearing.

MR. ALEXANDER:  Your Honor, may the record reflect the in-court identification of the Defendant Harun Yener.

THE WITNESS:  It's noted.

BY MR. ALEXANDER:

Q.   And Detective, throughout the interaction up until the time the search was done and everyone was exiting, was Mr. Yener's demeanor calm?

A.   Yeah.  Absolutely.

52

Q.   Was there a point -- do you recall -- at what point did that change?

A.   As soon as one of the agents said that she was going to take his cell phones.

Q.   And what did you notice at that time?

A.   There was an immediate change in behavior and his speech.

Q.   How so?

A.   He became threatening.  He said we were not cool anymore. He said he was, at the time, trying to be neutral with us and answer any of our questions and talk about his people.  But he said:  "Mark my words.  I'm promising you, if you take my phones, we're not cool anymore."  And at one point towards the very end he even said:  "I hope they fuck y'all up."

Q.   And was that captured on the --

A.   Yes, it was.

Q.   -- Officer D'Agostinis's body camera?

A.   Yes, it was.

        MR. ALEXANDER:  Your Honor, if I may have a moment.

        THE COURT:  All right.

        MR. ALEXANDER:  Detective, I have no further questions, but I believe Defense counsel may have some questions for you.

        THE WITNESS:  Thank you.

        THE COURT:  Cross-examination.

53

CROSS-EXAMINATION

BY MS. BECKER:

Q. Good morning, Detective Faiola.

A. Good morning.

Q. So Detective Faiola, you arrived at the Coral Springs Diner on March 1st around 8:20 a.m., right?

A. I couldn't tell you what time it was.

Q. Okay. We'll take a look at the body-worn camera in just a moment so we can come back to that.

A. Okay.

Q. When you arrived, Mr. Yener was in handcuffs, correct?

A. Yes.

Q. When you arrived, there were two other law enforcement officers who were standing in front of Mr. Yener, correct?

A. They were standing there. I don't know their positioning from his position. But yes, there were two others there.

Q. Okay. Well, he had his back to the wall, right? So --

A. Yes. Yeah. He was sitting on an outdoor bench.

Q. Okay. Those officers were Detective Chad Whittington, right?

A. Yep.

Q. He was the gentleman in the black Polo shirt, right?

A. Yes.

Q. And Officer D'Agostinis, he's the road patrol officer wearing the body-worn camera?

A.   Yes.

Q.   You were not wearing a body-worn camera that day, correct?

A.   No.

Q.   As a detective, you generally do not, right?

A.   Correct.

Q.   And you have reviewed, though, the entirety of Officer D'Agostinis's body-worn camera footage from that day; is that right?

A.   Yes, I have.  Yes.

Q.   Okay.  There was a part of the body-worn camera footage that Mr. Alexander played for you on direct examination that I wanted to ask you a question about.  We can play it again if we need to, but given our audio problems we'll see if we need to get there.

A.   I'll do my best.

Q.   Just before you approached, Officer D'Agostinis asks Detective Whittington:  "Is he free to leave or no?"

A.   Uh-huh.

Q.   Do you recall that?

A.   Yes.

Q.   Okay.  That exchange took place right in front of Mr. Yener, right?

A.   Yes.

Q.   Okay.  And in response, Detective Whittington says:  "We'll figure it out"?

A. Uh-huh.

Q. Sorry. You've got to answer with a -- you've got to answer verbally for the court reporter.

A. Yes.

Q. Okay. So Detective Whittington did not tell Officer D'Agostinis that Mr. Yener was free to leave, correct?

A. Correct.

Q. Okay. Now, up until that point, Mr. Yener had been sitting quietly on the bench, correct?

A. As far as I know. I don't know how it was before the camera started.

Q. From what you saw on the body-worn camera?

A. Sure. Yes.

Q. Okay. And it's right after that exchange between Detective Whittington and Officer D'Agostinis that Mr. Yener then says: "What is all this," right?

A. Yep.

Q. Okay. And in response, Detective Whittington says to Mr. Yener that his partner -- and that's you, right --

A. Yes.

Q. -- that his partner: "As soon as he gets off that call right there, he'll come over here and talk to you and explain everything. So -- and we'll probably get you out of here as quick as we can. Okay?"

A. Yes.

Q. When you approached Mr. Yener, did any of your colleagues tell you that Mr. Yener had said he didn't want to talk?

A. No. Previous to my arrival, when Detective Powers called me, he just said that they had him stopped. And I did ask him -- I was like: "Was he read Miranda or anything?" He had not been read Miranda. But as far as any talking back and forth, I wasn't privy to.

Q. Okay. You did ask if they had provided Miranda warnings?

A. Correct.

Q. And the response was: "No"?

A. Correct.

Q. Okay. Now, when you first approached Mr. Yener, you asked if he was handcuffed, right?

A. Yes.

Q. And you asked that the handcuffs be taken off of him?

A. Correct.

Q. Officer D'Agostinis took the handcuffs off, correct?

A. Yep.

Q. And after he took off the handcuffs, Officer D'Agostinis immediately told Mr. Yener: "Have a seat"?

A. Okay.

Q. Do you remember that or should I -- do we need to play the body-worn camera?

A. I mean, I don't remember it. But I'll take your word for it.

Q. Okay.  We can go back to the video if we need to. Mr. Yener complied with that command, though.  You recall that, right?

A. He was sitting the entire time.

Q. Well, he stood up so that the handcuffs could be removed, right?

A. Makes sense.  Makes sense.

Q. And then sat back on the bench, right?

A. Yes.

Q. Now, you're a detective, so you don't wear a uniform generally, right?

A. I mean, I do at times, yes.  Not a patrol-style uniform, though.

Q. Okay.  On that day, you were not wearing a uniform?

A. Correct.

Q. You did have your police badge around your neck, though?

A. Correct.

Q. And you carry a service weapon, right?

A. Yes.

Q. You had it that day?

A. Yes.

Q. It was on your waist, right?

A. Yes.

Q. Visible?

A. Yes.

58

Q.   Now, as soon as you approach Mr. Yener, you started asking him questions about what was in the storage unit, right?

A.   As soon as I walked up to him, I had him uncuffed.

Q.   Understood.

A.   Okay.

Q.   You introduced yourself?

A.   Yes.

Q.   And you began questioning him about the storage unit?

A.   I explained why I was there, and I asked if he was willing to tell me about it.

Q.   Okay.  And the three of you, the three law enforcement officers, continued standing around Mr. Yener while you asked him questions, correct?

A.   Officer D'Agostinis was walking around occasionally.  But yes, we were all generally in the same area.

Q.   You asked Mr. Yener if he wanted to talk to you about what was in the storage unit, you just said, right?

A.   I know at one point I said:  "Do you want to tell me?  This is your opportunity to talk to me."

Q.   Okay.  And immediately after that, you said to Mr. Yener: "Listen, just so you -- you're not in trouble.  Okay?  You can't get in trouble for things, like, that you say or whatever."  Do you remember that?

A.   Yes.

Q.   Okay.  So you advised him he can't get in trouble for

things he says?

A. That's what I told him.

Q. Okay. Now, you testified on direct that you wanted Mr. Yener to know that he could speak to you or not speak to you. Do you recall that?

A. Yes.

Q. Okay. You didn't expressly advise Mr. Yener of that, though, correct?

A. No.

Q. Okay. It was about 20 minutes after you had arrived that the FBI agents arrived at the diner. Does that sound right to you?

A. I'm going to agree with you. I don't know the time frame, but I'm assuming you have that written down.

Q. There were a few minutes that you were there questioning Mr. Yener before the FBI agents arrive?

A. Yes.

Q. Okay. Before they arrived, you had been communicating with FBI Special Agent Sutherland by text message, correct?

A. Yeah. I think I called her first, but then text, yes.

Q. Okay. There were a few messages that you exchanged.

A. Sure. Yeah.

Q. You sent a message to let her know that you were with Mr. Yener at the diner, right?

A. I'm sure I did.

Q. Okay. If you need to look at the messages, let me know.

A. Okay.

Q. She responded that she was on her way, right?

A. Yeah.

Q. And she said by text message: "I'll be up there in 20. Can you hang onto him until then," right?

A. I'm not going to lie. I don't recall these text messages. But I'm sure you have the transcripts, so sure.

Q. Would it refresh your recollection to take a look at the messages?

A. Well, it would, because I have no recollection of them. So...

Q. Okay. Well, I don't want you to speculate.

MS. BECKER: Could I connect to the HDMI at the podium, please.

BY MS. BECKER:

Q. Detective Faiola, I'm going to show you what's marked for identification only as Defense Exhibit 1. If you want to just take a look. Let me know if I need to scroll down. And when you've had a chance to read just through, I would say, Message 13, just let me know.

A. Okay.

(Witness complies.)

THE WITNESS: Yes. I read them, yes.

BY MS. BECKER:

Q. Does that refresh your recollection as to the messages you exchanged with Special Agent Sutherland that morning?

A. Yes.

Q. Okay. So you would agree that after you advised Mr. Sutherland -- I'm sorry -- Agent Sutherland that you were with Mr. Yener, that she asked you to keep him there until she could get there, right?

A. Yes.

Q. She, in fact, asked you twice by text message to keep him until she could get there, right?

A. Yes.

Q. Okay. Now, once Agent Sutherland and the second special agent, Agent Bowman, arrived, they joined the group that was standing around Mr. Yener, correct?

A. Correct.

Q. And the questioning continued?

A. Yes.

Q. Okay. In fact, you-all questioned Mr. Yener for nearly an hour outside the diner. Does that sound about right?

A. Yes.

Q. Okay. Now, after about an hour of questioning, you asked Mr. Yener if you could go and look at what he had in the storage unit. Do you recall that?

A. Yes.

Q. Okay. You said something to the effect of: "If you're cool with it, we all go over there, right, and end this all today, so that you don't have to worry about anyone jumping out on you again, like happened today"?

A. Yes.

Q. At that point, Mr. Yener did not agree to take you over to the storage unit, correct?

A. He said he wanted to get to work.

Q. Okay. Well, he first said that he needed to go over there himself, right?

A. To work or the storage facility?

Q. To the storage facility.

A. Okay. Yeah.

Q. And at that point, Agent Sutherland said: "Do we all want to go over there and just kind of take a look so we can patch this all up now?" Do you recall that?

A. Yes.

Q. Okay. And again, Mr. Yener's response was: "No. I can't right now," correct?

A. Correct.

Q. Okay. You didn't accept that answer. You kept trying, right?

A. I mean, your inflection was slightly different than his at the time, but yes.

Q. He -- he said "no" when you asked to go over to the storage

63

unit.  We can agree on that, right?

A.  Yes.

Q.  He said "no" multiple times?

A.  Yeah.

Q.  Okay.  And at that point -- bear with me for one moment -- one of the officers told Mr. Yener that unless he showed you what was in the unit that this was going to keep happening to him, right?

A.  I don't know if it was worded just that way.

THE COURT:  Ms. Becker, is this recorded on some type of video or audio that the Court can see the inflection and the tone --

MS. BECKER:  Yes, Your Honor.  Absolutely.

THE COURT:  -- and the manner in which these statements were made?

MS. BECKER:  Yes.  I'll play this portion, Your Honor.

And this is showing you the video that's in evidence as Government's Exhibit 3A.

I'm going to move ahead to the...

(Video played.)

MS. BECKER:  Sorry.  I'm going to pull it ahead just a bit farther.  The time stamp is not showing up when I move forward.  So...

Starting around the one-hour-and-five-minute mark, for the record.

(Video played.)

BY MS. BECKER:

Q.   So you heard there it's Detective Whittington who says: "This same situation's going to happen over and over, unless you show us what's in the unit," correct?

A.   I mean, at that point, he's already agreed to the search -- to go.  He says:  "As long as you go to my boss, so he doesn't can my ass."

Q.   And you took that as him agreeing to show you what was in the storage unit?

A.   To going over to the storage unit, yes.  He said:  "As long as you go to my boss" -- because his really only "no" was:  "I got to clock in.  I got to go to work."  I asked:  "Why?"  He said:  "I don't want to get fired.  I got to go to work."

Q.   Okay.  So you understood him at that point as providing consent to search his storage unit?

A.   Verbally.  Obviously, he didn't sign the consent form at that point, but yeah.

Q.   Okay.  That, again, though, took place --

A.   And his first no that you brought up was him saying:  "No. I don't have a lock on it."  It was a:  "No," pause, "I didn't have a lock on it."  So there's your first "no" that you brought up originally.

Q.   Okay.  We can agree that Mr. Yener said "no" to the search several times, correct?

A. No.

THE COURT: Is there a transcript for the -- it's not helpful if you're disagreeing on the content of the statements that were made --

MS. BECKER: Agreed, Your Honor.

THE COURT: -- and there's a transcript and there's a full one-hour-and-15-minute video for the Court to review.

MS. BECKER: Agreed. And I believe the Government submitted the transcript in its response to the Motion to Suppress.

THE COURT: So could we -- could we perhaps refer to a portion of that transcript.

MS. BECKER: Absolutely, Your Honor.

So yes, looking at Page 71. I believe. There are two different page numbers on each page, Your Honor.

MR. ANTON: Your Honor, would you like me to show you Government's Exhibit --

THE COURT: It's been filed, so I have it. I just -- you're disagreeing on the content, which would be easier to just point to the transcript, since the Defendant had no objection to the accuracy of the transcript and that's why the court reporter's not taking it down.

MS. BECKER: Correct. So if you turn to Page 68 -- and I'm looking at the page number at the bottom of the transcript, because there's a conflicting one at the top --

when Detective Faiola first broaches the subject of going over to the unit.

BY MS. BECKER:

Q.  Detective, you say -- and I'm looking at the bottom of the page --

A.  I don't have it, if you're --

Q.  Understood.

A.  Okay.

MS. BECKER:  If I could have the ELMO for the witness, please.

BY MS. BECKER:

Q.  You state:  "I would like, if you're cool with it, we all go over there, right, and end this all today, so that you don't have to worry about anyone jumping out on you again, like happened today."  You see that?

A.  Yes.

Q.  Okay.  And Mr. Yener, in response, sort of rambles a bit, you would agree?  Right?  He says:  "I mean, I -- again, one, I don't even know how much they've seen; two, I'm in deep shock about the whole situation."

A bit further down the page -- and I'm now on Page 69, TS -- that's Taylor Sutherland, the special agent with the FBI, correct?

A.  Yes.

Q.  She says:  "Do we all wanna go over there and just kind of

take a look so we can patch this all up now?" And Mr. Yener's response is: "I can't right now," correct?

A. Yes.

Q. Okay. Moving to the next page of the transcript, Page 70, at the bottom. TF, that's you, correct?

A. Yes.

Q. Okay. You say to Mr. Yener: "So that we don't go through this again because this -- this might continuously happen if more things happen. So if we can all shoot over there, and we all take a look together, and you can explain in detail," and you continue for a bit more, correct?

A. Yeah.

Q. In response, Mr. Yener says: "I mean, I can't. I just can't go right now," correct?

A. Yes.

MR. ALEXANDER: Your Honor, I would object. If counsel is going to read portions of Mr. Yener's response, the entirety should be read.

THE COURT: Well, I'm reading along. I think for purposes of the cross-examination, the words are what the words are. I think what was happening is the witness didn't have the transcript. So you can continue and I'll follow along to give it context.

MS. BECKER: And, Your Honor, I'm not going to read the full thing. There are a number of statements that are made

that are not directly relevant to this question.  So I'm trying to just sort of stick to what's relevant.

BY MS. BECKER:

Q.  Turning to Page 73.  Again, this is you, correct?  You say: "Right.  I would like the next move to be all of us go there now, and this way we can squash this."

And Mr. Yener's response is:  "I mean, I -- I can't right now," right?

A.  Yes.

Q.  He says that he needs to go to work?

A.  Yes.

Q.  Okay.  Now, you do say that you'll explain to his boss the reason why he's going to be late, right?

A.  Correct.

Q.  Okay.  And he's appreciative that, you know, he wouldn't get fired, right?  So he's already --

A.  Yes.

Q.  -- expressed that he needs to already clock in at work, correct?

A.  He said he needed to clock in.  I don't know at what time.

Q.  Okay.  He repeatedly expressed to you that he was worried about being late to work, right?

A.  Correct.

Q.  Okay.  And you told him that you would tell his boss that he was with you and that's why he was late, correct?

A.   Yes.

Q.   Okay.  Now, it's after that exchange that Mr. Yener acquiesces to being taken over to the storage unit, correct?

A.   He says:  "As long as you explain it to my boss, so I don't get my ass canned," something along those lines.

Q.   Okay.

A.   He agrees to go over.

Q.   I'm going to play for you --

          MS. BECKER:  I apologize.  If we could switch back to the HDMI, please.

          I'm going to play a part of what's in evidence as Government's Exhibit 3B.

BY MS. BECKER:

Q.   This is another body-worn camera video, correct?

A.   Yes.

Q.   Okay.  And this is still Officer D'Agostinis's body-worn camera?

A.   Yes, it is.

Q.   Okay.  And we see the timestamp here of 9:28 a.m., correct?

A.   Yes.

Q.   Okay.  So this video is a continuation of the encounter that we've been discussing so far, correct?

A.   Correct.

Q.   It's just a different -- a different file?

A.   Yes.

Q.  Okay.  All right.

MS. BECKER:  I'm going to play just a couple of minutes from here, starting from the beginning of this video.

(Video played.)

MS. BECKER:  I'm going to pause the video there at about the 10-minute mark.

BY MS. BECKER:

Q.  We saw there that you told Mr. Yener that Officer D'Agostinis would take him over to the storage unit, correct?

A.  Yes.

Q.  Okay.  And that's, in fact, what happened?

A.  Yes.

Q.  He was transported in a police vehicle from the Coral Springs Diner to the Coral Springs Mini Storage?

A.  Yes, he was.

Q.  Okay.  Now, that last part, as you all were walking to your cars, Officer D'Agostinis noted that Mr. Yener had been drinking a beer, correct?

A.  Yeah.  He said something about a liquid breakfast, and Mr. Yener said he had a beer.  I don't know if it was open or not.

Q.  Okay.  Did you ask Mr. Yener at any point any questions to try to determine whether and how much he had been drinking that morning?

A.  No.

Q.  Okay.

THE COURT:  Ms. Becker, I'm going to need to stop you, only because it's an hour and 45 minutes into the hearing, but, unfortunately for us, we have a jury coming back in 30 minutes.

MS. BECKER:  Understood.

THE COURT:  And I need to be sensitive to my staff, particularly my court reporter, who needs to be here for that.

MS. BECKER:  Of course.

THE COURT:  So what I'd like to do is continue the hearing.  But in the interim, I would request, Mr. Alexander, that Exhibits 3A through D -- if you'll provide them on a disk or some -- on a hard -- on a flash drive, so that I may review the body-cam recordings with the verbatim transcript, so that I can -- because it's come in piecemeal and it's not very helpful to understand the full interaction.

MR. ALEXANDER:  Not a problem, Your Honor.  I have a copy of a flash drive --

THE COURT:  All right.  So if you can provide that to the Court.  And I'm not certain of your schedule.  We anticipate that we should have this with the jury either late today or at least Monday morning.  So how does your schedule look Monday afternoon at one o'clock?

MR. ALEXANDER:  That works for the Government, Your Honor.

MR. VAN DYKE:  Works for the Defense, Your Honor.

72

THE COURT: All right. So why don't we just continue this for Monday at -- Monday -- let me give you the date. Monday, February 9th, at one p.m.

All right. And if -- Mr. Alexander, if you could provide that to the courtroom deputy.

MR. ALEXANDER: Absolutely, Your Honor.

THE COURT: And I apologize that we had to break this up, but unfortunately we don't have the time that this case deserves for this morning's hearing.

MR. ALEXANDER: Thank you, Your Honor.

THE COURT: Have a nice weekend and I'll see you Monday morning.

MR. ALEXANDER: Thank you, Your Honor.

(Proceedings concluded at 12:17 p.m.)

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 6th day of February, 2026, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 73.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 1st day of April, 2026.


/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov