IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:24-cr-20523-BB-1


UNITED STATES OF AMERICA,

                Plaintiff,                    February 9, 2026
                                              1:06 p.m.
          vs.

HARUN ABDUL-HAMID YENER,

                Defendant.                    Pages 1 THROUGH 80

_____


                    TRANSCRIPT OF MOTION HEARING
                              DAY 2
                 BEFORE THE HONORABLE BETH BLOOM
                   UNITED STATES DISTRICT JUDGE



Appearances:

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                    AJAY ALEXANDER, AUSA
                    MARC S. ANTON, AUSA
                    500 East Broward Boulevard, Suite 700
                    Fort Lauderdale, Florida 33394


FOR THE DEFENDANT:  FEDERAL PUBLIC DEFENDER'S OFFICE
                    VICTOR VAN DYKE, FPD
                    ABIGAIL E. BECKER, FPD
                    150 West Flagler Street, Suite 1700
                    Miami, Florida 33130


COURT REPORTER:     Yvette Hernandez
                    U.S. District Court
                    400 North Miami Avenue, Room 10-2
                    Miami, Florida 33128
                    yvette_hernandez@flsd.uscourts.gov

**I  N  D  E  X**

Certificate................................... 80


**W  I  T  N  E  S  S**

**ON BEHALF OF THE GOVERNMENT:** PAGE

DETECTIVE THOMAS FAIOLA
CONTINUED CROSS-EXAMINATION BY MS. BECKER 4

SPECIAL AGENT TAYLOR SUTHERLAND
DIRECT EXAMINATION BY MR. ALEXANDER 14
CROSS-EXAMINATION BY MR. VAN DYKE 24

(Call to order of the Court, 1:06 p.m.)

COURTROOM DEPUTY:  Calling Criminal Case Number 24-20523, United States of America v. Harun Abdul-Hamid Yener.

Counsel, please state your appearances for the record.

MR. ALEXANDER:  Good afternoon, Your Honor.  Assistant US Attorneys Ajay Alexander and Marc Anton on behalf of the United States.  With the United States is FBI Special Agent Garrett Bowman.

THE COURT:  Good afternoon.

MR. VAN DYKE:  Good afternoon, Your Honor.  Victor Van Dyke, from the Federal Defender's, for Harun Abdul-Hamid Yener, who is present.

MS. BECKER:  Good afternoon, Your Honor.  Abigail Becker, also on behalf of Mr. Yener.

THE COURT:  Yes.  Good afternoon to each of you.

All right.  We were in the middle of the testimony.  Do we have Detective Faiola outside?

MR. ALEXANDER:  Yes, Your Honor.

(Pause in proceedings.)

THE COURT:  Hi.  Good afternoon.

Detective Faiola, let me remind you that you were placed under oath.  And you may have a seat, sir.

THE WITNESS:  Yes, Your Honor.  Thank you.

THE COURT:  And we'll continue with the cross-examination.

MS. BECKER:  Thank you, Your Honor.

CROSS-EXAMINATION [Continued]

BY MS. BECKER:

Q.  Good afternoon, Detective Faiola.

A.  Good afternoon.

Q.  When we spoke last week, we were talking about the events of March 21st, 2024, correct?

A.  Correct.

Q.  So I just sort of want to reorient everyone as to where we were very briefly, and then we're going to get back to some of the body-worn camera footage.  Okay?

A.  Okay.

MS. BECKER:  And, Your Honor, I know that some of my questioning was a bit confusing last week.  I will try to keep Your Honor better oriented today as to where we are, both in the video and the transcript.

THE COURT:  I've reviewed all of the body cam, and I have the transcript in front of me.

MS. BECKER:  Perfect.  Thank you, Your Honor.

BY MS. BECKER:

Q.  So just a very brief summary.  You testified last week that on the morning of March 1st, 2024, Mr. Yener had been stopped by members of the Coral Springs SWAT team, correct?

A.  Correct.

Q.  Okay.  And that was in response to a be-on-the-lookout

notice that you had issued?

A.   Yes.

Q.   He had initially been handcuffed, right?

A.   Yes.

Q.   He had been told to sit on a bench?

A.   I wasn't there for that.

Q.   Okay.  He was sitting on a bench when you arrived, right?

A.   Yes.

Q.   Okay.  When you arrived, he was uncuffed?

A.   Correct.

Q.   And instructed to sit back down on the bench?

A.   Yes.

Q.   Right?

Okay.  He was then questioned for about an hour by at least four law enforcement officers who were standing around him, right?

A.   Yes.

Q.   Okay.  Now I'd like to get back to around when you-all made the decision to go to the storage unit.  Okay?

A.   Okay.

Q.   Okay.  So we're going to turn back to Government's Exhibit 3B, which is in evidence.

MS. BECKER:  Assuming the audio/video equipment cooperates, I'm going to try to put us at about the one-minute -- I'm sorry -- the one-minute-30-second mark.  But

I'll start just a couple seconds in advance, because I think the audio lags a bit. And I believe this should correspond to about Page 79 of the transcript that the Government filed as an exhibit to their response.

(Video played.)

MS. BECKER: Okay. So I'm going to pause the video about the two-minute-40-second mark.

BY MS. BECKER:

Q. In that portion of the video, Detective Faiola, you told Mr. Yener that Officer D'Agostinis would drive him over to the storage unit, correct?

A. Yes.

Q. Okay. And we saw that Officer D'Agostinis took Mr. Yener's backpack from him, right?

A. Yes.

Q. Okay. He put Mr. Yener's backpack in the front seat of his police vehicle, right?

A. Yes.

Q. Okay. Then he patted Mr. Yener down, correct?

A. Correct.

Q. And he placed Mr. Yener in the back seat of his police vehicle?

A. Correct.

Q. Okay. I'm going to move ahead now to the part of the video where they drive over and arrive at the storage facility.

MS. BECKER:  And we're going to start again at about the 10-minute mark of the video.  I am going to start it a few seconds in advance again because of the audio lag.  And we're at Page 83 of the transcript.

(Video played.)

MS. BECKER:  I'm going to pause it there at the 12-minute-36-second mark.

BY MS. BECKER:

Q.  So in this section of the video, we see Officer D'Agostinis let Mr. Yener out of the back seat of his police vehicle when they arrived at the storage facility, correct?

A.  Yes.

Q.  And that's because the back doors of his car are locked, right?

A.  Should be.

Q.  Okay.  So a backseat passenger in a police vehicle can't simply open the door themselves, right?

A.  Typically.

Q.  Okay.  When they arrive at the facility, Officer D'Agostinis asks Yener if he has the key.  Did you hear that?

A.  Yes.

Q.  Okay.  And Mr. Yener says:  "No.  You have to get it from the office," right?

A.  Correct.

Q.  Okay.  After that, Officer D'Agostinis tells Mr. Yener

8

where to stand, right?

A.   I mean, he asked him to sit in the shade, out of the sun.

Q.   Okay.  He told him to stand in the shade, right?

A.   Sure.

Q.   Okay.  And Officer D'Agostinis stays with Mr. Yener until the other agents and officers arrive, correct?

A.   Yes.

Q.   Okay.  And that happens just a few moments later, you'd agree?

A.   My arrival?  Yeah.

Q.   Yes.  Your arrival, together with Special Agent Bowman.

A.   Yes.

Q.   Okay.  Now, Officer D'Agostinis does not give Mr. Yener his backpack back at this point, correct?

A.   I think it's still in his car.

Q.   Okay.  When the other agents and officers arrive at the storage unit, Officer D'Agostinis asks you if you have the key, right?

A.   Yes.

Q.   And it's Special Agent Bowman who says:  "I've got the key"?

A.   Correct.

Q.   So Special Agent Bowman got the key to the facility before you arrived with Mr. Yener?

A.   I believe he stopped at the main office first.

Q.   Okay.  So he got the key from the management office first?

A.   Yes.  Because he didn't have a lock on his storage unit --
Mr. Yener -- so obviously he did not have a key.

Q.   Okay.  There's a key that was needed to get into the
building, right?

A.   I don't know if that's the same key or not.  I'm not sure
of that.  I don't know.

Q.   Okay.  And you mentioned that Mr. Yener didn't have his own
lock on the unit, right?

A.   Which is what caused the employee to enter in the first
place.

Q.   Right.

A.   Yes.

Q.   And then you had been in touch with the management of the
storage facility prior to this day, correct?

A.   No.

Q.   Were you in touch with them that day?

A.   On the 1st?

Q.   Uh-huh.

A.   No.

Q.   Okay.

A.   Not until we arrived.

Q.   Okay.  But you had learned that the management had placed
their own lock on Mr. Yener's unit --

A.   Correct.

Q.   -- because his unit didn't have a lock, correct?

A.   Yes.

Q.   Okay.  So Agent Bowman has a key?

A.   Yes.

Q.   Right?  Which he got from the management office?

A.   Yes.

Q.   Okay.  And what we see in the video is that Agent Bowman was the first law enforcement agent down the hall upon your arrival, correct?

A.   Yes.

Q.   Okay.  And he opened the door to the storage unit right away.  You saw that?

A.   Yep.

Q.   Okay.  So the video is currently paused at the 12-minute-36-second mark.  You can see there's a silver door behind Special Agent Bowman, right?

A.   Yes.

Q.   That is the door to Mr. Yener's storage unit, correct?

A.   Yes.

Q.   Okay.  So at this point, the storage unit is already open?

A.   Yes.

Q.   Okay.  And you can see Agent -- Special Agent Bowman facing toward the unit, correct?

A.   He's -- yeah, he's looking in it.

Q.   He's looking in it.

Mr. Yener is standing next to Special Agent Bowman, correct?

A. Correct.

Q. Also sort of in front of the door to the unit?

A. Yes.

Q. Okay.

MS. BECKER: And I'm going to play one more clip from the video -- again, Government's Exhibit 3B. I am going to pull it back just a few seconds to about the 12-minute mark and play through thought 16-minute-30-second mark. So we'll be starting at the top of Page 86.

(Video played.)

MS. BECKER: Okay. So I'm going to pause the video there about the 16-minute-30-second mark.

BY MS. BECKER:

Q. In that part of the video, Detective Faiola, at the beginning, we see you sort of paging through a folder that you've got, right?

A. Yes.

Q. You were looking for a Consent to Search form?

A. Yes.

Q. And you didn't have a Consent to Search Premises form?

A. Correct.

Q. You said something like you only have electronic media?

A. Yes.

Q. So Agent Sutherland was also paging through the papers she had. She also didn't have the right form, correct?

A. I have to assume, yes. Yeah.

Q. Okay. Well, she also says that she's only got media as well, right?

A. Yes. I don't know what she has.

Q. And it was Detective Wittington who handed you the right consent form eventually, right?

A. Correct.

Q. Okay. So then you fill out your part of the form and present the form to Mr. Yener, correct?

A. Yes.

Q. Okay. And that's what we see is sort of still happening here where I've paused the video, right?

A. Yeah. I asked him if he was cool with it, and I even told him: "If you need to look at it again."

Q. Okay. There are, at this point, six law enforcement officers in the hallway with Mr. Yener, correct?

A. Yes.

Q. Okay. I think we've talked about them. But just to make sure we're all on the same page, so there's you, Detective Wittington, Officer D'Agostinis, Special Agent Bowman, Special Agent Sutherland, and then someone by the name of Benny Langford?

A. Yes.

Q. Okay. I don't think we've talked about him before. We saw him a moment ago in the, like, purple Polo shirt, right?

A. Correct.

Q. Okay. So there are six law enforcement officers in this hallway when you present Mr. Yener with the Consent to Search form, right?

A. Yes.

Q. Okay. And the unit we see is already open, correct?

A. Yeah.

MS. BECKER: Nothing further. Thank you.

THE COURT: All right. Any redirect?

MR. ALEXANDER: No redirect, Your Honor.

THE COURT: All right. Thank you.

MR. ALEXANDER: And, Your Honor, may this witness be excused?

THE COURT: Ms. Becker?

MS. BECKER: Yes. Thank you.

THE COURT: All right. The witness is excused.

(Witness excused.)

THE COURT: And the Government's next witness.

MR. ALEXANDER: Your Honor, the Government's next witness is Special Agent Sutherland, Taylor Sutherland.

(Pause in proceedings.)

THE COURT: Hi. Good afternoon.

Special Agent, if you'll remain standing. Raise your

right hand to be placed under oath.

SPECIAL AGENT TAYLOR SUTHERLAND, GOVERNMENT WITNESS, SWORN

COURTROOM DEPUTY: Would you please state your name and also spell it for the record.

THE WITNESS: Yes. First name Taylor, T-A-Y-L-O-R. Last name Sutherland, S-U-T-H-E-R-L-A-N-D.

COURTROOM DEPUTY: Thank you.

MR. ALEXANDER: Your Honor, if I may proceed.

THE COURT: Yes. Of course.

DIRECT EXAMINATION

BY MR. ALEXANDER:

Q. Special Agent Sutherland, could you identify your current title.

A. Yes. I'm a special agent with the FBI.

Q. And how long have you served in that capacity?

A. As a special agent, for about two and a half years.

Q. And what are your duties and responsibilities as a special agent for the FBI?

A. I'm currently assigned to the Counter Terrorism Division.

Q. And Special Agent, have you been involved in the investigation of Harun Abdul-Hamid Yener?

A. I have, yes.

Q. And I want to draw your attention to March 1st of 2024. Were you present on that day with Mr. Yener?

A.   Yes.

Q.   And what was your involvement in that day?

A.   My involvement in that day -- I was the case agent.  I received a call from a detective with Coral Springs letting me know that they had found Mr. Yener.  And myself and my partner, we drove up there to initiate an interview with Yener.

Q.   And when you say your partner, who are you referring to?

A.   Special Agent Garret Bowman.

Q.   And when you arrived on scene, did you ultimately interview Mr. Yener?

A.   Yes.

Q.   And have you had an opportunity to review Government's Exhibits 3A through 3D?

A.   I have.

Q.   And do those videos capture the interactions that you had and other law enforcement had with Mr. Yener?

A.   Yes.

Q.   Now, Special Agent Sutherland, where did you meet the Defendant for the first time that day?

A.   That day, it was outside of the Coral Springs Diner, up in Coral Springs.

Q.   And did you ultimately go to a different location?

A.   That day?

Q.   Yes.

A.   Yes, we did.

16

Q.   And where did you go?

A.   He went to Yener's storage unit, which is the Coral Springs Mini Storage.

Q.   And what was the purpose of going to that storage unit?

A.   The purpose was we ultimately, through conversations with Yener, agreed to go look through his unit with Yener.  He provided and signed a consent form for us to do so.  And that is where the interview did also lead, was at the storage unit.

Q.   And during your interactions with Mr. Yener from the Coral Springs Diner up to the point of the storage unit, where you were searching it, was Mr. Yener cooperative?

A.   He was.

Q.   Was he answering questions posed to him?

A.   Yes.

Q.   And as he was answering these questions, was law enforcement searching that storage unit?

A.   Yes.

Q.   After the search of the storage unit, did you and the other law enforcement officers step outside of the storage unit with Mr. Yener?

A.   We did.

Q.   Okay.  Did Mr. Yener have any cell phones on him?

A.   He did, yes.

Q.   Did he provide consent to search the cell phones?

A.   No.

Q. After he denied providing consent, can you describe what happened.

A. I'm sorry. After I advised him that we were going to be seizing the phones?

Q. So let me take a step back. Let me rephrase that.

A. Okay.

Q. So Mr. Yener declined to provide consent to search his phones, correct?

A. Yes.

Q. What decision did you and other law enforcement make regarding the cell phones?

A. That led us to essentially seizing the phones.

Q. And did that occur outside or inside of the facility?

A. Outside.

Q. And who advised Mr. Yener that the phones were going to be seized?

A. Myself.

Q. And can you describe Mr. Yener's demeanor when you told him you were going to seize those phones.

A. It quickly escalated. He was very upset with us and not happy.

Q. And that interaction, was that captured on the --
Government's Exhibits 3B --

A. Yes.

Q. -- 3B or 3C?

18

A.   Yes, it was.

Q.   But prior to that moment, prior to escalation, was Mr. Yener's demeanor calm?

A.   Yes.

Q.   Now, Special Agent, why did law enforcement seize the phones?

A.   Ultimately, that day, there were many discussions that we had with Yener.  And, in those discussions, he advised us that he was in contact with members of known foreign terrorist organizations, as well as militia groups, being that he claimed he was in one, as well as the cartel.

Those conversations, as well as the writing and the drawings that we did see in Yener's storage unit, led to a conversation with our supervisors -- or our supervisor at the time, as well as our US attorney at the time, and collectively we decided that we were going to seize the phones.

Q.   But beyond -- and can you be a little bit more specific as to what about those conversations warranted the decision to take the phones away from him, rather than just going off and getting a warrant and then coming back.

A.   Right.  So obviously there was concern that we just went overt with Yener that day, and there was ultimately a concern that he would destroy some of the evidence that was on the phone, those contacts and the messages that he was interacting with the members that he claimed to have.

Q. And why did you believe that there was a risk of destruction of the contents of those phones?

A. I believed that we just went overt with him and we were having a discussion with him. And so, naturally, he would want to delete that evidence. In case we bumped into him again, it wouldn't be there.

Q. And in terms of the conversations, and the nature in which Mr. Yener described his interactions with these individuals, what about that prompted you to want to search it further?

A. Well, I guess, collectively the -- the writings that he had in his unit were talking about a coming day of battle, "Be prepared, brothers." And those writings -- he told myself and my partner that those were meant to be sent to these members of the unknown foreign terrorist organizations.

So with that, we wanted to collect that evidence and see, if they are associated, what is the threat there, what upcoming day of battle, what should we be concerned of. That was ultimately why we believed that that was the reason we should seize those phones, so that we could have that evidence with us.

Q. And during the course of your communication with Mr. Yener on this day, did he make any statements about recruitment efforts?

A. Yes. And I believe, as -- he had told us that he was in contact with them as recent as January. And this was March

20

1st.  So he was still in contact.  He had expressed that they had reached out to him to recruit him overseas.  But ultimately, if he didn't want to do that, he could also do something here in the United States as well.

Q.  And Special Agent Taylor, did law enforcement ultimately seize the cell phones?

A.  Yes, we did.

Q.  And did law enforcement apply for a search warrant?

A.  We did, yes.

Q.  Prior to obtaining the search warrant, did law enforcement search those phones?

A.  No.

Q.  Did law enforcement wait until obtaining a search warrant before searching the phones?

A.  Yes.

Q.  Where were the cell phones placed in the interim, between the time of its seizure and ultimately the execution of the warrant?

A.  In our evidence room.

MR. ALEXANDER:  Your Honor, if I may have access to the ELMO.

THE COURT:  Certainly.

BY MR. ALEXANDER:

Q.  Special Agent, I'm showing you what's been admitted as Government's Exhibit 6.  Do you recognize this packet?

A.   Yes.

Q.   And is this the -- what we're looking at right now -- the application for the search warrant to search the two cell phones?

A.   It is, yes.

Q.   And I should clarify.  Were two cell phones seized from Mr. Yener on March 1st, 2024?

A.   Yes.

Q.   The violation that is listed, do you see right in the middle --

A.   Yes.

Q.   And what is that violation?

A.   It is 18 USC 2339B --

Q.   And what is -- yes?

A.   -- providing material support or resources to designated foreign terrorist organizations.

Q.   And is that your signature on this application?

A.   It is.

Q.   And on the bottom, it says:  "Attested to by the applicant, in accordance with the requirements of Federal Rule Criminal Procedure 4.1 by FaceTime."  And then it's the name of the Honorable Alicia O. Valle, United States Magistrate Judge.  Was this application presented to Judge Valle?

A.   Yes.

Q.   And were you under oath when this application was presented

to her?

A.  I was.

Q.  And did she authorize this warrant?

A.  She did.

Q.  And within Government's Exhibit 6, is this the warrant application or the warrant itself?

A.  Yes, it is.

Q.  And on the bottom, is that Judge Valle's signature?

A.  It is.

Q.  And Special Agent Sutherland, attached to the application which is within Government's Exhibit 6, there is an affidavit, and it begins with:  "I, Taylor Sutherland."  Did you draft this affidavit?

A.  I did, with the assistance of my partner.

Q.  And the information that's conveyed in here, does this establish probable cause for the execution or the obtaining of the search warrant?

A.  Yes.

Q.  Paragraph 4 of your affidavit -- could you read that -- actually, no.  Strike that.

Could you read Paragraph 5 for me.

A.  "Because this affidavit is being submitted for the limited purpose of obtaining a search warrant, it does not include each and every fact observed by me or known to the Government.  I have set forth only those facts necessary to support a finding

of probable cause."

Q. But the information that's conveyed in here, in this exhibit, based on your assessment, based on your knowledge of the case, did you believe this to contain sufficient probable cause for obtaining a search warrant to search both cell phones?

A. Yes.

Q. And as you testified earlier, you've had an opportunity to review the body-cam footage from March 1st, 2024?

A. I have.

Q. Is it fair to say that there are statements of Mr. Yener from that day that are not memorialized in this affidavit?

A. Yes.

Q. But based on your assessment of the statements that Mr. Yener made, and the totality of the investigation at that point, did you and other law enforcement believe that this warrant contained sufficient probable cause to search both cell phones for this violation?

A. Yes, it does.

MR. ALEXANDER: Your Honor, if I may have a moment.

THE COURT: Certainly.

MR. ALEXANDER: Special Agent, I have no further questions, but I believe Defense counsel may have some questions for you.

THE COURT: All right. Cross-examination.

MR. VAN DYKE: Just one moment, Your Honor.

THE COURT: All right.

(Pause in proceedings.)

CROSS-EXAMINATION

BY MR. VAN DYKE:

Q. Good afternoon, agent Sutherland.

A. Good afternoon, sir.

Q. We've met in the past, but my name is Victor Van Dyke and I just have a few questions for you.

A. Sure.

MR. VAN DYKE: And, Your Honor, I'd like to refer to Government's Exhibit 6, which is the search warrant affidavit we just reviewed. It's also been filed at Docket Entry 68-5.

THE COURT: All right. Certainly.

MR. VAN DYKE: And then, as well as Government's Exhibit 4, the transcript of the recording on March 1st.

Permission to approach the witness, Your Honor.

THE COURT: You may.

BY MR. VAN DYKE:

Q. And Agent Sutherland, I've just handed you Government's Exhibits 6 and 4. Could you just page over them and verify that that is the same search warrant you just discussed with AUSA Alexander, as well as a transcript of the recording on March 1st.

A. (Witness complies.)

I've reviewed -- it is.

Q.   Thank you.

Now, Mr. Alexander's direct examination began on March 1st. I'd actually like to take a step back and talk about the course of investigation before that.  At what point was the FBI first contacted about Mr. Yener?

A.   I believe the date was February 19th of 2024.

Q.   And by whom was the FBI contacted?

A.   It was a tip that was reported initially that did get funneled down to my squad, and I was assigned to that guardian.

Q.   And that tip, was that by Mr. Harry Heisler?

A.   Yes.

Q.   And did you speak to Mr. Heisler on February 19th?

A.   I did the 19th or 20th.

Q.   Sorry?

A.   I think it was either the 19th or 20th.

Q.   And what was discussed during that call?

A.   The tip that he was reporting, essentially wanted to get any more additional information that he might have and just talk through the tip that he reported.

Q.   And on February 20th, did Mr. Heisler send the FBI the photographs that he had taken from Mr. Yener's storage unit?

A.   Yes.

Q.   Between February 19th and when you make contact with Mr. Yener on March 1st, can you describe the course of the

investigation.

A.   Sure.  So I essentially received the tip.  I spoke with Mr. Heisler.  My partner and I did, you know, initial baseline checks on the -- on Mr. Yener.  And ultimately, throughout the investigation, it led us to some Oklahoma records that we had on Yener, certified records, as well as an interview with his prior boss in Coconut Creek, which also led to some violent phrases that he had said when he was Baker-Acted that day from his employment.

We worked closely with Coral Springs Police Department, specifically their Threat Management Unit, where they initiated a BOLO or an attempt-to-locate.  And that was what led us to the SWAT team locating Mr. Yener at the Coral Springs Diner and us doing the interview that day.

Q.   So Coral Springs's decision to issue the BOLO was made in part through discussions with the FBI; is that fair?

A.   Yes.

Q.   Did you ever apply for a search warrant to search the unit between February 19th and March 1st?

A.   No.

Q.   And the reason you didn't is because the drawings and information you had at the time did not, in your opinion, make out probable cause to search the storage unit, correct?

A.   I believe we were still early on in the investigation, and we didn't have sufficient evidence at that time to move forward

with the investigation.  We wanted to ultimately locate Mr. Yener and have an -- a discussion with him prior to doing so.

Q.  And the reason the interview was important to continue the investigation is because the information you had before March 1st was not sufficient to make out probable cause; is that fair?

A.  I don't believe so.  I mean, the -- the evidence that we had from the unit was definitely a big part of the probable cause.  But painting a whole picture, I believe an interview with Yener himself was what led us to writing the search warrants.

Q.  So I don't mean to be difficult.  But just if you remove the interview out of it, and all you have is the information that you have at the end of February, in your opinion, did the FBI have sufficient probable cause?

A.  No.  Which is why we did not draft one at that time.

Q.  Okay.  Let's jump to March 1st.  On the morning of March 1st, you're in contact with Detective Faiola from Coral Springs Police Department, correct?

A.  Correct.

Q.  And you're texting him throughout the interaction?

A.  Correct.

Q.  And around 8:18 a.m. -- we can pull up the text if you don't remember -- you text him that you'll be there in about

20.  "Can you hang onto him until then?"  Do you recall sending that?

A.  I do.

Q.  And your ask to Detective Faiola, at that point, is that Mr. Yener not be able to leave until you get there; is that fair?

A.  No.  It was ultimately like:  "Hey, if you finish your interview, could you just drag it out so we have an opportunity to talk with him as well."

Q.  "Can you drag it out."  You texted him again at 8:29 -- so that's about 10 minutes later -- that he should keep Mr. Yener there until you arrive, right?

A.  Yes.

Q.  And he responds:  "Copy."

A.  Yes.

Q.  I'd like now to discuss the search warrant affidavit with you.  It's Government Exhibit 6 that I handed you.

A.  Yes.

        MR. VAN DYKE:  If I could have the ELMO, please.

BY MR. VAN DYKE:

Q.  And I'm looking at --

        MR. VAN DYKE:  -- this has already been admitted, Your Honor --

BY MR. VAN DYKE:

Q.  -- at Pages 14, 15 and 16.  Do you see those pages, Special

29

Agent Sutherland?

A. I did.

Q. Now, these are drawings -- or excuse me -- these are photographs taken of drawings on a notebook found in Mr. Yener's storage unit; is that right?

A. Correct.

Q. I'd like to just ask you a few questions about these drawings, if I may.

A. Sure.

Q. And these are Pages 15 and 16 of the PDF of Government Exhibit 6.

Did these drawings indicate to you on March 1st that the person who drew them had some specialized knowledge in making explosive devices?

A. I cannot confirm or deny that. I'm not specialized in anything bomb-tech related. But from my first look at this, I wanted to make sure that my bomb tech could have a look at these.

Q. And I want to talk about what your bomb techs ultimately found. But earlier you testified that these drawings played a role in the probable cause analysis, correct?

A. Sure. Yes.

Q. So by viewing these drawings, what did they indicate to you?

A. That he had some sort of knowledge in bombs or explosive

30

materials.

Q.  Did the drawings indicate to you that the artist who drew the photos was capable of building an explosive device?

A.  I cannot confirm or deny that, again, through my experience and expertise.

Q.  Okay.  I'd like to jump to discussing Paragraph 41, which is on Page 16.

A.  Okay.

Q.  And I'd just like to read out the statement.  Let me know if I read that right.  "When questioned about his experience with bombs and improvised explosives, Yener admitted to interviewing agents to creating what Yener described as rockets" -- and "rockets" is in quotations -- "that utilize precise chemical mixtures to launch."

Did I read that right?

A.  Correct.

Q.  And then the next sentence reads:  "Yener referenced how the chemical mixtures were very volatile" -- "volatile" in quotes -- "and would explode if mixed incorrectly," correct?

A.  Correct.

Q.  By putting the words in quotations, you mean to indicate that those were words spoken by Mr. Yener on March 1st; is that fair?

A.  I would have to review the video to actually confirm that. I'm sorry.

Q. So I have the transcript. I handed you the transcript up there. That's Government's Exhibit 4.

I believe the interaction you're referring to is on Page 146. If you could jump there.

A. (Witness complies.)

Q. Is that the discussion you're referring to in Paragraph 41 of Government Exhibit 6?

A. It could have been part of it. As you may have known, when you reviewed the body-cam footage, I was -- there were moments where I wasn't present and Yener had conversations outside of that. But I do remember this specific -- the sugar rockets at the time, and giving us details on that. Yes.

Q. Okay. The search warrant is based on your personal knowledge, correct?

A. Correct.

Q. Do you have any knowledge of any other conversation involving the word "rocket," other than the one memorialized on Page 146 of the transcript?

A. At the moment, I do not.

Q. Okay. He doesn't use the word "volatile" in this exchange; is that fair?

A. In this exchange, correct.

Q. Does he use the word "volatile" anywhere else in the transcript?

A. I would have to review the entire transcript.

Q.  It's in evidence, so I'm not going to make you read the whole thing.

A.  Okay.

Q.  Don't worry.

Okay.  The rocket at issue, discussed on Page 146, is a sugar rocket, correct?

A.  Oh.  On 146 here.  Yes, it is.

Q.  What is a sugar rocket?

A.  It is -- according to Yener's words, it is a -- potassium nitrite, flour mixed together gently.  "Mix it together too much, too harshly, it will blow up in your face."

Q.  Okay.  Do you have any knowledge on what a sugar rocket is?

A.  I do not.

Q.  Did you discuss with your bomb tech what a sugar rocket is?

A.  During the course of the investigation, I'm sure I did.

Q.  Is a sugar rocket a mixture of potassium nitrate and flour?

A.  I don't recall.

Q.  Did the description of making -- do you know what sugar rockets are used for?

A.  I do not.

Q.  Do you know if sugar rockets are legal?

A.  I do not know that.

Q.  Okay.  In the course of your conversation with the FBI bomb tech, did you discuss what the purpose of a sugar rocket is?

A.  I don't recall.

Q. Did the description of how to make a sugar rocket indicate to you that Mr. Yener had experience or knowledge in making improvised explosive devices?

A. I don't recall the exact conversation, so I cannot talk any further on that.

Q. So you have no recollection right now of any discussion you had as to whether or not the description of a sugar rocket in the transcript played a role in the analysis, correct?

A. For the sugar rocket, I'm not remembering at this moment. I had a lot of conversations with our bomb tech through this yearlong investigation, and I don't feel comfortable stating something that I don't fully recall.

Q. Understood. The conclusion of Paragraph 41 -- I'm just going to read it. Let me know if I read it correctly. "At the conclusion of the interview, Yener told the CDPD [sic] officer that if they told him to mix chemicals Yener knew how to and would help them with the chemicals."

What does that statement refer to?

A. I believe that refers to the conversation that he had while the Coral Springs Police Department officer was driving Yener to his employment.

Q. Okay. If you could jump to Page 234 of the transcript. Government Exhibit 4.

A. I'm sorry. What was the page again?

Q. 234 of the actual PDF, so the page number at the bottom.

A.   My transcript only goes up to 233.  I'm sorry.

MR. VAN DYKE:  Just one moment, Your Honor.

THE WITNESS:  Okay.

(Pause in proceedings.)

THE COURT:  Mr. Van Dyke, I have 234 and 235.  Do you want me to give it to the witness?

MR. VAN DYKE:  That would be great, Your Honor.  I can also just put it on the ELMO, if Your Honor would like to read along.  I have no issue with that.  I can put it on the ELMO.  Thank you.

THE COURT:  All right.  Thank you.

BY MR. VAN DYKE:

Q.   Is this the interaction you were just referencing, Special Agent Sutherland?

A.   Yes.  This is the interaction.

Q.   You'd agree with me that there's no discussion of mixing chemicals, correct?

A.   Not in this transcript, no.

Q.   Thank you.

Okay.  And Paragraph 30 of the search warrant affidavit, you write that:  "Yener claimed that in or around 2015 members of ISIS had reached out to him," correct?

A.   Yes.

Q.   And this actually isn't the only foreign terrorist organization or domestic terrorist organization that is

discussed during the course of the March 1st interview; is that fair?

A.   Correct.

Q.   The Al-Nusra Front is also discussed?

A.   Yes.

Q.   Hezbollah?

A.   Yes.

Q.   Hamas?

A.   Yes.

Q.   Al Qaeda?

A.   Yes.

Q.   Drug cartels in Mexico?

A.   Yes.

Q.   White supremacist groups in the United States?

A.   Yes.

Q.   Like, the Boogaloo Bois discussed specifically?

A.   Yes.

Q.   The Proud Boys are discussed?

A.   (No verbal response.)

Q.   Did you say yes to that?  Sorry.

A.   Yes.

Q.   Yeah.  Sitting here today, you have Mr. Yener's Internet history; is that fair?

A.   Yes.

Q.   You have no evidence that he's ever been in discussion with

36

any of these groups; is that fair?

A.   From our look of the phone, they -- there weren't any communications between those interactions and those groups that you just went over; however, there were applications that we were not able to get into.  So yes, and then there's the unknown.

Q.   Okay.  I want to talk about a particular conversation involving ISIS.  On March 1st, Mr. Yener claimed -- and you had discussed this on your direct examination -- that Mr. Yener had -- that a member of ISIS had reached out to Mr. Yener in January 2024, correct?

A.   Yes.

Q.   And that was the most recent communication between a foreign terrorist organization and Mr. Yener that was discussed on March 1st; is that fair?

A.   Yes.  Correct.

Q.   But in the course -- and this is 168, Page 168.

A.   In which exhibit?

Q.   Of the transcript.

A.   Okay.

Q.   Government Exhibit 4.

In the course of that conversation, Mr. Yener states that he actually didn't believe that individual was from ISIS, correct?

A.   Yes.  But he claimed he was to Mr. Yener.  Correct.

Q.   According to the tone of this individual, Mr. Yener believed he was a member of Al-Nusra, correct?

A.   Correct.

Q.   Mr. Yener does not claim to currently be in contact with any FTO, as of March 1st, 2024, during the course of your interaction with him; is that fair?

A.   I don't think that's fair.  No.

Q.   Can you elaborate.

A.   Sure.  He, during discussions -- I would have to go through to give you an exact quote, but there were conversations that they would randomly hit him up.  And when we asked details on those specific foreign terrorist organizations, he did not give us those details.

We asked repeatedly:  "Who's 'they'?  Who's 'they'?"  The "they" part was, in our eyes, referencing members of organizations that he did not want us to have the details of.  So I wouldn't say no.  I wouldn't say that that's fair to say that.

Q.   That's -- I understand, and I appreciate your elaboration.  What I'd actually like to focus on is the "randomly hitting up" bit of your answer.

A.   Sure.

Q.   Mr. Yener does not claim that he had ongoing conversation with FTOs as of March 1st, correct?

A.   During that interview, correct.

Q.   Thank you.

Mr. Yener states repeatedly -- or actually, let's go to Paragraph 8.  Apologies.  Paragraph 8 of the search warrant application.

Let me know if I read this right --

MR. VAN DYKE:  I apologize, Your Honor.  I'm dealing with a bit of a cold.

BY MR. VAN DYKE:

Q.   "Yener reported that the unnamed, unidentified individuals contacted him through mobile applications and messaging platforms on his cellular telephone to discuss current events and to recruit Yener to joined the aforementioned FTOs."

Did I read that right?

A.   Correct.

Q.   "He further claimed that the unnamed and unidentified FTO members offered to assist Yener in traveling overseas to countries, including Iraq and Syria.  Yener informed the interviewing agents that he considered accepting the unnamed and unidentified individuals' assistance to travel overseas to join the aforementioned FTOs in their conflicts against others, including the United States of America."

Did I read that right?

A.   You did.

Q.   What does that statement refer to?

A.   I would have to look through the transcript to find -- but

there were multiple conversations that Yener spoke about

traveling -- they would have him travel overseas and avoid

certain airports.  He talked about considering joining because

they were, quote/unquote, kicking ass at the time.  And so

this -- I think this paragraph mentions or relates to a couple

of different conversations that happened that day.

Q.  So if you could jump to Pages 49 and 50 of the transcript

that's Government Exhibit 4.  I actually think everything you

just listed is on those pages, but let me know if I'm wrong.

A.  Yes.  This is part of the paragraph.  Correct.

Q.  So the first paragraph on the top of 49, when you write in

the search warrant affidavit that he considered accepting the

assistance to travel overseas, what you are referring to is the

sentence in which he says:  "I ain't gonna lie.  At first, I

was like eh"?

A.  I'm thinking of another conversation that is in this

transcript where he also reiterated that.  But yes, this is

part of that paragraph.  Correct.

Q.  Thank you.  It's actually clear from this conversation that

the -- whatever was going on was not against the United States

because in the second paragraph on 49 it states that the

opponent would ask the United States for firepower.  Do you see

that?

A.  Yes.  I think the instance that I'm referencing is when he

was talking more so about him going overseas to fight or

assisting them over here in the United States. So I'm not referencing this paragraph.

Q. Okay. If you could jump to Page 180 of Exhibit 4 -- actually, 179 and 180, the questions on the bottom of 179, and the answer is on the top of 180.

A. (Witness complies.)

Q. Do you see it?

A. I'm there. Yes.

Q. You ask Mr. Yener: "But you're saying, for instance, ISIS, Al Qaeda, Hezbollah, Hamas come over here, right, and they start some stuff, you're down to get involved with that? That's what you're saying," question mark.

Did I read that right?

A. You did.

Q. Mr. Yener's response is: "No. Because, again, their ideologies are not my ideology."

Did I read that right?

A. You did.

Q. Two responses down, Mr. Yener states: "Their beliefs are disturbing -- their objectives -- because they are so focused on their beliefs."

Did I read that right?

A. Yes.

Q. Jump to Page 187, please. Let me know when you're there.

A. (Witness complies.)

41

I'm here.

Q.   CW asks:  "Maybe push again to gain power over here?"

Harun -- Mr. Yener responds:  "I wouldn't do that.  I wouldn't waste my time with the United States.  I would leave instantly."

Did I read that right?

A.   You did.

Q.   Page 194 of Exhibit 4.  Please let me know when you're there.

A.   (Witness complies.)

I'm here.

Q.   CW asks:  "Let's say -- let's say the United States was in chaos because of that, and you and your buddies saw an opportunity to take over a small state in the United States, let's say, Rhode Island, and they want to take over a Rhode Island and make it an Islamic state."  Mr. Yener's response: "I -- I wouldn't bother with the United States, man.  I'm going to be honest.  I would not bother."  Did I read that right?

A.   You did.

Q.   Okay.  We can move on.

In Paragraph 31 of the search warrant affidavit -- it's Exhibit 6 for the record -- the last sentence reads:  "Yener told interviewing agents the individuals" -- oh.  I apologize. The first sentence reads:  "Yener said he decided not to join ISIS in 2015 because Yener believed ISIS would not ultimately

succeed in achieving their objectives."

Did I read that right?

A.   Correct.

Q.   In fact, Mr. Yener states repeatedly over the course of the March 1st interview that he does not share an ideology with ISIS; is that fair?

A.   That's correct.

Q.   Thank you.

Okay.  Paragraph 29 of the search warrant affidavit -- that's Exhibit 4, for the record.  I'm going to start about halfway down.  Let me know if I read this right:  "When asked to clarify what he meant by 'over there,' Yener told interviewing agents he was referring to the Middle East.  When questioned for a recent example of such a conversation, Yener stated that with the conflict between Israel and Hamas, and between the United States and proxy groups operating in Yemen and Iraq, Yener stated unnamed individuals contacted him to inquire about whether the United States had positioned warships in locations which could strike adversarial positions in Iraq.

"Yener stated the unnamed individuals reached out to him seeking news and information because they were unable to access Western media and news in their countries."

Did I read that right?

A.   Correct.

Q.   Okay.  I would like to jump to Page 37 of Exhibit 4.

A.   I'm there.

Q.   This is the conversation you're referring to in Paragraph 29 of Exhibit 6, correct?

A.   This is part of the conversation.  Correct.

Q.   What's the other part?

A.   I just -- I -- I haven't read the whole paragraph.  You only read a section of it, so I'm stating that this is part of the paragraph.

Q.   Oh.  I apologize. Thank you. Yes.  This -- the portion that I read out loud refers to this --

A.   Correct.

Q.   Thank you.  I'm going to read Mr. Yener's answer in the transcript.  "They just -- I check up on them.  They check up on me.  I was talking to a guy a few weeks ago in Iraq.  I know he was telling me -- I told him to look out because the US was -- we were beefing with them at the time.  This was very, very recent.  And he was like:  'Well, yeah, I know you guys got your ships outside around our country.'"

     Did I read that correct?

A.   Yes.

Q.   So it was the person in Iraq who stated the position of these warships, correct?

A.   I'm referencing to a different part, where he stated to us that he does send military updates to that individual as well.

Q.   Okay.  Okay.  Just a few more questions, Special Agent

44

Sutherland.

MR. VAN DYKE:  And I don't need the ELMO.

BY MR. VAN DYKE:

Q.  The search warrant affidavits that you fill out indicate probable cause for providing material support to terrorist groups, correct?

A.  Correct.

Q.  I just want to ask you a few questions about material support.  Mr. Yener never stated during the course of the March 1st interview that he would provide any property to a foreign terrorist organization, correct?

A.  I'd have to review.

Q.  Standing here today, you don't recall him --

A.  I don't recall.

Q.  Any currency?

A.  I don't recall.

Q.  Any financial security?

A.  I don't recall.

Q.  Doesn't claim he'd provide lodging?

A.  I don't recall that.

Q.  Any training, correct?

A.  I'm sorry.  Yener asking for training from them or them offering training for him?

Q.  No.  No.  Providing.  Yener never offers to provide --

A.  Offer to provide training, no.

Q.   Okay.  Never offers to provide any safe houses?

A.   No.

Q.   Any false identification or documentation?

A.   No.

Q.   Any communications equipment?

A.   I don't recall.

Q.   Any facilities?

A.   I don't recall.

Q.   Any weapons?

A.   I don't recall.

Q.   Any lethal substances?

A.   I don't recall.

Q.   Any explosives?

A.   I don't recall.

Q.   Any personnel?

A.   I don't recall.

Q.   And doesn't offer to provide any transportation?

A.   I don't recall.

Q.   At some point after March 1st, after the search warrants are obtained and the phones are looked into, the investigation changes course; is that fair?

A.   Yes.

Q.   And rather than investigating Mr. Yener for providing material support to terrorist organizations, the FBI chooses to go down a different path; is that fair?

A.   I'm sorry.  Could you repeat the question?

Q.   Rather than continuing to -- I apologize.  Rather than continuing to investigate Mr. Yener for providing material support to a foreign terrorist organization, the FBI chooses a different path for the investigation?

MR. ALEXANDER:  Your Honor, I'm going to object on relevance and the deliberative process.

THE COURT:  Yeah.  How is that relevant?  Sustained.

MR. VAN DYKE:  I can move on, Your Honor.  Nothing further -- or if I could have one moment to --

THE COURT:  Yes.  Of course.

MR. VAN DYKE:  Nothing further, Your Honor.

THE COURT:  All right.  Any redirect?

MR. ALEXANDER:  No redirect, Your Honor.

THE COURT:  All right.  Thank you.  You are excused.

THE WITNESS:  Thank you, ma'am.

(Witness excused.)

THE COURT:  Anything further on behalf of the United States?

MR. ALEXANDER:  No, Your Honor.

THE COURT:  On behalf of the Defendant?

MR. VAN DYKE:  No, Your Honor.

THE COURT:  All right, then.

Do the parties wish to engage in any type of argument or do you want to stand on the briefings?

MR. VAN DYKE:  I do have an argument.

MR. ALEXANDER:  Argument, Your Honor.  Yes.

THE COURT:  All right.  Well, since it is the Defendant's motion, even though the United States has the burden, if you'd like to proceed, Mr. Van Dyke.

MR. VAN DYKE:  Thank you, Your Honor.

May I approach the podium?

THE COURT:  Yes.  Of course.

MR. VAN DYKE:  So there's a few points I want to emphasize, and I want to take it kind of in order with the Fifth Amendment issue first, followed by the Fourth Amendment issue.

But first, just an observation that each step of this interaction appears to be infused with some level of unconstitutional and coercive behavior.  And it actually starts with Detective Faiola.  He said something on the stand that I wasn't really prepared for.  He said that he called before arriving to the scene and inquired as to whether Mr. Yener had been Mirandized.  He then -- later, in the course of his testimony, he says he wanted Mr. Yener to know that he could or could not talk.  The way that you inform someone that they have the right to speak or not to speak is by providing Miranda. And he had called ahead of time to ensure that Mr. Yener had not been Mirandized.

Now, obviously, the test for this is not what the

officer's intent was. I think if it was this would be a much easier case. The question is: What did Mr. Yener think? What did he feel during the course of the interaction? Did he feel free to leave?

But the reason I want to emphasize how this began, and I want to talk about kind of what led to the consent to search, is because the Government's relying on the good-faith exception. But the good-faith exception --

THE COURT: Well, I think that's the alternative, is the good-faith exception. Have they conceded that?

MR. VAN DYKE: No.

THE COURT: All right. So I just want to -- because what I'd like to kind of do is break it down into four areas. And with regard to the questioning and the claim that Mr. Yener wasn't Mirandized, would that be an issue with regard to the Fifth Amendment and the product of custodial interrogation? Do you believe that he was in custody for purposes of the Fifth Amendment?

MR. VAN DYKE: I do, Your Honor. I think the combination of a few things. One, the officers admitted -- they testified that they put hands on him. They actually put hands on him a number of times to pat him down; two, he was placed in handcuffs; three --

THE COURT: But if I could stop you there, Mr. Van Dyke. When he was placed in handcuffs, are there any

statements that were the product of interrogation that you're seeking to suppress?  Because it would appear that when Detective Faiola came on scene he asked that the handcuffs be removed.

MR. VAN DYKE:  He did.

THE COURT:  So that fact would no longer be at issue. And, in fact, he was given an opportunity to smoke a cigarette. I'm just trying to understand, for purposes of the Fifth Amendment, where you claim or at what point do you claim that he was in custody for purposes of the interrogation that ensued.

MR. VAN DYKE:  Sure.  So I do think the fact that the handcuffs were removed plays a part in the analysis.  But the fact that he was originally placed in handcuffs also does go to his reasonable expectations.

The moment -- I have a time stamp for Your Honor -- as to when he is in custody, knows he is not free to leave, is eight minutes and 18 seconds of the video.  And everything after that point, it is our position, should be suppressed. That is the moment where Officer D'Agostinis, standing just a few feet in front of Mr. Yener -- and if we could go actually back for a moment in time, Mr. Yener says:  "There's nothing to talk about."  That's the last thing that says -- he says.

Then at eight minutes and 18 seconds, Officer D'Agostinis asks one of his fellow officers -- and this is

audible on the video -- "Is he free to leave or no?"  The other officer says:  "No.  But we'll figure it out," and then says: "We'll get you out of here as soon as we can."  That is a fact that's not present in any of the Government's cases.  That is the officers informing Mr. Yener:  "You are not free to leave." That speaks directly to what his reasonable expectations were. He responds:  "Excuse me.  What is this even about," or "What is going on?"  I don't have the exact quotation there.

And then, later, when Faiola arrives and the handcuffs are removed, there's no discussion of his Miranda rights.  It's immediately launched into an interrogation.  So that is the moment at which we say everything after that certainly must be suppressed, eight minutes and 18 seconds.

I'd like to just briefly touch on whether Mr. Yener actually did invoke his right to Miranda.  I think, given what's come to light, given that statement at eight minutes and 18 seconds, it actually -- it doesn't matter because he was entitled to Miranda at that point.

But this, you know, permutation of the case law that the Government's relying on that his invocation was at best equivocal, you know, the first officer -- when D'Agostinis arrives, hears he doesn't want to talk, Mr. Yener says: "There's nothing to talk about," and then later that he's not free to leave.  If it is an equivocal invocation of the right, the law is clear as to what has to happen -- and this is --

it's Jacobs against Singletary.  I can get the case cite from our pleading, Your Honor, but it's 952 --

THE COURT:  I have your briefing.

MR. VAN DYKE:  -- F.2d 1282.

"At a minimum, the scrupulously honored standard requires that the Government refrain from questioning a suspect unless he both, one, initiates further conversation, and two, waives the previously asserted right to silence," the United States against Muhammad quote.  That's an unpublished decision at 196 F. App'x 882, but it does quote a published decision.

"If a defendant's request to cease questioning is somewhat equivocal in nature" -- which, again, is what the Government is arguing -- "we have made clear that the Government must immediately cease the formal interrogation and subsequent questioning can be directed only towards clarifying that initial request."

So even if the Government's right, even if it was an equivocal invocation, the, you know, well-trodden hornbook procedure as to what has to happen after that invocation was not followed here.  And again, all of this is occurring against the backdrop of Special Agent Sutherland directing Faiola to keep Yener there; and Faiola confirming that Mr. Yener had not been Mirandized; and Officer D'Agostinis telling Mr. Yener in Mr. Yener's presence:  "You are not free to leave."  That's all in the video.  And it's been shown through the testimony, Your

52

Honor.

I'm happy to move on to the Fourth Amendment issue, unless Your Honor has further questions on the issue of Miranda --

THE COURT: No. I have the argument. I mean, I'm looking at it, obviously, and the way that the parties have briefed it. You know, obviously, when you're claiming that Mr. Yener was in custody for Fifth Amendment purposes and when the interrogation began; obviously, the search of the unit and whether in this case it appears that the unit was unlocked -- the management provided a lock, so it was -- the consent was given by management to utilize the lock that was placed, but, obviously, the issue is the search of the unit and whether Mr. Yener gave valid consent; and then the search of the phones; and obviously the search warrant.

MR. VAN DYKE: So -- and I just want to -- just briefly on the Fourth Amendment issue, it's not our position that because Mr. Yener wasn't Mirandized it automatically nullifies the consent. We think it's a factor to take into the discussion.

We heard Detective Faiola say something about Mr. Yener gave consent immediately: "If you'd speak to the boss" -- "If you speak to my boss."

I went and pulled the citations. That occurs on Page 73 of the transcript. But it's four or five pages earlier,

where the officers are -- and I think this is a pretty coercive set of events where they're threatening him with future legal action, future troubles.  "You know, if you don't let us search the unit, some other jurisdiction's going to stop you.  They're going to give you these troubles.  They might Baker-Act you." That is incredibly coercive behavior.  And when you combine it with the fact that he was not Mirandized, you combine it with the length of the detention that he was there, I think the totality of circumstances clearly points to this not being a knowing and voluntary consent to search.

There's also just a few more facts I'd like to highlight for Your Honor on the issue of the Fourth Amendment. The key that's provided, I think based on Detective Faiola's testimony, is the key to get into the building.  But the unit itself didn't have a lock on it.  So not only is he not Mirandized through the entire en counter, and not only is he threatened with future police actions, but when they arrive to the unit, the FBI and the officers are leading him into the unit, as if to say:  "We're here.  We got it."  And this is before the Consent to Search form is signed.

They're standing in the alleyway of that storage unit. Mr. Yener is surrounded by five or six officers.  Special Agent Bowman already has the unit opened, peering in.  And those are the circumstances, after an hour plus of interrogation, that Mr. Yener signs the Consent to Search form.

54

I think the fact that they went and got the keys, opened the unit, tell him they know what's in it, tell him they know his criminal history, and start threatening him with future legal action, makes clear that the consent to search was not voluntary.

I don't think I have anything else on the Fourth Amendment. I would like to talk briefly about whether the warrant itself was tainted. And I think it was tainted not only with material misstatements. I think it was also tainted with the fruits not only of the Miranda violation but also the fruits of the unconstitutional search.

If it's tainted with the fruits of the search, which was -- if Your Honor finds the search was unconstitutional and the warrant is tainted with the fruits of it, the good-faith exception doesn't apply. And if the warrant is relied on misstatements, it's also clear that the good-faith exception of just getting a warrant would not apply.

Your Honor has the transcript. We didn't object to its admission. I'd just like to highlight a few portions, Pages 48, 49, and 51. Mr. Yener is asked repeatedly whether he'd like to get involved with the foreign terrorist organizations, says he does not. He's asked if there are messages on the phones. He says: "No." He say he's not ISIS affiliated. "I don't have any interest in ISIS." That's Page 59. Claims repeatedly he doesn't support their ideology. One

such reference is on Page 63.

Claims repeatedly he's not interested in hurting the United States.  That's Page 177.

He's asked directly twice:  "If ISIS, Al Qaeda, Hezbollah, or Hamas come over here, are you going to get involved?"  He says:  "No" on Page 179, 180, 181.  Wouldn't waste his time, wouldn't bother with a conflict in France.  Those are Pages 187, 189.  Wouldn't bother with the United States, Page 194.  Last contact with the FTO was two months prior.

And then I think the actual -- the misstatements that came to light through Agent Sutherland's testimony are worth highlighting as well.  She claims in the search warrant affidavit that he's currently in contact.  She admitted on the stand that the most previous contact was in the past.

This whole issue of considering accepting an invitation for a confrontation with the United States in the Middle East, the transcript does not support that at all.  "At first I was like eh" is the only thing that I think the Government can point to to support that assertion in the search warrant affidavit.  And actually, if you continue reading, it's clear that the confrontation had nothing to do with the United States, whatever it was that was going on with the Middle East.

The search warrant affidavit says repeatedly that Mr. Yener has experience mixing volatile chemicals.  The word

"volatile" is never used by Mr. Yener. What we're talking about is a sugar rocket, something fifth-grade students in physics class put together. It's described as a sugar rocket. Sugar somehow isn't an ingredient that's even listed. He never states, as the search warrant says in Paragraph 6, that he would mix chemicals for a foreign terrorist organization. I think that is a gross, gross misstatement as to what is actually said on March 1st. Never in that transcript does Mr. Yener says: "Oh. I will mix chemicals for a foreign terrorist organization."

So yeah, I think the search warrant is not only tainted with misstatements, there's also the issue of the warships. I don't want to belabor it. I know that was towards the end of the testimony. But there are misstatements made by Special Agent Sutherland in the search warrant affidavit. And then obviously the fruits of the search are littered throughout.

If you remove the search from the questioning -- and this is where I began my cross-examination with Agent Sutherland: "Do the drawings make up probable cause," and she answered honestly and said: "No." For that reason, I don't think the Government can rely on the good-faith exception. I think every statement made by Mr. Yener on March 1st after 8:18 -- eight minutes, 18 seconds of Government's Exhibit -- eight minutes and 18 seconds of Government Exhibit 3A should be

suppressed. I do not think the consent to search was voluntary in consideration of the totality of the circumstances, and I do not believe the Government can rely on the good-faith exception.

If Your Honor has no further questions, I rest on --

THE COURT: Did you want to address the seizure of the phones?

MR. VAN DYKE: Oh. Thank you, Your Honor. Yeah.

So obviously it's not probable cause to search. It's probable cause -- separate and articulable probable cause that there was evidence of this crime, providing material support to a terrorist organization on those phones. And what I did with Agent Sutherland at the end of that cross-examination is I went through every category of aid listed in the statute. That's 22 -- I believe 2339A, providing material support to a foreign terrorist organization. And she answered either "No" or "I don't recall" to each one of those.

Your Honor has the transcript. I think it was stated multiple times that Mr. Yener's statements are accurately displayed on there. The only thing that comes close -- and this is why I wanted to clarify this issue with the warships -- the only thing that comes close to providing a service is this discussion of warships on Page 39 of the transcript. And what the search warrant affidavit does is it inverts who's providing the information. It's this unnamed, unidentified individual in

Iraq who says:  "The warships are close."  Other than that one statement, there is nothing even close to providing material support.  For that reason, there was no separate and articulable probable cause.

I direct Your Honor to what Detective Faiola says early on:  "You can't get in trouble for what you think or what you say."  Obviously, that's not entirely true.  We have some threats counts in this case.  But being contacted by people overseas does not make out probable cause that you have provided material support to a terrorist organization.  The only thing that comes close is this issue from the warships.  And I think the transcripts from it disputes what the Government asserts in the search warrant affidavit.

Thank you, Your Honor.

THE COURT:  All right.  Thank you, Mr. Van Dyke.

MR. ANTON:  Judge, just briefly, I think it's important to analyze this case not only in chronological order but as a whole.  Because if you take these pieces in a vacuum, it severely distorts the totality of circumstances, and the probable cause, and the chain of events that happened in this case.

So I think it's important to start first with February 14th, where you have storage unit employee Harry Heisler entering the unit because it doesn't have a lock, in violation of corporate policy.  Of course, he sees the backpack in the

otherwise empty unit. It's very suspicious. He sees alarming writings inside, which you've seen and have been admitted into evidence. And as a concerned citizen, acting with the blessing of management, he calls the Coral Springs Police Department to report these alarming writings and drawings, and he takes pictures of what he saw. And again, those were all admitted into evidence.

Now, that's exactly what we teach citizens to do on a daily basis: "If you see something, say something." And it's very important, of course, in this case, because there were extremely concerning writings that needed to be explored, that needed to be analyzed, and that needed to be hashed out by law enforcement.

In this case, there was some cross-examination about whether or not the employee of the storage facility was allowed to search or not or if he did it on his own. We introduced into evidence his lease agreement, which I think is very important in this case. It's Paragraph 11, which clearly states the landlord's rights to inspect and repair the premises. And in detail, it states: "Landlord and landlord's agents and other representatives, including the police and fire departments, and other government authorities, shall have the right to enter into and upon the premises, or any part thereof, at all reasonable hours for the purpose of examining the same."

First and foremost, Judge, this is a perfectly okay

search by Mr. Heisler because of the lease agreement.  But in and of itself, Judge, it's very important to note that the Fourth Amendment does not apply to private citizens.  In this particular case, I think the Defense even concedes that fact when they're really only attempting to suppress any evidence after March 1st.  But there was absolutely no testimony whatsoever that there was any type of government involvement in Mr. Heisler's search of the premises initially, of the photographing or of the documenting of the items within the backpack or the notes that he took.

So those items of evidence are one hundred percent admissible not only because of the fact that the lease agreement specifically allowed for that particular search by Mr. Heisler, and as an employee of the company he was allowed to do so, but the Fourth Amendment simply doesn't allow suppression in this particular case for the actions of private citizens because the Fourth Amendment does not apply to private parties in this case.

But with that information, knowing that there were drawings and writings that were so concerning, of course Mr. Heisler calls the Coral Springs Police Department and informs them of what they found -- or what he found.  And that's important because, armed with that information, and armed with additional information that they gather from database checks, they prepare the be-on-the-lookout, or the

BOLO, on February 23rd of 2024.  And that BOLO is important because it states an attempt to locate, and it's based on the concerning writings and drawings.

And in those writings and drawings, it discusses language such as:  "War is coming.  Be prepared.  Our enemies will have guns and bombs," and drawings about schematics of bombs and pictures of automatic weapons.

That is then combined with Yener's history, his mental history and his previous interactions with an additional law enforcement agency.  And they discuss the fact that he had previously expressed an interest in wanting to hurt and kill people, just like the Parkland shooter did, kill anyone in the hospital that comes near him, and statements to the effect of: "I walk by Marjory Stoneman Douglas High School every day thinking about it, and I'm going to put this on the map again, just like Parkland."

Mr. Yener is a homeless individual with no local address and an arrest history that included threats to perform acts of violence, domestic strangulation, and assault and battery.  These are all in now the minds of law enforcement as they find him and locate him ultimately at that diner.

So on March 1st of 2024, when the Coral Springs SWAT Team happens to be eating at the diner, and they locate Mr. Yener, it is one hundred percent perfectly reasonable for them to handcuff him at that time.  They know, based on the

BOLO, that he has a violent criminal history, that he has made multiple statements to a previous law enforcement agency about actions involving violence.  And they're aware of the drawings that were found in the storage facility by the storage facility owner.  So, at that point, he is detained with handcuffs, and Detective Faiola is called pursuant to the be-on-the-lookout form.

This investigatory detention is entirely reasonable and lawful, based upon the totality of facts and circumstances, because they had ample, reasonable suspicion to detain him, and that's exactly what they did in this case.

Judge, even though he was initially detained, as you point out, the fact that he was handcuffed prior to any questioning is irrelevant, because we have the detective arriving on scene, and at that point the handcuffs come off.  And I think that's where the analysis really needs to begin.  But even with the handcuffs, the fact that police handcuff a person or even draw their weapons -- which was not done in this case -- does not, as a matter of course, transform an investigatory stop into an arrest.  And that's the Eleventh Circuit case of US v. Diaz-Lizaraza, as indicated in our briefing.

And moreover, an investigatory stop is not an arrest, despite the fact a reasonable person would not believe that he was free to leave.  Defense counsel made argument that just

63

because Mr. Yener thought he wasn't free to leave that's the standard.  That is not the standard under the Eleventh Circuit jurisprudence, or anywhere, for that matter.  It is not what he believed or what the officers believed.  It's what the objectionable facts were in this particular matter.

But the questioning didn't start while he was detained sitting at the diner or being held for Detective Fabiola.  It only began after Detective Faiola arrived on scene.  And when he arrived, the handcuffs came off and the detective immediately stated:  "Listen, just so you -- you're not in trouble.  Okay?  You can't get in trouble for things like -- that you say or whatever.  But you have people concerned.  That's all.  That's why I took you out of the handcuffs. You're not under arrest.  Okay?  But I do want to speak to you about these writings, just to kind of put you -- your mind at ease."

And then, shortly thereafter, two FBI agents arrive on scene and they participate in the interview.  As you could see from the body-camera footage, this is a consensual, non-custodial interview with the Defendant.  During the interview, he admits to making the writings, and states:  "It doesn't surprise me that now that I know someone found them -- now it all makes sense why you're here.  But I understand, like, this would be the consequence.  If anyone did that, the police are going to come and ask questions."

64

And later, when asked by the police, he states:  "So if I found these things, what would you think you're up to," and he responds:  "I mean, you would think I'm plotting something."  The Defendant himself admits that anyone would think that he was plotting something based on what they found already.

The law regarding Miranda and custodial interrogations was outlined in our brief on Page 4 of Docket Entry 68, which was our response to the Defense Motion to Suppress.  And it's clear, based on the testimony of what you have heard over the last two days, and from reviewing the body camera, that this was not a custodial interrogation that required Miranda.  When questioned, he was not handcuffed.  He was allowed to smoke. He was offered breakfast.  He was never threatened with arrest. And law enforcement even called his employer on his behalf when he expressed concern about being late to work or cooperating further with law enforcement.  He was in a neutral location. He was outside a diner.  He was not locked in any type of interrogation room at a police station.  And the tone of the conversation was at all times normal and calm.

Quite honestly, Judge, having reviewed the body cam, and having done this for many years, I can't point to a more calm and relaxed environment than the one I've seen here. There were jokes going back and forth.  There was small talk. Everybody seemed relaxed and calm.  There wasn't any type of

coercion or threat applied to Mr. Yener.  He was cooperative at all times and told from the outset that he was not under arrest.

As I stated earlier, the inquiry that Your Honor must ultimately determine is whether or not -- the ultimate inquiry, of course, is:  Is there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest?  The inquiry is an objective one, and the actual subjective beliefs of the suspect and the officer are irrelevant.

So, Judge, it is for you to decide, based on the totality of the circumstances, whether or not objectively there was formal arrest or restraint on freedom of movement to the degree associated with a formal arrest.  And in this particular case, it simply was not there.  And as such, no Miranda was required, as the Defendant was not in custody.

And after that questioning, we now transform and move over to the search of the storage unit and the voluntariness of the consent to search.  And as part of that determination, where, again, we have -- Yener is allowed to smoke a cigarette during the interaction.  He is having a non-confrontational discussion with the detectives and the agents, and he agrees to go to the storage unit voluntarily with the police, stating: "If you-all explain to him, so he don't can my ass, I'm good."

THE COURT:  But the actual search of the unit occurred

before Mr. Yener was presented with the form, correct?

MR. ANTON:  Well, it looks like from the video that the door was open, but that they weren't inside actually searching the unit.  But even prior to that -- prior to getting into the car and leaving the diner area, Mr. Yener had consented to the search, saying:  "Yeah, I'm good with the search, as along as you take care of" -- "and I'm good with going there, as" --

THE COURT:  I think he said he was good with going there, not the actual search of the unit, going in and having the officers, or the detectives, or the special agents go through the actual unit.  That conversation took place when they were actually at the storage facility.  No?

MR. ANTON:  The conversation -- or the signing of the paperwork occurred at the storage unit, yes.  But the discussion about:  "Why don't we go over there and search the unit" occurred before.  And that's what led to him getting into the police car and being brought over there.  So he had already had a hundred percent knowledge of exactly what was going to go on, because otherwise they wouldn't have left the diner to go to the storage unit.

The detectives and the agents had said to him:  "We'd like to go search your unit," and that's when they had the discussion about:  "Well, as long as I'm not going to get fired, I'm okay.  Let's go."  So that, in and of itself, is an

admission that he's giving consent to search the unit prior to even getting in the car. Otherwise, he would have said: "No, I'm not going with you. I'm not going to go to the storage unit and you can't search." But he said: "I'm good," and that's why they drove him over to the storage facility.

Once they were there in that hallway, as you could see from the video, they present him with the actual Consent to Search form to formalize and actually document in writing his previously indicated verbal consent. There is no indication that there is any kind of consent or coercion with the signing of that form. As I mentioned, he was offered breakfast, which he refused. They discussed whether or not it was too hot in the vehicle and the conditions of the car. He wasn't handcuffed, and he's standing in the shade at some point prior to everybody arriving.

There's nothing coercive of that particular environment that would lead the Court to suppress the Consent to Search form based on any kind of coerciveness or any threats. It just simply wasn't there. And when the Defendant is presented with the actual form to memorialize and document his previously issued consent, he voluntarily signs the form, which authorizes them to make a thorough search of the premises and to confiscate any contraband and/or evidence or any object that they suspect of being contraband and/or evidence found within said premises. And he states that the authorization is

given voluntarily.

And you can see the casualness and the calm continues in that hallway as the Consent to Search form is being signed. He voluntarily and knowingly consented to this search without coercion to placate concerns regarding the writings inside. He was reassured that law enforcement would contact his boss about being late to the shift, and he was offered food. And again, not in handcuffs.

But it's not just the Consent to Search form. It's not just the writings. It's the totality, again, that now, even if Your Honor finds that the Consent to Search form is invalid, there was ample probable cause for the agents to conduct a warrantless search of the premises irregardless of the Consent to Search form.

It's important to note, Judge, that during the questioning he admitted -- the Defendant, that is, admitted to contact with ISIS on Facebook on his phone. That he had wanted originally to go overseas to train to fight, to come back to the United States. And admitted to contacts on the phone with Hezbollah, ISIS, Al-Nusra Front, and -- among others.

And at this point, regardless of the Consent to Search form, agents had probable cause to seize his phones, due to the potential evidence of a crime located therein, as Yener himself stated that the phones were used to communicate with known terrorist organizations for discussions about weapons,

69

explosives, recruitment efforts, experience with explosive chemicals, and the commission of terrorist attacks.  And as such, law enforcement is entitled to a warrantless search of the phone at that point, and there's ample probable cause established to believe that the evidence would be also removed or destroyed before a warrant could be obtained.

So here, Judge, we have Yener who knows exactly why he's being questioned.  He had been questioned now for a little over an hour.  And the severity of what he had written and the attention he had garnered, even stating that he didn't want to draw the attention of the feds, and for some reason maintained an unlocked storage unit, releasing the phones back to Yener at that time with full knowledge of what had been discussed with law enforcement, with the knowledge of the incriminating nature of the items within the phone, and what had been discussed within the interview, all would have been guaranteed that the phones would have been wiped, or destroyed, or tampered with in some way to delete incriminating evidence, from an individual who is transient, homeless, with a violent prior arrest history, with the writings and thoughts, and who had maintained these items in an unlocked storage unit.

It's no different, Your Honor, than if agents had been investigating a drug infraction or a drug crime, and observed a kilo of cocaine sitting in a residence, and were discussing the ins and outs of drug-trafficking with a potential defendant.

And then decided:  "Okay.  Well, let's just leave."  Judge, at that point, agents would have of course had to have seized the kilo of cocaine that was sitting in the residence --

THE COURT:  But that's different.  That's contraband.  Right?  That's contraband, as opposed to the phone -- the two phones that were retrieved, correct?  There is a distinction.

MR. ANTON:  There is a distinction, but it is strikingly similar in that the phones that are sitting there are evidence that the Defendant has already admitted he's used to commit these particular offenses and that he has admitted he has been using to contact foreign terrorist organizations.

That, combined with the drawings, what's already been found, his history and his statements, and the facts that he has no home, that they wouldn't necessarily be able to find him again, and that these phones are easily discarded, wiped, or deleted, clearly lend credence to the belief that if these items were left with Mr. Yener, with the knowledge and the totality of what had occurred to this point, that they would have been gone forever.

So, Judge, it's not just the consent to search.  But as a fallback, this certainly is a warrantless search based on -- warrantless seizure based on probable cause because at the point that they were seized they weren't searched until after yet another prophylactic layer was sought, and that was the search warrant from Magistrate Valle.

THE COURT: But is that a distinction in the case law, the fact that the two phones were seized and inventoried but not searched? In other words, the contents were not viewed by law enforcement, but the two phones were inventoried.

MR. ANTON: Inventoried only that they were seized with --

THE COURT: Right. They were seized.

MR. ANTON: Yes.

THE COURT: So is there a distinction in the law where a phone is inventoried, but not -- the contents are not searched?

MR. ANTON: Well, yes, in that the distinction is the law states that if the police seize an item based solely on probable cause, whether it be without consent to search or without a search warrant, that they must seek a warrant promptly. And that's United States v. Mitchell at 565 F.3d 1347. That's the Eleventh Circuit from 2009.

So the distinction is if the police are going to make a warrantless seizure of something, they then have to get a search warrant in a reasonable amount of time. Defense hasn't made a particular argument in terms of timeliness of the warrant. But here, we only have a four-day difference between the seizure, which occurred on essentially a Friday, and the warrant being sought immediately thereafter over the weekend on a Monday. So we have four actual days, but we have two of

those days being the weekend.

And there is ample case law -- and I would point to even United States v. Laist at 702 F.3d 608, which is the Eleventh Circuit out of 2012. And that was a 25-day delay between the revocation of a consent to search and the issuance of a search warrant, and that was held to be reasonable. But here, in this case, we only have a four-day seizure delay and no search intervening. So based on that, Judge, the police did everything they were supposed to do in this particular case.

The Defense then moves on to say: "Well, despite the consent to search, despite the oral consent to search, despite the probable cause for the search of this storage unit and for the phones." Well, Judge, we have a search warrant. And then they're also claiming the search warrant's invalid as well. And Judge, there is ample probable cause for the magistrate to have made her determination that there was probable cause to not only search the unit but to seize and search the phones as well.

And as Your Honor is aware, the law is that they're -- magistrate determinations are entitled to great deference. But the Judge wasn't just looking at this in a vacuum, and as the affidavit stated, and as we've heard and seen through the body cam and the evidence through the testimony, there's plenty of probable cause for the magistrate to have made the determination that she made.

We have statements that Yener made regarding his interactions with members of a foreign terrorist organization, and their efforts to recruit him into committing terrorist attacks within the United States and overseas; his admission regarding his experience mixing chemicals to create volatile explosive reactions; how he would assist the foreign terrorist organizations if they asked him to mix chemicals, due to his expertise in working with explosives.

We have handwritten letters found within his storage unit that contain messages, such as preparing for combat, a successful war, "Action is key to defeating our enemies and their allies. A day for battle is coming this spring. Be prepared, brothers," and "self-sacrifice"; how foreign terrorist organizations asked him about whether the United States had positioned warships in particular places that could strike adversarial positions in Iraq; and Yener's confirmation that he provided such information; how the FTOs asked him to travel overseas to join their efforts, and encouraged him to commit acts within the United States; Yener's admission that he was waiting for an opportunity to facilitate an attack with the United States; and we have an ISIS flag as a Facebook profile associated with him.

Judge, it's not just one particular item in a vacuum that leads credence to the fact that the searches were valid, that warrants weren't required, or that there wasn't probable

cause.  It's the totality of circumstances in this case, and the totality is overwhelming.

Judge, in sum, we have a voluntary, non-custodial statement that did not require Miranda that then led to a valid Consent to Search signed by Yener, authorizing the search of the unit and the phones and the seizure of all potential evidence therein.  And even if the written and signed Consent to Search is invalid for some reason, Your Honor, agents had ample probable cause to conduct a warrantless search of the unit and seize items within, including the phones, based on probable cause supplied not only by the storage unit worker, who first alerted police, but by Yener's own statement himself.

And thereafter, even armed with a signed written Consent to Search form, agents still sought and received a valid search warrant from the federal magistrate, authorizing the search and seizure.

So as such, Judge, we'd ask that you deny the Motion to Suppress Statements and Evidence and allow their admission into evidence at trial.

THE COURT:  Thank you, Mr. Anton.

MR. ANTON:  Thank you, Judge.

THE COURT:  Mr. Van Dyke?

MR. VAN DYKE:  Just briefly, Your Honor.  Thank you.

So just to briefly streamline this -- and I do apologize.  I should have stated it in my initial -- we are --

the notion that Mr. Heisler was acting as a government agent on February 14th --

THE COURT:  You're not making that argument.

MR. VAN DYKE:  -- we're abandoning that argument, Your Honor.  But that is why I think it's so important -- Special Agent Sutherland's answers on cross-examination regarding whether the state of affairs before speaking to Mr. Yener on March 1st made out probable cause, and why the Government focused so much of its argument on whether the situation prior to the statements on March 1st made out probable cause. Because the drawings alone are not sufficient to make out probable cause.  Mr. Yener's criminal history, which was also discussed, not part of the record at this hearing.

I want to also just jump -- because AUSA Anton stated that the analysis should begin the moment the handcuffs come off.  And I think that's a little bit telling because it's before the handcuffs come off that individuals -- that Mr. Yener is told:  "You are not free to leave.  We will get you out of here as fast as we can, but as of now you are not free to leave."

Now, there was some discussion as to the case law -- could I have the ELMO -- oh.

This is the Government's response to the Motion to Suppress, Page 5:  "Courts normally apply a two-pronged test to determine whether a suspect is in custody and entitled to

Miranda. One: What were the circumstances surround the integration; two, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave?" Mr. Yener was told: "You are not free to leave" at eight minutes and 18 seconds of Government Exhibit 3A.

Mr. Yener was touched. Language was used indicating that compliance could be compelled, because the language used was exactly -- it's the silver bullet in these Miranda cases -- "You are not free to leave until we say that you are."

I also just want to focus on this issue of the drawing -- or actually, if I could backtrack just a moment, there was some discussion as to whether Mr. Yener provided consent to search the storage unit before they arrived to the storage unit. And Your Honor stated the only consent that was provided was consent to go. And Your Honor is exactly correct. "That's my point. I don't know if it's not serious until I know it's not serious. So if we all go together, you can explain -- if y'all explain to him so he don't can my behind, I'm good." That is not consent to search the storage unit that was given.

I apologize, Your Honor. That's Government Exhibit 4 at Page 73.

There were also -- there was some statements made about what Mr. Yener said about his conversations with the -- these unnamed, unidentified individuals that we're assuming, I

guess, are members of foreign terrorist organizations. I heard that weapons were discussed, explosives were discussed, chemicals were discussed, explosive attacks were discussed, and the mixing of explosives were discussed. The transcript has been entered. I do not think there are any discussions of, like, ongoing terrorist attacks with anyone overseas; about the receipt or distribution of any weapons, or any explosives, or the missing of any chemicals. That simply is not there. We went over the pertinent pages of the transcript with Special Agent Sutherland, and that level of specificity is just completely absent. It is not illegal, it does not make out reasonable suspicion, and it does not make out probable cause to be contacted by somebody overseas.

Now, if you help them with a terrorist attack, that certainly is a crime. But merely being contacted, which is the only thing we have evidence of from the conversation on March 1st, does not make out probable cause.

Just one final point, Your Honor, very briefly. There was this discussion again of, you know, the drawings. And I asked Special Agent Sutherland if in her opinion it meant that he had some kind of specialized knowledge. She said: "Yes."

I'd like to direct Your Honor to -- this is in evidence as Government Exhibit 6. It's Page 14, Footnote 1. It's the only footnote in here. "According to an FBI special agent bomb tech who assisted with the search, these were not

schematics of actual explosive devices and appeared, in some instances, to be consistent with doodling." Those are the words of the FBI in submitting the search warrant affidavit, Your Honor.

So I think we're actually in agreement on what the law requires. As to the issue of Miranda -- that's Page 5 of Docket Entry 68 -- the circumstances surrounding the interrogation, from the fact that hands were placed on him, to the fact that he was placed in handcuffs, to the fact that he did invoke his right to remain silent, and, most importantly, eight minutes and 18 seconds, "Mr. Yener" -- it's not stated like this but -- "You are not free to leave until we say that you are," clearly indicate that he was in custody. He was not able to terminate the conversation and leave.

I do not think any consent to search the storage unit was provided until the Consent to Search form was handed to him. This is after he had been threatened with future legal action. This is as he's surrounded with six members of law enforcement and while the unit is open and being searched, as Your Honor also noted.

With that, we ask that the motion be granted. Thank you, Your Honor.

THE COURT: All right.

Thank you, Mr. Van Dyke.

And I thank you for the thorough presentation. I

believe that it would be appropriate for the Court to issue a written decision on the Motion to Suppress.

Are there any other matters that we need to address in this case?

MR. ALEXANDER:  No, Your Honor.

MR. VAN DYKE:  Not for the Defense.  Thank you, Your Honor.

THE COURT:  All right.

Then I thank you for the presentation, and the Court will issue an order in short order.

MR. ALEXANDER:  Thank you, Judge.

THE COURT:  Have a nice afternoon.

MR. VAN DYKE:  You as well, Your Honor.

(Proceedings concluded at 2:56 p.m.)

80

UNITED STATES OF AMERICA    )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at, and reported in machine shorthand, the proceedings had the 9th day of February, 2026, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 80.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 1st day of April, 2026.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov