**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 24-cr-20523-BLOOM/Elfenbein**

UNITED STATES OF AMERICA,

     Plaintiff,

v.

HARUN ABDUL-HAMID YENER,

     Defendant.

_____/

## <u>OMNIBUS ORDER</u>

**THIS CAUSE** is before the Court upon Defendant's Motion to Compel, ECF No. [109],

Motion *In Limine* RE Recorded Statements ("Motion *in Limine*"), ECF No. [113], and Motion for

Reconsideration RE: Curtain, ECF No. [122]. The Government filed Responses in Opposition,

ECF Nos. [112], [118], [124]. Defendant filed Replies in Support, ECF Nos. [117], [121], [125].

The Court has reviewed the Motion, the supporting and opposing submissions, the record, and is

otherwise fully advised. For the reasons that follow, Defendant's Motion to Compel, ECF No.

[109], is denied, Defendant's Motion *In Limine*, ECF No. [113], is granted in part and denied in

part, and Defendant's Motion for Reconsideration, ECF No. [124], is denied.

### I.    BACKGROUND

On August 27, 2025, Defendant was charged by Superseding Indictment with Attempted

Use of a Weapon of Mass Destruction, in violation of 18 U.S.C. § 2332(a) (Count 1), Attempted

Use of Explosive, in violation of 18 U.S.C. § 844(i) (Count 2); Threatening to Assault and Murder

a Federal Law Enforcement Officer, in violation of 18 U.S.C. § 115(a)(l)(B) (Counts 3-5) and

Possession of Obscene Visual Representations of the Sexual Abuse of Children, in violation of 18

U.S.C. § 1466A(b) (Count 6). ECF No. [46] at 4.

Early in the case, the Government represented that the case involved classified materials and will involve filings pursuant to the Classified Information Procedures Act, 18 U.S.C. App. III, ("CIPA") and requested appointment of a Classified Information Security Officer ("CISO). ECF NO. [19]. The Court thereafter granted the motion. ECF No. [26] (citing Classified Information Procedures Act, Pub. L. 96-456 § 9, 94 Stat. 2025 (1980)). The Court issued further unopposed protective orders. *See* ECF Nos. [32]; [52]; [57], and, on March 2, 2026, granted the Government's motion to allow a screen (or other measure) to be used to block the view of the Undercover Employees ("UCEs") and Confidential Human Source ("CHS") from the public at trial. ECF No. [93].

Defendant now seeks reconsideration of the Order permitting use of a screen at trial to block the view of the UCEs and CHS from the gallery. Defendant also seeks, pursuant to Federal Rule of Criminal Procedure 16, the Government's entire file regarding the CHS and the identities of the UCEs and CHS used by the Federal Bureau of Investigation ("FBI") in this case. ECF No. [109]. Defendant further seeks to exclude certain evidence of recorded statements, pursuant to Federal Rules of Evidence 401, 402, 403, 404, and 803, and the Fifth and Sixth Amendments. ECF No. [113]. The Government opposes all requested relief.

## II.    LEGAL STANDARD

### A.  Motion to Compel

Rule 16 of the Federal Rules of Criminal Procedure "is the primary rule governing pretrial discovery in criminal cases, and it 'spells out the materials the prosecution must produce on the defendant's request.'" *United States v. Russell*, Case No. 22-20348-CR, 2022 WL 17736195, at *1 (S.D. Fla. Dec. 17, 2022) (quoting *United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003)). In addition to the discovery obligations embodied by Rule 16, a criminal defendant's due process rights obligate the prosecution to disclose information that is favorable to the defendant and that

is material either to guilt or to punishment. *Brady v. Maryland*, 83 S. Ct. 1194 (1963).

Favorable evidence for *Brady* purposes includes both exculpatory and impeachment evidence. *See Giglio v. United States*, 405 U.S. 150 (1972); *Jordan*, 316 F.3d at 1253. But mere "favorableness" to the defendant is not enough to qualify for Brady protections – the information must also be material. Evidence "is material as long as there is a strong indication that it will 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (internal citation omitted). In *Giglio*, the Supreme Court extended *Brady* to disclosure of impeachment material. *United States v. Singleton*, CASE NO. 22-14048-CR, 2023 WL 2164588, at *3 (S.D. Fla. Feb. 13, 2023); *see Jordan*, 316 F.3d at 1253. Under *Giglio*, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" justifies a new trial. Giglio, 405 U.S. at 153-54 (internal citation omitted).

The difference between *Brady* material and *Giglio* material is that *Brady* information is exculpatory, meaning it "relates to evidence which directly tends to lessen a defendant's guilt," while *Giglio* material is impeaching, meaning that it relates to "witness credibility type evidence of a collateral nature...indirectly making it less likely that the defendant is guilty." *United States v. Hopkins*, Cr. No. S–05–0538 EJG, 2008 WL 4453583, at *2 (E.D. Cal. Oct. 3, 2008) (emphasis omitted). The purpose of *Giglio* and its progeny is "to ensure that the jury knows the facts that might motivate a witness in giving testimony[.]" *Brown v. Wainwright*, 785 F.2d 1457, 1465 (11th Cir. 1986) (quoting *Smith v. Kemp*, 715 F.2d 1459, 1467 (11th Cir. 1983)).

### B. Motion *in Limine*

A party can file a motion *in limine* to exclude anticipated prejudicial evidence from future proceedings. *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). "In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds." *United States. v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010). The movant has the burden of proving that the evidence is inadmissible. *Id.* "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *In re Seroquel Prods. Liab. Litig.*, Nos. 6:06-md-1769, 6:07-cv-15733, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009). Likewise, "[i]n light of the preliminary or preemptive nature of motions *in limine*, 'any party may seek reconsideration at trial in light of the evidence actually presented and shall make contemporaneous objections when evidence is elicited.'" *Holder v. Anderson*, No. 3:16-cv-1307, 2018 WL 4956757, at *1 (M.D. Fla. May 30, 2018) (quoting *Miller ex rel. Miller v. Ford Motor Co.*, No. 2:01-cv-545FTM-29DNF, 2004 WL 4054843, at *1 (M.D. Fla. July 22, 2004)); *see In re Seroquel*, 2009 WL 260989, at *1 ("The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine*.") (citing *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989)).

"In general, a district court may deny a motion *in limine* when it 'lacks the necessary specificity with respect to the evidence to be excluded.'" *Vaughn v. Carnival Corp.*, 571 F. Supp. 3d 1318, 1325 (S.D. Fla. 2021) (quoting *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, No. CIV. A. 99-D-880-E, 2001 WL 617521, at *1 (M.D. Ala. Feb. 20, 2001)). "Motions *in limine* should be limited to specific pieces of evidence and not serve as reinforcement regarding the various rules governing trial." *Powers v. Target Corp.*, No. 19-cv-60922, 2020 WL 1986968, at

4

*7 (S.D. Fla. Apr. 27, 2020) (quoting *Holder v. Anderson*, No. 3:16-cv-1307, 2018 WL 4956757, at *1 (M.D. Fla. May 30, 2018)).

### C. Motion for Reconsideration

"Although the Federal Rules of Criminal Procedure do not specifically authorize motions for reconsideration, both the [United States] Supreme Court and [the Court of Appeals for the Eleventh Circuit] have permitted parties to file such motions in criminal cases." *Serrano v. United States*, 411 F. App'x 253, 254-55 (11th Cir. 2011) (citation omitted); *United States v. Nunez*, No. 2:17-CR-87-FtM-38MRM, 2020 WL 5569522, at *1 (M.D. Fla. Sept. 17, 2020). In ruling on a motion for reconsideration in a criminal case, federal district courts apply civil standards and exercise substantial discretion. *See United States v. Sabooni*, No. 09-20298-CR, 2014 WL 4385446, at *1 (S.D. Fla. Sept. 4, 2014) (citing *United States v. Pugh*, 426 F. App'x 876, 876 (11th Cir. 2011)).

> Federal Rules of Civil Procedure 59 and 60 govern motions for reconsideration. Rule 59(e) allows a court to amend or alter its judgment for 28 days. Fed. R. Civ. P. 59(e). "The only grounds for granting a Rule 59 motion are newly discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quotations and citations omitted). Likewise, Rule 60 allows a court to relieve a party from an order for select reasons like "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b). Under this framework, courts have interpreted three grounds for reconsidering an order: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." *Lamar Advertising of Mobile, Inc. v. City of Lakeland, Fla.*, 189 F.R.D. 480, 489 (M.D. Fla. 1999). These grounds show that motions for reconsideration cannot simply ask a court to reexamine an unfavorable ruling. *See Jacobs v. Tempur-Pedic Int'l., Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010). "The burden is upon the movant to establish the extraordinary circumstances supporting reconsideration." *Mannings v. Sch. Bd. of Hillsboro Ctny., Fla.*, 149 F.R.D. 235, 235 (M.D. Fla. 1993).

*Nunez*, 2020 WL 5569522, at *1; *see also Smith v. Ocwen Fin.*, 488 F. App'x 426, 428 (11th Cir. 2012) ("A motion for reconsideration cannot be used to relitigate old matters, raise arguments, or present evidence that could have been raised prior to the entry of judgment" (citing *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007))).

5

Indeed, reconsideration is an "extraordinary remedy" that should be "employed sparingly." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1370 (S.D. Fla. 2002). As such, to warrant reconsideration, the movant "must demonstrate why the court should reconsider its prior decision and set forth facts and law of a strongly convincing nature to induce the court to reverse its prior decision. A motion for reconsideration should raise new issues, not merely address issues litigated previously." *Instituto de Prevision Militar v. Lehman Bros.*, 485 F. Supp. 2d 1340, 1343 (S.D. Fla. 2007) (citation omitted).

## III.    DISCUSSION

### A.    Motion to Compel

Defendant moves to compel the Government's entire file regarding the CHS and the identities of the UCEs and CHS used by the Federal Bureau of Investigation ("FBI") in this case. Defendant agrees to treat the information as sensitive and utilize the information consistent with the Protective Order Regarding Classified Information, ECF No. [52]. Defendant argues that whether to compel the disclosure of a confidential informant's identity requires the Court to balance the "public interest in protecting the flow of information against the individual's right to prepare his defense." *Id*. at 6 (quoting *Roviaro v. United States*, 353 U.S. 53, 77 (1957)). Defendant points out the Eleventh Circuit has set forth a three-factor test to guide this inquiry, which includes "(1) the extent of the informant's participation in the criminal activity; (2) the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant; (3) the government's interest in non-disclosure." *Id*. at 6 (quoting *United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991)). Defendant contends each factor weighs in favor of disclosure. First, Defendant argues the extent of undercover involvement in this case is complete and total as the UCEs and CHS were not mere tipsters, but the only other active participants. Second, Defendant intends to present the defense of entrapment and avers that the

ability to interview, investigate, and call as witnesses the UCEs and CHS is critical to that defense. Finally, Defendant argues the Government's interest in non-disclosure is nonexistent, given the protective orders already in place in this case.

The Government responds that this Court has already twice ruled the items Defendant seeks are not discoverable, and the Motion should be denied. ECF No. [112] at 1. Specifically, the Government points out this Court's November 14, 2025 Protective Order states "[i]n light of the Giglio information that will be produced to defense counsel prior to trial, disclosures of the true names and identifying information, to include places of birth, dates of birth, addresses, social security numbers, to defense counsel is not required." ECF No. [57] at 3. The Government also relies on the Court's March 2, 2026, in which the Court granted the Government's motion to allow the UCEs and CHS to testify at trial using the undercover pseudonyms without publicly disclosing their true identities. ECF No. [93].

The Government represents that in balancing the highly sensitive and classified information at stake with its discovery obligations, it initially provided modulated, pixelated versions of the recordings in which the identities of the UCEs and CHS were redacted. ECF No. [112] at 5. On March 3, 2026, considering the Court's prior order, ECF No. [93], the FBI declassified an unmodulated and unpixellated version of the recordings in which the identities of the UCEs and CHS remain redacted. *Id*. at 6. The Government asserts that declassifying the unmodulated, unpixellated audio and video recordings does not mean the identities of the UCEs and CHS, as well as the information within the CHS file, are no longer classified. *Id*. at 6-7. Moreover, the Defendant should not have access to the highly sensitive and classified information concerning the identities of the UCEs and CHS because "[a]ny disclosure of this highly classified information risks serious damage to the national security of the United States, interference with

crucial on-going national security investigations, and places the safety of the witnesses, including their families, at risk." *Id*. at 4.

The Government cites *United States v. Chaoqun*, No. 18 CR 611, 2022 WL 2543846, at *1 (N.D. Ill. July 7, 2022), in which that court conducted the *Roviaro* analysis and found that the government's need to protect national security and maintain the confidentiality of information outweighed the limited helpfulness of the information to the defense's theory of the case. 2022 WL 2543846 at *5. In *Chaoqun*, defendant sought an order directing that the UCEs personal identifying information be disclosed to defense counsel only. *Id*. at *1. There, defendant argued the information was relevant to prove that he was coerced into participating in an intelligence operation. *Id*. at *4. The court determined that defense counsel's cross-examination of the UCE as to what he said or did to coerce defendant was not only unimpeded by the government's request for a protective order, but also facilitated by the government's video recordings, which would contain the relevant information of what the UCE said, did, or asked during his meetings with defendant and defendant's reaction to the same. *Id*.

Defendant is correct that in deciding whether to compel the disclosure of a confidential informant's identity, the Court must balance the "public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro*, 353 U.S. at 62. It is also unrebutted that the extent of the UCEs and CHS's involvement in the criminal activity in this case is essentially complete, as "neither the fake militia nor the creation of the explosive device involved any civilian involvement." ECF No. [109] at 8.

However, the Court is unpersuaded by Defendant's argument that he cannot present the defense of entrapment without the Government's entire file regarding the CHS and the identities of the UCEs and CHS. "Entrapment is an affirmative defense that requires (1) government

inducement of the crime, and (2) lack of predisposition on the part of the defendant to commit the crime before the inducement." *United States v. Rutgerson*, 822 F.3d 1223, 1234 (11th Cir. 2016). Defendant's only argument for the relevance of the requested information is that "not every meeting, and certainly not every interaction, was captured on audio/video equipment." ECF No. [109] at 9. Defendant does not explain why the requested information would aid a jury in assessing either element. On the contrary, neither the identities of the UCEs and CHS nor the Government's file regarding the CHS, appears relevant to whether the Government induced the crime or whether Defendant was ready and willing to engage in the charged crime absent any contact with the Government's officers or agents. Moreover, the Government points out that disclosure of the requested information risks serious damage to the national security of the United States and would interfere in on-going national security investigations. As such, disclosure of the identities carries risk. *See Chaoqun,* 2022 WL 2543846, at *3 ("The use of the undercover employee's personal information as a basis for conducting a wider search would increase the likelihood of exposing, however inadvertently, the identity of the undercover agent and his/her family."). Accordingly, the Court finds that the Government's need to protect national security and maintain the confidentiality of this information outweighs the limited helpfulness of such information to Defendant's theory of the case. In the alternative, Defendant requests the opportunity to interview the UCEs and CHS before trial. ECF No. [117] at 7. Defendant cites to *United States v. Saa*, 859 F.2d 1067, 1074 (2d Cir. 1988), and argues the Government may not place a defendant at a tactical disadvantage by reserving to itself alone the ability to interview a material witness. However, in *Saa*, the witness the defendant sought to interview was not one the Government was calling at trial. 859 F.2d at 1074. Here, Defendant does not describe a single

witness it seeks to interview that the Government is not calling as a witness at trial. As such, Defendant's request for pre-trial interviews is denied. The Motion to Compel is denied.

### B. Motion *in Limine*

Defendant seeks to exclude evidence of recorded statements pursuant to Federal Rules of Evidence 401, 402, 403, 404, and 803, and the Fifth and Sixth Amendments. ECF No. [113] at 1. Defendant argues some of the recorded conversations include subjects that are not relevant in this case. Defendant further argues the conversations cover subjects that are highly divisive and use inflammatory and offensive language. Defendant identifies categories of conversations he seeks to exclude.

   i.     Political discussions:  Defendant seeks to exclude all political discussions not relevant to the alleged offense conduct, such as "opinions concerning the two candidates in the 2024 presidential election, the October 7, 2023, attacks on Israel and its subsequent response thereto, the Russia/Ukraine conflict, and unrelated acts of political violence in the United States.

   ii.    Contacts with FTOs:  Defendant seeks to exclude discussions of Defendant's purported contacts with foreign terrorist organizations ("FTOs") but acknowledges that some statements concerning past contacts may be relevant, but argues many of the statements are vague, rambling, and confusing.

   iii.   Prior arrests, acts, Baker Act:  Defendant seeks to exclude statements regarding prior arrests, uncharged acts of violence, and allegedly threatening statements he made at his place of employment, which resulted in him being "Baker Acted". Specifically, Defendant seeks to exclude all references to letters he wrote while in Oklahoma for unrelated charges. Defendant argues these letters are irrelevant, unduly prejudicial, and violative of Rule 404(b), as they are evidence of another

10

crime, wrong, or bad act with no purpose other to prove Defendant acted in accordance with his bad character. *Id*. at 9-10. Similarly, Defendant seeks to exclude a recorded call in which he tells the CHS about a prior incident in which Defendant claims to have pointed a gun at a man in a dispute over a missing remote control. Defendant contends this statement has no relevance to the instant charges. *Id*. at 10. Defendant also seeks to exclude references to a July 2, 2023, incident at Defendant's workplace in which he allegedly made statements threatening to "put this area back on the map just like Parkland." *Id*. Ultimately, the police were called in response, and Defendant was "Baker Acted". *Id*. Defendant argues such references are wholly unrelated to the alleged offenses and highly prejudicial. *Id*. Defendant further seeks to exclude recorded statements concerning a baseball bat covered in writings such as "die or fight," "Don't be scared to kill," "kill or be killed," and "take their souls." *Id*. at 11. Defendant contends such statements have no relevance to the instant matter, and inclusion of such statements would permit impermissible propensity evidence and serve to elicit an emotional reaction from the jury. *Id*.

iv. Religious background:   Defendant seeks to exclude discussions concerning Defendant's religious background. *Id*. at 12. Specifically, Defendant seeks to exclude statements he made to officers that he was raised Sunni, no longer attends mosque, and that his stepfather died in Tunisia fighting in the Arab Spring. *Id*. Defendant contends references to his religious background are not probative as the Government does not claim Defendant's actions were religiously motivated, but rather in support of a domestic "militia" whose aim was to "cause political turmoil".

*Id*. at 13.

v.      Firearms:  Defendant seeks to exclude statements concerning Defendant's possession of, views on, and knowledge regarding firearms. *Id*. at 14. Defendant contends that statements concerning firearms have no relevance to the charged crimes, but invites the inference that Defendant is "a bad man with criminal intent and therefore must be guilty of the specific offenses charges in the superseding indictment." *Id*. at 16.

vi.      N.Y. Attack:  Defendant seeks to exclude discussions of targets and plans for attacks following the alleged attempt to bomb the New York Stock Exchange. *Id*. Defendant contends such statements constitute improper 404(b) evidence and must be excluded. *Id*.

vii.      Racist Remarks:  Defendant seeks to exclude any recorded statements that racist, anti-Semitic, homophobic, or derogatory in nature. *Id*. Defendant contends there is no evidence that the alleged plot was motivated by racial animus, nor was it targeted as any racial, religious, or ethnic group. *Id*. at 17.  As such, Defendant argues such statements have minimal probative value, but are highly inflammatory and will result in extreme prejudice. *Id*.

The Government responds with the specific statements it intends to introduce and the basis for the statement's admissibility. *See generally* ECF No. [118]. The Court addresses those statements in turn.

### i.  Statements from Transcript, ECF No. [113-1] at 7

The Government seeks to introduce the following statement:

| SPEAKER | STATEMENT |
| --- | --- |
| Detective | I mean, they, they, they went as far to say as there was schematics of like bombs and everything. Would that be accurate to say or no? |
| Yener | [OV] No, I have no comment to any of that. |
| Detective | No? |
| Yener | I have no comment to that. |
| Detective | You have, I'm sorry I, I didn't hear you. |
| Yener | I have no comment to that. |
| Detective | Oh, you have no comment to that. |
| Yener | [UI] [shakes head no]. |
| Detective | Okay, uh, does that mean that that's, was not your intention to draw or you just don't want to talk about it? |
| Yener | It just means I have no comment to that. |

Defendant contends this statement is an invocation of his right to remain silent under the Fifth Amendment. ECF No. [113-1]. The Government argues Defendant's answer "no comment" does not amount to an unambiguous invocation of the right to remain silent as a suspect "must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer under the circumstances would understand the statement to be an assertion of the right to remain silent." ECF No. [118] at 8 (quoting *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994)). The Government argues this exchange is highly probative as it goes directly to Counts I and II, both of which involve the attempted use of an explosive. *Id*. at 9.

Defendant replies that he recognizes this Court has already found he was not in custody at the time he made the statements but maintains his objection to preserve the issue for further review. ECF No. [121] at 5. Defendant does not address the Government's argument that these statements are highly probative. The Court agrees with the Government that Defendant's "no comment" statement was not a clear and unambiguous invocation of his right to remain silent. As this was the sole basis Defendant sought exclusion, Defendant has not met his burden of proving that the statements are inadmissible on all potential grounds.

### ii.  Statements from Transcript, ECF No. [113-1] at 35-36

The Government seeks to introduce the following statements:

Case No. 24-cr-20523-BLOOM/Elfenbein

| SPEAKER | STATEMENT |
|---|---|
| Agent | What do you use to talk to everyone out there? |
| Yener | Hm? |
| Agent | Like WhatsApp? What do you use? |
| Yener | Uh, you gotta use apps nobody's really using. |
| Agent | [laughs] but like what? |
| Yener | BIGO. |
| Agent | I heard you say that. |
| Yener | Or uh, fucking, [UI] they, they, they sometimes fuck with Facebook but only to fuck with it to make a quick chat. They're not gonna like linger on it. Uh, fucking Instagram, Twitter but I got rid of those because— |
| Agent | A lot of people are using those, you just told me you gotta use apps that people aren't using. |
| Yener | Well, I mean when they're on the apps talking they're not having a full conversation, it's a quick message but if it's a private lets talk, it's gonna be messenger of BIGO like because BIGO is not a app anyone is really off the bat. |
| Agent | Yeah, I've never heard of that one personally. |
| Detective | Yeah new, new to me and I'm a, and I'm a tech guy. |
| Agent | Yeah he's, he's my IT guy. |
| Yener | Well I mean a lot of cops use it ironically, you will see cops on there. |
| Detective | Oh really? |
| Yener | Yeah. |
| Detective | I mean I've heard of like Telegram and Signal and all those. |
| Yener | I've never, I've heard of them but I don't use them, I, I don't but no I, I, I— |
| Agent | You said messenger, what messenger? |
| Yener | Facebook. |
| Agent | Like just Facebook messenger? |
| Yener | Oh Facebook messenger. |

The Government contends these statements are relevant because they show Defendant's use and familiarity with various online communication platforms. ECF No. [118] at 10. The Government argues the statements are probative because this exchange occurred approximately three months before Defendant met the CHS through Facebook messenger and quickly moved their conversation to WhatsApp. *Id*. The Government contends this exchange shows the random encounter between Defendant and the CHS was not out of the ordinary and Defendant welcomed communications from strangers on Facebook before transitioning to other platforms. *Id*.

Defendant replies that the statements are not relevant to any matter at issue in the case, nor do they tend to show that random encounters on Facebook messenger were a regular occurrence.

ECF No. [121] at 6. Defendant further argues the statements are part of larger group of statements regarding his family and religious background and the probative value is outweighed by the danger of unfair prejudice. *Id*. at 6-7.

The Court notes that the statements do not contain references to Defendant's family or his religious background. And to the extent the Government seeks to introduce the statements to show Defendant's familiarity with the platform he uses to communicate with the CHS, the statements are relevant. Accordingly, Defendant has not met his burden of proving the statements inadmissible on all possible grounds.

### iii.  Statements from Transcript, ECF No. [113-1] at 48

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---|---|
| Yener | But no, I, I had contact with them up until like 2015. |
| Detective | Them being, you're saying [redacted]? |
| Yener | Yeah. |
| Agent | [redacted] How, how did you come about them? Did they reach out to you? |
| Yener | Its easy, its easy. |
| Agent | Oh its easy? |
| Yener | They, they, they, they reached out to me. |
| Agent | For what? |
| Yener | They go on Facebook, they look for people with Middle Eastern names or Middle Eastern origin and they just start talking to you. |
| Agent | Are you still friends with them on Facebook or do you still— |
| Yener | [OV] I, they just, they don't do that, they disappear— |
| Agent | [OV] No? |
| Yener | --they come and they go [UI]. |

Defendant replies that he does not seek to exclude these statements. ECF No. [121] at 7.

### iv.  Statements from Transcript, ECF No. [113-1] at 123-126

The Government seeks to introduce the following statements:

Case No. 24-cr-20523-BLOOM/Elfenbein

| SPEAKER | STATEMENT |
|---|---|
| Yener | No. Hey I forgot I had, that's one of my favorite flags right there. |
| Detective -TF | What flag is it? |
| Officer | What flag for? |
| Agent 1 | What's it about? |
| Yener | It's a, uh, a boogaloo flag. |
| Agent 1 | A boogaloo flag? |
| Yener | Uh huh. |
| Agent 1 | Okay, that's interesting. Where'd you get it? |
| Detective - CW | What's, what's a boogaloo? |
| Yener | It's a militia. |
| Detective - CW | Militia? |

| SPEAKER | STATEMENT |
|---|---|
| Agent 1 | Were you a boogaloo? |
| Yener | I was. |
| Agent 1 | You was? When was that? |
| Yener | Oklahoma. |
| Detective - CW | Like electric boogaloo back in the day? |
| Yener | It, it, it, they go by many names. Alphabet boys. |
| Agent 1 | Back like a few years ago though? |
| Yener | Yeah |
| Agent 1 | Yeah |
| Yener | Uh, it, I got that from them. |
| Agent 1 | From the boogaloo boys? |
| Yener | Yeah. |
| Agent 1 | Are you in touch with any boogaloo boys? |
| Yener | I used to, only one now. |
| Agent 1 | Only one now but you're still in touch with him? |
| Yener | Yeah. |
| Agent 1 | When was the last time you talked to him? |
| Yener | A year ago. |
| Agent 1 | A year or so ago? |
| Detective - CW | [UI] [laughs]. |
| Yener | They're worse than [redacted], they're more secretive.[6] |
| Agent 1 | They're, they're more secretive than [redacted]? |
| Yener | They don't t-they don't— |
| Detective - TF | I've not seen a lot of their videos. |
| Yener | You gotta, they, I mean they're known because they wanna be known but like they're recruiting is different, they don't just recruit. |
| Detective - TF | How'd you get recruited by them? |
| Yener | I bumped into them. |
| Detective - TF | They're the ones that wear Hawaiian shirts right? |
| Yener | Yeah., yeah, yeah, yeah, yeah. |
| Agent 2 | Alright-- |
| Yener | [UI] |
| Agent 2 | --uh, this --- |
| Detective – CW | [SC] [singing electric boogaloo] |
| Agent 2 | --perfect example of power, is this from your friend overseas or why, why are we talking about power being used? |
| Yener | Oh, I'm just copying his rants. He would rant and I copy it just because I could. |

The Government argues that evidence at trial will show Defendant willingly joined what he believed to be an anti-government militia with the intent of serving as its bombmaker and Defendant ultimately made critical decisions on how to successfully effectuate violent acts of domestic terror. ECF No. [118] at 14. The Government further argues this exchange is relevant and highly probative because it shows Defendant's willingness to join an anti-government militia even before meeting the UCEs. *Id*. at 15. The Government contends these statements are also admissible in establishing Defendant's predisposition toward the commission of Counts I and II. *Id*. Defendant replies these statements are "purely propensity evidence". ECF No. [121] at 8. Defendant further contends the prejudicial value of the statements far exceeds their probative value. *Id*. at 9.

While the Government may not ordinarily introduce evidence of a Defendant's predisposition to engage in criminal activity, "it may do so once a defendant submits evidence which raises the possibility that he was induced to commit the crime[.]" *United States v. Walther*, 867 F.2d 1334, 1343 (11th Cir. 1989). Moreover, "[i]ntroduction of extrinsic offense evidence is a reliable method for showing the criminal predisposition necessary to rebut any allegation of entrapment." *United States v. Brannan*, 562 F.3d 1300, 1308 (11th Cir. 2009) (citing *United States v. Salisbury*, 662 F.2d 738, 741 (11th Cir. 1981). Here, statements which show the Defendant's predisposition to join an anti-government militia has probative value. This is particularly true to the extent that Defendant seeks to present an entrapment defense. As such, Defendant has not met his burden of proving that the statements are inadmissible on all potential grounds.

### v.  Statements from Transcript, ECF No. [113-1] at 161-164

The Government seeks to introduce the following statements:

17

| SPEAKER | STATEMENT |
|---|---|
| Officer | Have you been, when's the last time you've been out of the country? |
| Yener | I've never been out of the country. |
| Officer | Never been out of the country? |
| Yener | No but uh— |
| Officer | [OV] Anyone offered to, uh, get you out? |
| Yener | A lot of people have offered to get me out. |
| Officer | Okay, why don't you take them up on it? |
| Yener | Wh-what am I gonna do over there? |
| Officer | Whatever business they have you know they're asking about. |
| Yener | You-y'all don't want me over there because if I go over there, I'm gonna be honest I'm gonna fuck y'all up from over there. |
| Detective – CW | [laughs] |
| Officer | Hold on why you wanna fuck us up, what'd we do? |
| Yener | I, I mean just because there's nothing to stop me over there [laughs] what police? They ain't got no police and if they do, they're just as fucked up as the motherfuckers they don't like. |
| Detective – CW | Mhm. |
| Yener | To be honest they're no better so like and I've told them that, they're like "come over here" I'm like y'all don't want me over there [laughs] I will fuck y'all up over there. I'm just contained here because I can't do, I can't do crazy shit here, you know what I'm saying, anywhere— |
| Officer | Do you wanna do crazy shit? |
| Yener | No I don't wanna do crazy shit but I'm just saying it's the facts, you know? Over there there's no real law and order like over here, in certain countries but not most. |
| Officer | So, is that what keep, is being here is that what's keeping you from doing fucked up |

| | shit? Is that what you're saying? |
|---|---|
| Yener | Nah, I'm j-I'm just being honest— |
| Officer | [OV] Because you said if you go over there, you'll fuck us up, so— |
| Yener | Hell yeah I would be acting a fool, all sorts of acting a fool because no one can stop me like who would be there to stop me? |
| Officer | Like when you say act a fool what does that entail? |
| Yener | Whatever the hell I want it, whatever it is I feel like doing. Whatever it may be that day. Whatever its with that day. |
| Officer | So basically, what you're saying is that being over here is keeping you from doing fucked up shit. |
| Yener | Eh, its, it's not keeping me from doing fucked up shit its just— |
| Officer | I mean apparently— |
| Yener | [OV] It, it, its— |
| Officer | --you ain't doing fucked up shit in Coral Springs because they patrol so heavily. |
| Yener | Oh yeah, you can't do shit here, it's too much. |
| Officer | Parkland you can right? |
| Yener | No you can't do shit in Parkland. |
| Officer 2 | Oh there you go. |

The Government argues the statements are highly probative and relevant in proving Defendant's

intent for Count I and II. ECF No. [118] at 17. The Government contends Defendant's statements

18

show he is cognizant that domestic law enforcement presence could prevent him from "doing fucked up shit", which explains Defendant's "surreptitious behavior when he began constructing the explosive he sought to detonate outside the New York Stock Exchange and his detailed advice on how to prevent apprehension post-detonation." *Id*. Moreover, the Government contends these statements are admissible as evidence of his predisposition toward committing destructive acts within the United States. *Id*.

Defendant describes these statements as "vague and rambling" and argues the statements do not reveal intent. ECF No. [121] at 9. Defendant further argues "doing fucked up shit" can encapsulate many acts and is not specific enough to attribute to an attempt to place an explosive device at the New York Stock Exchange. *Id*. Defendant further argues these statements are not admissible as evidence of his predisposition and cites *Jacobson v. United States*, 503 U.S. 540 at 550 (1992), for the general proposition that evidence that merely indicates a generic inclination to act within a broad range is of little probative value in establishing predisposition. In *Jacobson*, a defendant ordered and received copies of a magazine which contained photographs of nude preteen and teenage boys. *Jacobson*, 503 U.S. at 543. Such conduct was not made illegal under Federal law until later. *Id*. at 551. Thus, the Supreme Court held that "[e]vidence of predisposition to do what once was lawful is not, by itself, sufficient to show predisposition to do what is now illegal, for there is a common understanding that most people obey the law even when they disapprove of it." *Id*.

Here, in contrast, Defendant's statements contemplate his willingness to do "fucked up shit" absent law enforcement presence. Such predisposition statements do not contemplate a predisposition to commit legal conduct as was recognized in *Jacobson*. The Court finds the statements may admissible given the context in which it is introduced, especially in the event

Case No. 24-cr-20523-BLOOM/Elfenbein

Defendant puts forward an entrapment defense. The Court further finds Defendant has not met his burden of demonstrating the statements are inadmissible on all potential grounds. The Government has proffered that the statements will explain the Defendant's behavior when he began constructing the explosive he sought to detonate outside the New York Stock Exchange and his detailed statements on how to prevent apprehension post-detonation.

### vi. Statements from Transcript, ECF No. [113-1] at 164-165

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---|---|
| Yener | But like and I'm not seeking the trouble I'm just stating the facts like they've even been like come over here duh, duh, duh for whatever reasons, they're personal or not. I had a guy just a couple months ago try to offer me a construction job over there because they keep blowing shit up and I was like nah I'm good. |
| Officer | A lot of work over there. |
| Yener | Yeah, I was like I don't fuck with that. |
| Officer | Listen man, you think about it shit, they'd be making you great fucking money over there and— |
| Yener | No they don't, they're poor, broke, ha-trying to fucking eat dirt and shit to survive, motherfuckers barely have water eh, the only, the only thing over there is conflict and it's just not something I'm into. It, it doesn't benefit me it just, if I'm gonna get into a conflict it has to benefit me. |
| Detective - BL | And what would benefit you? Financial? |
| Yener | Just depends, I don't care about money. |
| Detective - BL | So, how would it be beneficial to you? Like help me understand. |
| Yener | I-It would be beneficial in recognition and, and I don't care about their money, they don't, I, I just want, I would want power— |
| Detective - CW | [SC] Had to get some fresh air, it's a little warm in here. |
| Detective - BL | You, you said recognition so you wanna be known? |
| Officer | [SC] You think? |
| Yener | Power, I would want something like that I wouldn't want [UI]. |

The Government contends these statements are relevant and probative because they show Defendant is motivated by the personal benefit of power. ECF No. [118] at 18. The Government contends the trial will reveal that Defendant sought to use the militia to commit multiple bombings throughout the United States and would continue to facilitate attacks in order to "reset" the government. *Id*. The Government argues this desire for power is consistent with Defendant's behavior during the investigation in which he never sought wealth or materialistic rewards. *Id*. The

Government further argues the statements are predisposition evidence as the statements show Defendant was driven by his pursuit of power. *Id*. at 19. The Government explains that the evidence at trial will show Defendant recorded a statement to send after the bombs detonated which explained his desire for a reset of the Government and a call for public support. *Id*. The Government argues these statements about Defendant's desire for power are consistent with the steps he would later take to become the voice of the anti-government movement. *Id*. Defendant argues an interest in power does not necessarily equate to an interest in obtaining power by means of placing an explosive device. ECF No. [121] at 9.

The Court agrees with the Government that these statements explain Defendant's motivation. At this stage, Defendant has the burden of proving that the statements are inadmissible on all potential grounds. Considering the Government's representations about what the evidence at trial will show, Defendant has not met his burden.

### vii. Statements from Transcript, ECF No. [113-1] at 174-178

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---|---|
| Yener | No, yeah, no I never been over there, I've had – |
| Detective - CW | [OV] but people have offered to bring you over there— |
| Yener | [OV] All the fucking time, all the fucking time. |
| Detective - CW | --but why, why, why wouldn't you go over there or what's the reason you don't want to be over there? |
| Yener | They're, they're, they're, they're trying to get me involved with their conflicts or bullshit but that conflict or bullshit won't benefit me. |
| Detective - CW | Okay. |
| Yener | And my benefit is, if I go over there, I don't want their money, their money has no value. I don't, like I told them, I don't need American money because they'll do that thing, "Work for us, we'll give you American money" they can, they have American money but it's no value to me because I'm American. |

| | |
|---|---|
| Agent 1 | Work, work for yo-them how? What do they want you to do here? |
| Yener | Whatever. |
| Agent 1 | What is that, what's whatever? |
| Yener | Its whatever they ask but they haven't really gotten into detail they just say, uh, "if you're there you can do damage" you know what I mean like they don't really, when they talk they're not gonna be like they do on TV and straight tell what they're talking about you gotta, you gotta gotta get the jist of, know how they operate to know— |
| Agent 1 | [OV] Yeah, yeah sure. |
| Yener | --what they're saying. They're not gonna be like "yeah, we're, we're just gonna go blow this shit up you wanna join us, come on let's go get a coffee" They're gonna be like "you know there's some things going down in certain situations and areas and you know someone's gotta handle it" that type of talk. |
| Agent 1 | Yeah. |
| Yener | Yeah but— |
| Detective - CW | [OV] So, as I was walking away over there you basically said like, obviously you don't want the money but like if you, if you did go over there— |
| Yener | [OV] Power. |
| Detective - CW | --power it would be about power. |
| Yener | Its simple. Power. |
| Agent 1 | Is that what you're looking for? |
| Yener | That's the only valuable thing over there is power. |
| Detective - BL | And what kind of power are you looking for? Like do you wanna be the head of a group? What do you want? You want your own team of people? Like what, what are you looking for? |
| Yener | Just, I don't know have my own team of people, do our thing, have our control of [UI]. |
| Detective - BL | You say do your thing, what is your thing? |
| Yener | Control what we got over there. |
| Detective - CW | If, if you were over there, let's say they took you over there, what, what wo-where would you be focusing your efforts? Would you be focusing against like against the United States you think or against, uh, places over there— |
| Yener | I mean, I would-I wouldn't waste my time beefing with the U.S., it's just gonna fuck up my manpower. That's what I was telling them, all that's just fucking your manpower. You're not, they're not ready though they just keep shooting and then when they lose manpower, they need more manpower. They need to do is hold their manpower— |
| Detective - CW | [OV] Yeah. |
| Yener | --train it better and the people who do support them, government wise across the globe, |

Case No. 24-cr-20523-BLOOM/Elfenbein

| | |
|---|---|
| | they need to take the weapons they give them, store the shit, actually learn how to fucking use the shit, train with the shit because its obvious, I've told them this, its obvious when you guys shoot shit you're just shooting it, you don't know what the fuck you're doing. |
| Detective - CW | Yeah, yeah. |
| Yener | There would have to be some kind of order. |
| Detective - BL | But you said that you would fuck us up if we were over there. |
| Yener | If they came over, if they came over there to fuck with me hell yeah, in a heartbeat. I don't give a fuck what it is. |
| Detective - BL | But if you were over there you wouldn't look to [UI]. |
| Yener | [OV] I wouldn't worry about y'all, I'd build up my own forces and take over my own shit. Now if and control my own territory. |
| Detective - BL | But you wouldn't look to come over here? |
| Yener | If they came over there in some Black Hawk Down shit, hell yeah I'm gonna fuck them up, ab-absolutely. |
| Detective - BL | So my question is, would, if you had your own team over there— |
| Yener | [OV] I wouldn't focus on here. |
| Detective - BL | --would, would you, would you try to come over here— |
| Yener | [OV] No, I wouldn't worry about it, I wouldn't worry about here. |
| Detective - BL | Mostly just because you don't think it's worth it or because you don't think you'd be successful? |
| Yener | Both. |
| Detective - CW | Why wouldn't you be successful? |
| Yener | Not enough manpower, not enough training, not enough weapons, the moral is good but— |
| Agent 1 | But if you had enough of that, you would? |
| Yener | No, I wouldn't— |
| Agent 1 | [OV] Where, where's your, okay, where's your loyalty here? |
| Yener | I wouldn't, I-I wouldn't, I, I have no loyalty to either. It's not about loyalty— |
| Agent 1 | [OV] No? You don't have— |
| Yener | --it's about control. |
| Agent 1 | Oh okay. |
| Yener | They, I-I've told them this, we've gotten into arguments, this is one of the reasons they don't fuck with me too much because I keep getting into arguments with them about this. You, you have the morale to do what they're doing and they have the manpower, they're just taking advantage of it and fucking the whole thing up, they have no training, no discipline, no type of any charisma whatsoever, they're just randomly doing shit. |

Here, the Government repeats its arguments for admissibility in the context of Defendant's desire for power and control. ECF No. [118] at 21. The Government also again argues admissibility as to Defendant's predisposition. *Id*. Defendant also repeats his previous arguments about power to argue exclusion. ECF No. [121] at 9-10. Accordingly, Defendant has not at this time met his burden of proving that the statements are inadmissible on all potential grounds.

**viii.    Statements from Transcript, ECF No. [113-1] at 182-184**

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---|---|
| Agent 1 | What, what moment are you looking for? Who? What? When? |
| Yener | When, when they, whenever— |
| Detective - BL | Has there been any talks of anything about to pop off because you said its coming soon so what— |
| Yener | [OV] they, they, they, they, they— |
| Agent 1 | [OV] You wrote in your book about spring? |
| Yener | --I keep telling y'all, I keep telling y'all, they're working with, everybody's working with everybody, how do you think they get, they get in here? |
| Detective - BL | But in your quote, you said war is coming soon. |
| Agent 1 | Spring, Spring. |
| Yener | I know because how do you think they get in here? |
| Detective - BL | Okay so— |
| Agent 1 | So what does spring have to do with anything? |
| Yener | How, how do y'all think they get in here? |
| Agent 1 | Oh w-I, we are well aware that they are here. That is not our question, I need to know, I need to know what you're talking about when you s-when you bring up spring? What's happening in spring is that what you're waiting, being patient for? |
| Yener | I was talking about another situation but I-I like when it comes to like them, I'm not worried about them, I would push them out myself. |
| Agent 1 | Who are you worried about? |
| Yener | I-I-I see them as a distraction for the government. So while their governments worried about them I can do what I want. |
| Agent 1 | Oh, okay. What do you want? |
| Detective - CW | Yeah I was gonna just say man you, you, you talked about Arab Spring, you've talked about all these, you know [redacted][8] but you've also talked about the Boogaloo, which I mean are you basically just looking for something to happen so you can get your chance type thing? |
| Yener | No, no, no I've talked and I mean, everybody's just waiting man, everybody's just waiting. |
| Agent 1 | For what though? |
| Detective - CW | Are you, like what are you thinking there's gonna be like a civil war here in the United States? You think there's gonna be a global conflict? |
| Yener | [OV] It don't matter, it don't matter, it don't matter, it don't matter, it don't matter so |
| Agent 1 | What will your role be when something pops off? |
| Yener | It, when it pops off, I'll go to my people, I'll get my- |
| Agent 1 | Who, that's what I'm asking you see where we keep looping around and back to the same question? Who are your people? |
| Yener | Wha-I mean my peoples, the people who I fucks with and they fucks with me. I'm not gonna go into more detail about that but they— |
| Agent 1 | Okay, so, yeah I understand now. |
| Yener | --they've hit me up, they, you know and like I-I'm just, everybody's just waiting dude for their chance, whenever that chance may be, whatever— |
| Detective -TF | What's your chance? |
| Yener | --whatever they feel any kind of weakness pops up, they're gonna exploit |

The Government argues these statements show Defendant's readiness to engage in conflict. ECF No. [118] at 24. The Government argues the statements, when read in conjunction with Defendant's pursuit of power and control, show the Defendant was being patient for his chance to achieve what he wanted. *Id*. The Government contends the statements contribute to the recurring theme that power and control were Defendant's motivation for becoming involved in the anti-government militia and the statements are admissible as evidence of predisposition. *Id*. Defendant reiterates his previous arguments that the statements are vague, rambling, and improper predisposition evidence. ECF No. [121] at 9-10.

The Court finds that the statements are probative of the Defendant's motivation and may be admissible to rebut a proffered entrapment defense. Accordingly, Defendant has not met his burden of proving that the statements are inadmissible on all potential grounds.

### ix. Statements from Transcript, ECF No. [113-7] at 4

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---------|-----------|
| Yener | Bro I want to ask them about … as time goes on … I won't ask them this too early. I feel like it's too early. I met them too early to ask that kinda question…but…like bro as time goes on I want to ask them if I could buy a gun off them. |
| CHS | Oh ya ya, I'm sure they got you something…something. |

The Government argues at trial it will present evidence that Defendant threatened to assault and kill the federal agents that interacted with him on March 1, 2024. ECF No. [118] at 25. The Government correctly notes that to prove Count V, Threatening to Assault and Murder a Federal Law Enforcement Officer, in violation of 18 U.S.C. § 115(a)(l)(B), it must prove that Defendant's threats were "true threats" in which "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" and not merely hyperbole." *Id.* (quoting *Virginia v. Black*, 538 U.S. 343, 359-60 (2003)).

25

The Government represents that Defendant made multiple references to using a firearm to murder the federal agents and Defendant's statement about wanting a firearm shows his threats to the agents were not made in jest or hyperbole. *Id*.

Defendant replies that his statement on September 30, 2024 in which he expresses interest in purchasing a firearm is in no way related to his October 20, 2024 statement concerning his purported desire to kill federal agents. ECF No. [121] at 10. Defendant points out that the September 30, 2024 statement makes no reference to the killing of agents or what he would use the firearm for. *Id*.

The Eleventh Circuit has established that "the probative value of pre-threat conduct include the following: the proximity in time between the threat and the prior conduct, the seriousness of defendant's prior conduct, and the extent to which the pre-threat conduct has progressed towards carrying out the threat." *United States v. Barbour*, 70 F.3d 580, 587 (11th Cir. 1995). While the proximity in time between Defendant's threat and prior conduct is marginal, the Court recognizes that Defendant not only never acquired a firearm, but his conduct never progressed toward carrying out the threat to shoot the federal agents. Moreover, as Defendant points out, he never indicated in his statement what he intended to use the firearm for. The Eleventh Circuit previously rejected as admissible, evidence that a Defendant purchased over $4,000.00 worth of weapons 53 days prior to placing a phone call threatening to kill his former boss. *See United States v. Philibert*, 947 F.2d 1467, 1468 (11th Cir. 1991). Here, the nexus between the statement wishing to obtain a firearm and the threats to shoot the federal agents is even more marginal as there is no evidence Defendant ever obtained a firearm. Absent a clear connection between the acquisition of a weapon and the intent to carry out a specific threat, the Court cannot find that Defendant's statement that he would

26

at some point like to acquire a firearm probative of whether a later threat was a true threat. As such, the statement is excluded.

### x. Statement from Transcript, ECF No. [113-11] at 12-13

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---|---|
| Yener | So they're gonna be a problem. Plus, one thing we must consider as well if we're talking militia to other militia. There are militias that support him. Proud Boys, the two percenters, there's another one I forgot their name. But the Proud Boys and two percenters for sure. And they don't even go on. But the Proud Boys are the ones I'm really worried about. Cause they're known to be fucking huge. |

[. . .]

| SPEAKER | STATEMENT |
|---|---|
| Yener | See but he's gonna be a problem because there's so many, it'd be different if like, it was like dying suppolt, but he has militias behind him. There's even, he even quote on quote said that famous line: "Proud Boys stand back and stand by." You remember that? Yeah like niggas really is doing that. Like really ready to fuck shit up for him so- |
| UCE | mmhmm |
| Yener | -- I'm pretty sure if a militia or anyone gave him problems dude, he'd just be like "Kill them niggas. They're giving me a problem." And then we got to fight them niggas to get to him, which of course that's war and I'm down for anything. Like I told him, if it comes down to it, and you know we gotta shoot some shit out with whoever, we gotta use way more aggression and force than they do. |
| UCE | Mmhm |

The Government argues these statements show Defendant's intent to further the anti-government militia by acknowledging that if President Donald Trump were to assume the presidency, President Trump would have no hesitation ordering death against militias who opposed him. ECF No. [118] at 27. The Government contends that Defendant's readiness to engage in armed conflict in such a scenario is highly probative of the context, motive, and set-up of the crimes alleged in Counts I and II. *Id*. at 28. The Government further argues these statements are linked in time and circumstances with the charges crime and form an integral and natural part of an account of the crime. *Id*.

Defendant replies that nothing in these speculative statements is relevant to any matters in this trial and the risk of wasting the jury's time with such minimally probative evidence is high. ECF No. [121] at 11. Defendant further argues the "marginal probative value of such statements is minimal, particularly given the volume of much more directly relevant evidence available to the [G]overnment." *Id*.

At this stage, Defendant has failed to meet his burden of proving that the statements are inadmissible on all potential grounds. The Government has proffered that these statements will contribute to the jury's understanding of context, Defendant's motive, and set-up of the alleged crimes. To the extent that manifests at trial, the statements would be admissible.

### xi. Statements from Transcript ECF No. [113-12] at 2

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---|---|
| Yener | Trump, cause Trump lives down here, Desantis, and the last thing you want is a guy, if it happened down here bro Trump [HY stutters] Trump would have so much support cause this is MAGA country down here honestly. |
| UCE | Yeah |
| Yener | But the, if it happens in New York bro, in liberal territory, like it could've been anybody, they'll be like everybody. |
| UCE | mmhm |
| Yener | They won't know who it is at first. |

The Government argues these statements are relevant to show Defendant's intent to target a location outside of Florida to minimize detection. ECF No. [118] at 28. The Government contends this statement is highly probative because Defendant indicates a place like New York would sow confusion regarding who perpetrated the crime. *Id*. The Government further argues Defendant's selection of the city where the New York Stock Exchange is located is highly probative of the context, motive, and set-up for the selection of a target outside of Florida to evade apprehension. *Id*. Defendant does not address these statements and has not met his burden.

**xii. Statements from Transcript, ECF No. [113-13] at 19-20**

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---|---|
| Yener | I mean I know, when it, when it does happen and [UI] the more it goes on the highly unlikely I think it will for this election it might be for the next one, who knows it might be this one but just like I try to prepare my mind mentally like when it happens there's no turning back. The comfortable life you lived will no longer, its done once you pull the trigger, push the button it's over you know, it's war time but I try to have in my mind like when that time comes, fight them with more force and aggression then they give you because the way I see it, if they catch me, they not gonna show me the mercy that I you know tv tries to make it out there, [UI[ you know US troops are just like any other army you know different flags but same methods. |
| UCE-2 | Yeah. |
| Yener | This may not be Russia but its same methods like any army will shoot you and protect its government because that's who's giving them the dollars so it makes sense but like I try to think about that a lot in my mind, I was telling him [UI] on our way here there's a lot of things that I be thinking about in my mind like damn what if this goes down what if that goes down will I, will I even be mentally prepared for that like its one thing to see it on tv or another country but when that shits like face to face with you, God is testing you like are you really ready to meet that monster. |
| UCE-2 | I can say [UI] to that response I can say that, that, that's a decision between you and Allah [UI] whatever you believe in. You gotta remember the color of the law. it is what it is, what's gonna happen and what's gonna be its gonna be right, whether we die of a heart attack, we die of a stroke or we die by the police shooting us tomorrow you know what I'm saying, Allah has willed that you know what I mean so the way I look at it I try to [UI] because of Allah you know what I mean for the sake of Allah [UI] you feel what I'm saying so yeah you got to think about that you know what I'm saying because we all got [UI] we human, we all got second thoughts but you gotta make that decision— |
| Yener | [OV] Yeah. |
| UCE-2 | --because at the end of the day when you [UI] you gonna have to deal with the good and the bad of what you did for the ummah what you did for the ummah, what you did for your family and the reason why you did it so let's make sure, you know what I mean whatever you do like you said you're gonna be pushing a button you know what I'm saying, make sure you pushing the button for the right reason, if you gonna shoot |

| | |
|---|---|
| | that gun make sure you shoot that gun for the right reason you know what I mean and you gotta figure out how you wanna strike per say right? We do what we do— |
| Yener | [OV] Yeah. |
| UCE-2 | --you know what I mean n-not that you know what I'm saying you don't wanna [UI] some dumb shit like, like, like lets just say like, like you know other groups just, they go out and get a high body count but they don't got a good purpose a good message for what they do— |
| Yener | Mmmmm. |
| UCE-2 | --you know what I mean, it's gotta be symbolic because over here in the west that's what they're looking for, that's, that's what's gonna shake the, shake the ground you know what I'm saying? |
| Yener | Yeah, yeah if, if you do something that has no meaning people are just like what the fuck that was random terrorism yeah it's like a random attack but like, like, the plan I was telling him about the World Trade Center hit it with the bomb, people are gonna be like ohh even in the movies bro you, you Fight Club for example, he hit that shit he was even saying in the movie you hit that, people are gonna wake up and be like oh I get it nice. |
| UCE-2 | Yeah. |
| Yener | Like if, if, if you do something it has to be like really obvious at least to an extent what you're trying to say because like you say if you're just doing shit people are gonna be like what. |
| UCE-2 | Mhm. |
| Yener | You're not gonna gain support you're just gonna piss people off. |

The Government argues these statements show Defendant's awareness that following through with violent attacks against the Government means there is no turning back. ECF No. [118] at 30. The Government further argues Defendant's statements show he is committed to accomplishing his plan to bomb the New York Stock Exchange. *Id*. at 31. The Government contends the mere mention of "Allah" by UCE-2 in these statements is not prejudicial, but rather a means of explaining to Defendant that he must be sure in his decision-making. *Id*.

Defendant argues these statements impermissibly inject religion and his cultural background into the trial. ECF No. [121] at 12. Defendant further argues the statements are not specifically tied to the alleged bomb plot and the probative value of the statements are greatly diminished by the fact that this conversation is wholly duplicative and cumulative of nearly identical statements the Government seeks to admit. *Id*. In support, Defendant cites numerous parts

of the transcripts which reflect the same sentiments as the above statements but do not mention religion. *Id.* at 11-15.

The Court agrees with Defendant that the probative value of the above statement is severely diminished by its cumulative nature and risks unnecessary prejudice to the Defendant through reference to religion. *See United States v. Gbenedio*, 95 F.4th 1319, 1335 (11th Cir. 2024) ("Under Rule 403, relevant evidence may be excluded 'if its probative value is substantially outweighed by a danger of ... needlessly presenting cumulative evidence.'"). As such, the statements are excluded.

### xiii. Statements from Transcript, ECF No. [113-14] at 3-8

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---|---|
| Yener | Um, did you uh, did you hear about them guys in Oregon, and Washington who were uh, using pyrotechnics to burn a ballot box, boxes? |

| SPEAKER | STATEMENT |
|---|---|
| UCE | Yep. |
| Yener | Yeah, that's crazy, I was like damn! It's begun. |
| UCE | Um hmm. |
| Yener | It was crazy there, I will admit. What got me the most though honestly, is it happened on the west coast. That's very liberal territory. |
| UCE | Well, who do you think's doing it? |
| Yener | Uh, I think it's honestly a small group. Because they said whoever it was, hit uh, Vancouver, |
| UCE | Yeah. |
| Yener | yeah uh, Washington, and they went down to Portland. |
| UCE | So, who's big up there? |
| Yener | There's a lot of groups, big ass there. Antifa, |
| UCE | Yeah. |
| Yener | Antifa's very big out there. Uh, |
| UCE | And they like fire don't they? |
| Yener | Yeah. Boogaloo be out there sometimes, that's a California one though. But I, I have, there's a lot of groups out there It could be anybody. |
| UCE | Yeah. |
| Yener | I'm waitin' to catch, for them to catch them and find out. Cause see, with the news, you gotta be careful listening to news out there. |
| UCE | Yeah. |
| Yener | It's because the news has this tendency, the Feds, the Feds do control the news, the government to an extent because I noticed every time – |

| | |
|---|---|
| UCE | It might be more than to an extent, |
| Yener | Whoa, |
| UCE | but yeah. |
| Yener | yeah, way more. But eh, you notice like when they catch these kind of things, and these kind of guys, they don't tell people if it's a group or not. |
| UCE | Um hmm. |
| Yener | And if they, if they, if it is a bunch of people, they always go, they, they won't tell you. I, I noticed that. Like, you know it's obviously a group of people, but they'll, they'll just show like three or four people, and you're like, bro, it's obvious it's an organization. |
| UCE | Yeah. |
| Yener | It may – |
| UCE | Yeah. |
| Yener | not be big, it may not be powerful, or technically advanced, but it's still there. |
| UCE | Right. It's not just one person – |
| Yener | Yeah! |
| UCE | woke up and said I'm gonna torch – |
| Yener | Like, like the Trump assassins, like do I think the first two had a connection with each other? I do to an extent. Even if they never met, I think they talked once. |
| UCE | Yeah, like there's some degree of connection there. |
| Yener | Yeah. Because he tried to kill him, he got killed, and then they said there was bombs in the car. So, he either got cold feet or left and said fuck it, and saw the other guy get popped, and is like, eh. And then later on, got his cool back, and senses back, and decided to try with, finish what he couldn't do, but he got caught. |
| UCE | Yeah. |
| Yener | So, I will say this, I am learning from watching them. These people that do this. It's |

| | |
|---|---|
| | obvious though I will say what's fucking them is they're not really, like they're acting out of like anger, and rage. |
| UCE | Yeah. |
| Yener | They're not really coordinated a tact. |
| UCE | Right. |
| Yener | Like, they don't care if they get seen, they don't care if they get caught, they don't give a fuck if they die. I mean like… |
| UCE | It's just pure emotion. |
| Yener | Yeah. They're not really like, I get their point, but they're – |
| UCE | Right. |
| Yener | not, they're hoping like it'll catch attention, and make people rise. And yet, it caught my attention because it's showing that east and west, she, they're, bro, they're actually talking about she might win this shit. |
| UCE | Well and, and I don't think there's anything wrong with the emotion. Cause at the end of the day, what, what are we trying to get? We're trying to get people's reaction. We're trying to sway their emotions, right? |

| Yener | Yeah, that's – |
|---|---|
| UCE | You're, you're trying send a message in New York, and that, that's, it's gonna, it's to get people thinking, but part of that thinking, people do have emotions, where you know, they're emotional creatures. |
| Yener | That's true. |
| UCE | But it's, can people calm that down, and actually think something through, instead of being rash. And then you accomplish nothing, right? |
| Yener | Yeah, exactly. And they're, they're making their point, but they're not like making, |
| UCE | Yeah. |
| Yener | they're not yeah, they're not really like at the same time, they're, it's like you said, their emotions are getting in their way. |

The Government argues these statements are relevant because they show Defendant believes "the Feds" control the media and will refuse to attribute any anti-government conduct to a specific militia or organization. ECF No. [118] at 33. The Government contends this is why Defendant eagerly accepted the opportunity to craft a recorded statement that would be disseminated and that Defendant was unwilling to let "the Feds" control the narrative and sought to be the voice of the anti-government movement. *Id*.

Defendant argues that these statements contain no discussion of the need to prepare a recorded statement claiming responsibility for the planned attack. ECF No. [121] at 16. Defendant points out there exists multiple other conversations Defendant does not seek to exclude in which Defendant and UCE 1 discuss the desirability of recording a statement for the media, and what such a statement should include. *Id*. Thus, the probative value of Defendant's statements about "the Feds" controlling the media in the context of unrelated acts of political violence is minimal and outweighed by the risk of confusing the issues and wasting the jury's time. *Id*.

The Court finds the probative value of these statements outweighed by the danger of unfair prejudice and risks confusing the jury. Those statements are excluded.

**xiv.   Statements from Transcript, ECF No. [113-14] at 8-20.**

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---|---|
| Yener | Word. Um, is uh, is uh, do, shit, what was I gonna say? Yeah, they, things about to pop off dude. We got one week left I think. I think – |
| UCE | Yeah. |
| Yener | next week is their last week, and then the week after that, they tell us. |
| UCE | Yeah, cause – |
| Yener | What – |
| UCE | they're, they're saying they may not know right off like, right away. It's gonna, – |
| Yener | Yeah. |
| UCE | it'll take a few days. |
| Yener | They are telling people to be patient, yeah. Like they say this bit is officially, a million people are supposed to vote. People are doing early votin' too though. But, like if you go to the ballots, the 5th, and by the 8th they said the latest we should know who won, the 8th is the latest. |
| UCE | Yeah. |

| | |
|---|---|
| Yener | That's a good amount of time. |
| UCE | Uh – |
| Yener | I mean, if these amount. But uh, I'm gonna be honest dude, I'm surprised how chill, I like, I, I could feel like a difference in the air. But uh, like, what pisses me off about like, this country, is I feel like this country, people just don't get it dude. Like, people here don't struggle or have the fear other people in other nations have. |
| UCE | No, they're |
| Yener | And this could be – |
| UCE | they're too comfortable. |
| Yener | this is because multiple reasons, but one of the reasons is because they're so comfortable, and they don't like their government |
| UCE | Yeah. |
| Yener | but they still trust them compared to most governments out there. |
| UCE | Here, we'll hit this, the Home Depot on University, we'll hit that. |
| Yener | Yeah. And I'm like okay, that's cool and all to you brother, but at the same time you gotta remember, any army with the gun will shoot you. |
| UCE | Yeah. |
| Yener | Know what I mean? It's like, different flags, but the same methods, so. But yeah dude, I think, and honestly dude, I think if a civil war popped off, I think in the sense, I don't really think the Army, I think the National Guard. Because I'mma think it like this, the U.S. Army, the military, the government's not stupid. |
| UCE | Yeah. |

| | |
|---|---|
| Yener | They know that if they use their forces, weaponry, and heavy shit, shit that actually matters in a war, on civilians here, other countries are gonna take advantage of their own stakes or whatever bullshit they're on. For example, Ty uh, China admitted, they're waiting for us to get in whatever bullshit we're gettin' in, and they just did a drill not long ago in the dark. |
| UCE | Yeah. |
| Yener | Yeah, so they want to invade fuckin' Taiwan, they really want – |
| UCE | Right. |
| Yener | Taiwan. |
| UCE | Yeah, they took – |
| Yener | And then, |
| UCE | uh – |
| Yener | Korea just sent 10,000 troops and counting to fuckin' Ukraine. Bro, everybody's doing what the fuck they want cause they know shit is about to cook over here. |
| UCE | Yeah. |
| Yener | And the government knows that too. So, they're gonna start sending all their heavy shit, all their big guns, all their big boys over there, and just have Delta Force, Special Forces, some Feds, some CIA guys stay over here and fight whatever bullshit's going on here. Because – |
| UCE | And I think, I think also at that, they gotta figure some of those dudes that are serving, I mean, you served, |
| Yener | Yeah. |
| UCE | right? Is everyone in there gonna be willing to turn their guns on citizens, or some of them gonna say, you know what, I think this is bullshit too. |
| Yener | Yeah. They are. Because at the end of the day, like you said, they still have emotions, |
| UCE | And instead of – |
| Yener | instead of evil. |

| | |
|---|---|
| UCE | you know, it'll be almost like you know, Bowe Bergdahl, but it's just instead of walking off in the mountains of Afghanistan, they're just gonna pull that, pull the patch off their uniform and walk into Miami, or walk into Houston, Texas, and link up with some of us. |
| Yener | Exactly. |
| UCE | Or some of our other patriots. |
| Yener | Exactly. And I see that. That's why I say like, I think to distract those people, they're gonna send them overseas. |
| UCE | Yeah. |
| Yener | Because I mean, you can go AWOL overseas, but good luck. You're in enemy territory |
| UCE | Yeah. |
| Yener | or damn near around it. You know what I mean? So, it's not like you just run off and you don't know the language, you don't know the customs and shit, you're trapped. |
| UCE | Yeah. |
| Yener | Unless you go to some distant land you're used to. But, other than that, you're just, you're stuck over there. So, I think the theory is, they're gonna, shit's gonna pop off, or whatever. We pop off, they pop off, and they're not gonna use their heavy forces. Because if they do, then they won't have shit to fight foreign enemies with. |

| | |
|---|---|
| UCE | Right. Yeah, I think we're kind of, the citizens is gonna kinda be protected from the heavy stuff too because they know if they cross that line, they've lost. As soon as, as soon as they start using big hardware against people here, |
| Yener | Oh yeah! |
| UCE | it's over. |
| Yener | It's a wrap! Hmm, yeah, no. |
| UCE | Either |
| Yener | It's done. |
| UCE | either other countries are gonna start intervening, they're gonna say well if, if, if they start doing that, it's gonna destabilize everything. So, either (A), they're just gonna have to capitulate something, but ultimately, |
| Yener | How did – |
| UCE | you want to do a great reset, we're gonna have to actually get them out. |
| Yener | I'm gonna be real with you. I've been thinking about that. I think if the U.S. did get into a civil war, it would (A), a lot of countries would try to stay out of it, like militarily |
| UCE | Yeah. |
| Yener | cause honestly, there'd be no gain for them. And then to add insult to injury, to be fair to the countries, they don't know the terrain enough. |
| UCE | Right. |
| Yener | So, they're literally walking dangerous territory, and ambush territory blind. |
| UCE | Well, you know – |
| Yener | And, |
| UCE | uh, you know why Japan didn't invade during World War II, right? |
| Yener | Yeah, cause every blade of grass would've had a gun behind it. |
| UCE | And you think we've lost guns? We've just gained guns |
| Yener | Gained. There are more guns in here than citizens. |
| UCE | Yep. |
| Yener | Matter fact, and like, I would tell them, like, I'm gonna tell you this right – |
| UCE | Alright. |
| Yener | now bro, if they sent any foreign troops over here, my response to them would be, |

| | |
|---|---|
| | that's fair game to me. |
| UCE | Right. |
| Yener | Yeah, I would actually be more pissed off to be honest. |
| UCE | Yeah. |
| Yener | That, that would actually make me be like, you're about to get no Geneva treatment |
| UCE | Right. |
| Yener | in a minute. |
| UCE | I mean, the way I feel, we're, we're gonna, we're gonna ignite kind of our people here to fix our prob, to fix our own problems. And that problem means, cutting the head off you know, the two heads off the snake, and then cleaning house. But, that's our problem. I mean, does that mean you kinda feel the same way? |
| Yener | Uh, yeah! No one has the, I, I strongly believe that. I, I do not approve of any foreign force being in our fuckin' waters. |
| UCE | Yeah. |

36

| | |
|---|---|
| Yener | They're in our shores. There has to like, get the fuck out of here. You're not gonna rob shit, you're not gonna change shit. I don't give a fuck if they call themselves peacekeepers. |
| UCE | Now, what if they, what if they try and do, let's say, let's say whoever wins or whatever, just goes, goes nuts, and they start saying alright, we're gonna fly some stuff. What about a no-fly zone? Cause that's what we did back in the 90's with some of those other countries is we said hey, you guys can do what you need to do in house, but we're gonna put a no fly zone. You ain't bombing your own people. |
| Yener | If they do that, that's cool. Uh, I don't, I don't care if they do that, but they don't, I don't want them to have people here. |
| UCE | Yeah. How much you think you need? |
| Yener | Just 30 oughta be good. |
| UCE | 30? |
| Yener | But yeah, no. Like, all that shit, that's gotta stop dude. That shit's crazy. People are insane dude. |
| UCE | So, you just gettin' what, light bulb, |
| Yener | And a wire. |
| UCE | and wire? |
| Yener | Yeah, I'll be right back. |
| UCE | Did you need anything else? |
| Yener | No, |
| UCE | Alright. |
| Yener | I'll bring you your change, and the receipt. Hold on. |
| UCE | Alright bro. |
| Yener | Be right back. |
| | [BN] [Vehicle door closes, radio playing. – 00:16:51 – 00:30:06] |
| UCE | Yeah, he's coming out. |
| | [BN] [Misc. noises, music playing. – 00:30:09 – 00:30:30] |
| UCE | What's up bro? |
| Yener | Alright, alright. Just one second, just one second, just one second. I can't get stuff out of my pocket if I sit down. |
| UCE | All good. |
| Yener | Alright. Now, I believe we ready. |
| UCE | Perfect |
| Yener | Damn, they had the perfect wire too. I was like damn, I hope – because every wire |

| | |
|---|---|
| | they had was like, power line size. |
| UCE | Oh yeah? |
| Yener | And then dude's like, yes, because we gotta cut it. And I was like, oh, oh shit. |
| UCE | So, did you get it cut, or he just…? |
| Yener | No, no, it's this. |
| UCE | Okay. |
| Yener | Yeah, he's like no, we got it, we just gotta cut it for you. |

| | |
|---|---|
| UCE | Gotcha. |
| Yener | I was like, well shit, at least you got it. |
| UCE | Yep. |
| Yener | It's like damn, this big ass store, I told him straight on, I know ya'll got wire. There's no way ya'll ain't got it. You got like everything there bro. |
| UCE | Right. |
| Yener | But yeah man, this is, I, when they did what they did last night, I jumped up in joy when they hit them ballot boxes. And bro, they was, did you hear about that mail carrier in fuckin' uh, where that Nigga was? Bro, where was it? It was… it caused a big problem too. It was Georgia I think it was. Which is a big deal, cause that's a swing state like Florida. |
| UCE | Like hit like a mail truck? |
| Yener | Yeah, he fuckin' um, bro, get this, they, they found, they, he, they sent him on a job to deliver the mail. The mail nev – people are calling like bro, my shit never came. |
| UCE | Um hmm. |
| Yener | So, they're like, what the fuck is going on dude? He's playing stupid. So, of course they send the cops, and they went out there like, finding out what the fuck's goin' – this motherfucker abandoned the van. |
| UCE | [Laughs] |
| Yener | Went in the back, |
| UCE | Yeah. |
| Yener | took all the letters, went through them, found ballots, burnt – |
| UCE | Oh jeez! |
| Yener | one of them, and then threw them all scattered in the woods. So, basically, he parked on the side of the road in a wooded area, and went out there, dumped everything. Just – |
| UCE | Bro, that's hilarious. |
| Yener | and they don't what the fuck his deal was. I was even like, what the fuck was that? His point? Like, what was the point, he was fuckin' ballots and everything, but they said they got it, he didn't damage them to where they couldn't you know, save them. They got him in time, but it's like damn dude! Like bro, it's about to pop. Oh, I was smilin' – |
| UCE | I'm tellin' ya. |
| | [BN] [Slapping noise] |
| UCE | It's, it is the right time. Cause no matter which way this pendulum swings, people are pissed. |
| Yener | Uh, it's time dude. I'm so excited. When I heard about them dudes in Washington, and Oregon, I said to myself, that is some kind of militia, or organization. They're never gonna say it's a militia or organization because if they do, people will hang. |
| UCE | Um hmm. |
| Yener | Like, if they actually, like the people they catch doing this shit, they, they never say it's a group unless it's like, they catch them with something mean. |

| UCE | Yeah. |
|---|---|
| Yener | Then they have no choice. They catch them with like a nuke or something, now they gotta tell who it is. But, other than that, if it's just like some solo, they send that dude down on a solo op, he fails or he doesn't fail, it's still gonna make the news, make them look good, |
| UCE | Yeah. |
| Yener | and he was solo, so nobody knows, like that, that, I think that's one of things that's fuckin' with the Feds head. Is because they keep attacking solo, and not coordinating in groups, they don't know like if it's a group, and if it is a group, they don't know who the fuck it is. You know what I mean? Cause – |
| UCE | Right. |

The Government argues that like the previous section, these statements focus on what type of response Defendant expects from the Government. ECF No. [118] at 39. Specifically, the Government notes that Defendant recognizes a military response to a militia attack would result in a civil war which would cause the Government to lose support. *Id*. The Government further notes that Defendant expresses excitement at other individuals' efforts to destroy ballots and push back against the Government. *Id*. The Government contends this shows Defendant's full support for anti-government conduct, which serves as evidence in support of the intent and knowledge requirement in Counts I and II and the malice requirement in Count II. *Id*.

Defendant replies these statements are not clearly related to the alleged offense conduct but involve a general discussion of a possible civil war in the abstract. ECF No. [121] at 16. Defendant contends the statements lack probative value, while raising the risk of prejudice. *Id*. at 17.

The Court cannot find at this time that Defendant has met his burden of proving that the statements are inadmissible on all potential grounds. Though Defendant suggests these statements raise the risk of unfair prejudice, the Government correctly points out that the statements are probative of Defendant's motive and displays Defendant's support for anti-government conduct which can be elicited as evidence in support of Defendant's knowledge, intent, and malice.

Case No. 24-cr-20523-BLOOM/Elfenbein

**xv. Statements from Transcript, ECF No. [113-14] at 39-42**

The Government seeks to introduce the following statements:

| SPEAKER | STATEMENT |
|---|---|
| Yener | Uh, but shit, I know one thing, if, if, if I ever, if they ever had asked like in the future, if a war broke out, and they asked like, if I had anything to say about it, I would leave it with one simple sentence. That's it, I swear to God. And my sentences to them would be, May he change us from men, to swords. That's it. I have nothing else to say. There's nothing else to say. That's, that's enough said, and that's enough to understand what I'm trying to say. |
| UCE | May he change us from men to swords. |
| Yener | Yep. |
| UCE | Where's that from? |
| Yener | I made it up. I thought about it for like, the whole fuckin' week. |
| UCE | Yeah? |
| Yener | I said, if someone were to ask me this, that, or the other, I would just leave it alone Bro. Why is this, why is that, who's this, "da, da." I would just leave it alone. |
| UCE | And it – |
| Yener | And let people ponder on that shit. |
| UCE | I was gonna say cause the first question they're gonna ask you is, who's the he? |
| Yener | It, I wouldn't answer any of them dude. I will literally just leave it alone. Like, may he change us from men, to swords. |
| UCE | Yeah. |
| Yener | That's it. That's all people need to know. Cause if you leave it simple, it's, I'm, I want to keep people thinking. Cause if you give people the answer is, oh I did it cause of this, I did this, I did that, he did this, "da, da, da, da, da, da, da." |
| UCE | Cause that, cause that, that, first thing someone might say, and I mean, you tell me what you think, if you say that, they're gonna say it's a religious thing. |
| Yener | That's true but I, I would it for the simple fact of like, if he asked me why I said that, I would say, that's honestly, and I would say, that's honestly how I want people to pray and feel. Uh, when, when, because things are gonna change, and when things get violent, you're gonna pray, |
| UCE | Yeah |
| Yener | that he changes you from a man, to a sword. You know what I mean? Like, and, and that's what I pray for, that he changes me – |
| UCE | Yeah |
| Yener | from a man, to a sword, so when the battle field comes, I am fearless in that battle. I am steel. |
| UCE | I like it. |
| Yener | And if they ask me okay, that's what that meant? Yeah. That's simply what that means. When it's time for battle, may God change me from flesh to blade. |

The Government argues Defendant's statements show his desire to be a warrior in conflict. ECF No. [118] at 41. The Government contends the evidence at trial will show the conflict in question to be what Defendant deems an inevitable civil war set off by his bombing of the New York Stock

Exchange. *Id*. The Government further argues the desire to inflict harm and willingness to engage in battle consistent with anti-government agenda goes towards proving knowledge, intent, and malice. *Id*. Moreover, the Government argues the statements are probative of the context, motive, and set-up of the crimes set forth in Count I and II. *Id*.

Defendant replies the probative value of the statement is low as the Government intends to play "tens of hours of other recordings in which Defendant expressly discusses the context, motive, and set-up of his alleged actions." ECF No. [121] at 17. Defendant contends the other statements lack the dark religious overtones of these statements which make them unduly prejudicial. *Id*.

At this time, the Court cannot find Defendant has met his burden of proving that the statements are inadmissible on all potential grounds. The Court agrees with the Government that the statements are probative of context, motive, and set-up of the crimes set forth in Counts I and II, considering the Government's representation that the evidence at trial will show Defendant's desire to set off a civil war via the bombing of the New York Stock Exchange.

### xvi.   Statements Concerning Potential Future Targets

The Government seeks to introduce several of Defendant's statements which discuss potential future targets. Specifically, the Government seeks to introduce statements found in ECF Nos. [113-15] at 19-29; [113-18] at 50, 53-54, 197-199, 201-202; [113-19] at 14-17, 28-32. The Government argues discussion of future targets beyond the New York Stock Exchange established the intent and knowledge requirements associated with Counts I and II, and the malice requirement of Count II. ECF No. [118] at 45. The Government contends this is true because the planning of future attacks is inherently predicated on the success of the bombing outside the New York Stock Exchange and Defendant's ability to evade apprehension. *Id*. The Government further contends such statements are not extrinsic within the meaning of Rule 404(b), but arise out of the same transaction or series of transactions as the charged offense. *Id*. 45-46. The Government argues the

statements and identification of other targets are intrinsic because their admission at trial is necessary to complete the story of the crime. *Id*. at 46. The Government avers that such evidence allows the jury to understand that Defendant's perception was that the militia would conduct a series of attacks, which is why he does not intend on releasing his recorded statement to the media until after he knows the bombing of the Stock Exchange was a success. *Id*. The Government argues that without such evidence the jury would be left trying to understand how the attempted bombing of a single building would cause a reset of the Government. *Id*.

Defendant replies that the discussions of future targets do not constitute an integral part of the account of the charged offenses. ECF No. [121] at 18. Defendant contends that the Government's narrative of how the alleged plan to bomb the New York Stock Exchange can be told without any reference to future attacks. *Id*. Defendant argues references to future attacks are not relevant, only serve to paint Defendant in a bad light, and risk confusing the jury as to the matters at issue in the case. *Id*. at 19. Defendant further argues the statements constitute improper Rule 404(b) evidence, for which the Government has not provided the requisite notice. ECF No. [113] at 16.

The Court will first address whether the statements are extrinsic evidence subject to 404(b) analysis. Evidence of criminal conduct falls outside the scope of Rule 404(b) and is independently admissible if it is, "'(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense[s], (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense[s].'" *United States v. Ford*, 784 F.3d 1386, 1393 (11th Cir. 2015) (quoting *United States v. Baker*, 432 F.3d 1189, 1205 n. 9 (11th Cir. 2005)). Defendant's statements squarely fall outside the scope of Rule 404(b). First, the statements come within the same series of transactions as Defendant is actively discussing

future targets in the build up to the bombing of the New York Stock Exchange. Moreover, as the Government represents, the discussions of future attacks are informative as to Defendant's larger motivation in resetting the Government and aids in establishing the intent and knowledge requirements associated with Counts I and II, as well as the malice requirement of Count II. As such, the statements help complete the story for the jury as regards Defendant's overall goals with the militia which contributes to an understanding of his intent and motive. "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998) (quoting *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir.1985). As such, the Court cannot find Defendant has met his burden of proving that the statements regarding future targets are inadmissible on all potential grounds.

### xvii.   Statements from Transcript, ECF No. [113-15] at 47-49

The Government seeks to introduce the following statement:

| SPEAKER | STATEMENT |
|---|---|
| Yener | It's like, yeah, I ain't got not problem crashin' out. In fact, I ain't even got shit goin' on, to be honest. |
| UCE | Yeah |
| Yener | This is not like it mean much to me, anyway, but…if I could stay long enough- long enough- long- alive long enough to fuck 'em up and to go down with a blast, then, I'd rather do that than just fuck (UI) fuckin' |

The Government argues this statement reinforces Defendant's commitment to engaging in conflict and the inevitable civil war. ECF No. [118] at 47. The Government further contends this evidence ties into the writings that law enforcement observed in his storage unit on March 1, 2024, as well as his statements that he was waiting for the right opportunity to strike. *Id*.

In his Reply, Defendant points out Defendant and the UCE discuss "Muslim militias" and their tactics and appear to criticize some of the tactics utilized by such groups, including the use of suicide attacks. ECF No. [121] at 17. Defendant argues the abstract discussion of such tactics by other groups has no place in the trial and the Government's attempt to introduce such statements is an effort to improperly introduce Defendant's religious and cultural background.

At the outset, the Court notes that the only mention of a "Muslim militia" in the Government's proposed excerpt is the Defendant explaining that he does not want to sacrifice anyone in contrast to the actions of Muslim militias. ECF No. [113-15] at 48. The Court fails to see how such a statement attempts to introduce the Defendant's religious and cultural background. Moreover, the statements are probative of the context, motive, and set-up of the crimes as the discussion relates to the tactics Defendant would allegedly settle on in attempting to blow up the New York Stock Exchange. As such, the Court cannot find Defendant has met his burden of proving that the statements regarding future targets are inadmissible on all potential grounds.

### xviii.   Statements Concerning Defendant's Contacts with FTOs

Defendant acknowledges that some of his statements concerning past contacts with people he believed to be connected to FTOs may be relevant considering the threatening statements he made to federal agents after they informed him they were seizing his phones. ECF No. [113] at 8. Defendant only seeks to exclude statements concerning FTOs which are "unclear, confusing, and repetitive." *Id*. at 113.

The Government responds that Defendant's threats against the federal agents centered on references to "my people", "dudes", "he", and "them", and without context the jury will not be able to understand the threatening nature of the remarks and why these communications amounted to criminal threats. ECF No. [118] at 7. The Government argues Defendant's statements

concerning his contacts with FTOs provides context for many of the suspicious drawings and writings that resulted in law enforcement meeting with Defendant on March 1, 2024. *Id*.

The Court agrees that Defendant's statements concerning his contact with FTOs are relevant considering the threats he made and animosity he displayed to the federal agents after they informed Defendant they would seize his phone. At this time, the Court cannot find Defendant has met his burden of proving that the statements are inadmissible on all potential grounds.

### C. Motion for Reconsideration

Defendant asks the Court to reconsider its Protective Order, ECF No. [93], which permitted the Government to use a screen (or other measure) to block the view of the UCEs and CHS from the public at trial. Defendant argues that reconsideration is warranted because the declassification of the video files is "new evidence". ECF No. [122] ¶ 4. Defendant contends that because the recordings have been declassified, the faces of the UCEs and CHS will be seen on the videos played during trial, and there is no justification for the use of a screen. *Id*. ¶ 5. Therefore, it is Defendant's position that the use of the screen would be unduly prejudicial and the equivalent of presenting the Defendant in shackles or prison garb, giving the impression that Defendant must be separated from society. *Id*. ¶ 8. Defendant further argues the screen violates Defendant's right to a public trial and equates the use of the screen to a partial closure of the courtroom. Defendant relies on *Waller v. Georgia*, 467 U.S. 39, 46 (1984), for the proposition that "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id*. ¶ 10. Defendant contends that because the videos are now declassified, there is no governmental interest in using a screen. *Id*.

The Government responds that Defendant's Motion for Reconsideration is not legally justified as the identities of the UCEs and CHS remain classified and still must be protected from public disclosure. ECF No. [124] at 3-4. Moreover, the Government points out that courts have determined the use of a screen is an alternative to closure, rather than a closure subject to the requirement of *Waller*. *Id*. at 4. (citing *Blades v. United States*, No. 15-CF-663, 2019 WL 291888 (D.C. Jan. 23, 2019)) ("By contrast, where proceedings are conducted in the open courtroom but with some members of the public having an obstructed view, courts have generally concluded that the process is an alternative to closure rather than a closure subject to the requirements of *Waller*"). The Government asserts that it is not seeking to modify the Defendant's appearance to imply he is dangerous, needs shackles, or is currently incarcerated. *Id*. at 7.

Though Defendant argues the screen constitutes a closure of the courtroom subject to the requirements of *Waller*, courts have consistently found a screen to function as an alternative to closure. *See Blades v. United States,* No. 15-CF-663, 2019 WL 291888 (D.C. Jan. 23, 2019); *Rodriguez v. Miller*, 537 F.3d 102, 103-10 (2d Cir. 2008); *Pearson v. James*, 105 F.3d 828, 830 (2d Cir. 1997); *United States v. Lucas*, 932 F.2d 1210, 1217 (8th Cir. 1991). As such, the Court does not find it necessary to subject the use of a screen to the requirements of *Waller*. Furthermore, the Court does not find that the declassification of the videos is "new evidence" or has eliminated the Government interest in protecting the safety of the UCEs and CHS, vital national security information, and the ability of the United States to conduct other investigations implicating national security. Defendant has failed to cite support for his contention that the use of the screen is equivalent to placing Defendant in shackles or prison garb. The Defendant has failed to meet his burden on reconsideration to show an intervening change in controlling law, the availability of

46

new evidence, or the need to correct clear error or manifest injustice. As such, Defendant's Motion

for Reconsideration is denied.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows**:**

1. Defendant's Motion to Compel, **ECF No. [109]**, is **DENIED**.

2. Defendant's Motion *In Limine*, **ECF No. [113]**, is **GRANTED in part** and **DENIED in part**.

3. Defendant's Motion for Reconsideration, **ECF No. [122]**, is **DENIED.**

**DONE AND ORDERED** in Chambers at Miami, Florida, on May 29, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record