UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-20523-CR-BLOOM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

HARUN ABDUL-HAMID YENER,

     Defendant.

_____/

**MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT
OR, IN THE ALTERNATIVE,
<u>FOR AN ADVERSE JURY INSTRUCTION</u>**

The Defendant, Harun Yener, asks the Court to dismiss the prosecution against him based on outrageous government conduct or, in the alternative, for an adverse jury instruction based on the government's withholding of *Brady* and *Giglio* evidence favorable to the defense until after the inception of the trial in the above-captioned matter. In support thereof, Mr. Yener states as follows:

1. As part of the government's *Jencks* disclosure, the government disclosed to Mr. Yener two documents that constituted *Brady* evidence and should have been produced to the defense long before trial. *See* Def. Exs. KK, JJ. Those documents were ultimately introduced during the cross-examination of Special Agent Depenbrock. The first, dated September 23, 2024, memorializes an internal FBI finding that Mr. Yener "may have the knowledge to put together an explosives device, but **likely doesn't have all the components and explosives materials yet**." The

second, dated October 9, 2024, memorializes an internal FBI finding that Mr. Yener "did **not have the ability to travel independently** of borrowing his friends car."

2.      Both documents are plainly *Brady*.  Because Mr. Yener is charged with the attempted use of an explosive device against a building used in interstate commerce, there is no question that FBI findings related to Mr. Yener's inability to obtain either transportation or an explosive device are exculpatory.

3.      On the basis of that disclosure, defense counsel emailed to the government on June 18, 2026, a renewed request for all *Brady* and *Giglio* material, specifically requesting material "including but not limited to any findings, suspicions, or communications that Mr. Yener did not have access to components, explosive materials, or transportation, or that he lacked the knowledge or ability to construct an explosive device at any time."  In that same email, Mr. Yener also renewed his request for all *Giglio* material, including but not limited to, communications discussing the entrapment of Mr. Yener, or "any text messages or emails between members of the investigative team and members of the prosecution team regarding how the investigation should proceed, or any reports on the same topic."

4.      When no response to that email was received, Mr. Yener moved orally for that information in open court.  The government responded not that this information was mistakenly withheld, but that the information in the first category was not *Brady*, because it consisted of preliminary findings, and that the information in the second category was not *Giglio*, because of attorney-client privilege.  The Court ruled that both categories were discoverable and ordered the government to provide a renewed disclosure.

5.      The government has indeed provided further evidence to the defense, and that information is categorically *Brady*.  Attached at Exhibit 1 of this filing is a sampling of the evidence the government provided.  These include a September 24, 2024, email in which an FBI agent states that the FBI does "not assess that the subject has the resources to build a device and may suffer from mental health issues." They include a finding from late in the evening on March 1, 2024, in which an FBI agent concludes that Mr. Yener made no "threat to life.  As Kim stated, no specific threats were made.  Just general statements about a war that is coming."  This, of course, despite the fact that the government now is arguing to the jury that a specific threat to life *was* made on March 1, 2024.  They also include a finding from September 23, 2024, that Mr. Yener's "threats against the Government in general and the FBI Director specifically appear to be aspirational at this point."  They also include a finding that Mr. Yener's only communication with individuals in the Middle East had no "derog associated" and consisted of a discussion of "current events" and an offer to help Mr. Yener find a job in "construction."

6.      Perhaps most concerning is the production of the FBI's internal profile on Mr. Yener, which was testified to by Special Agent Depenbrock.  In that profile, which is referred to as a "baseball card" within the FBI, the FBI memorializes findings from September 24, 2024, which include that the FBI is "attempting to introduce [Yener] to a UCE," that a review of his cellphones found "no communication with known [Foreign Terrorist Organizations]," that "Yener prefers to work alone, and FBI MM was unable to introduce Yener to a UCE," and, most importantly, that

the FBI "has reviewed financial subpoena results which have been negative for purchasing bomb making materials."

7.      Each of the above referenced materials, which are only a subset of the government's full disclosure, speak directly not only to the elements of the charged offenses, but also to Mr. Yener's entrapment defense.

8.      There is no excuse for this late disclosure.  As the government is fully aware, the overlapping protective orders in this case prevented Mr. Yener from knowing the identities of the undercover agents involved in this case.  If two of the *Brady* documents had not slipped through the government's *Jencks* disclosure, none of the documents referenced in this motion would have been produced at any time. There is little question that the non-disclosure would have deprived Mr. Yener of the right to a fair trial.

9.      Separately, the government stated on Thursday, June 25, 2026, that it had completed its review of all communications between and within the FBI and USAO and had found no communications that might be subject to a further *Giglio* production.

10.     This seemed curious, for two reasons.  *First*, the *Jencks* disclosure that had already been provided made clear that there were ongoing communications between SA Taylor Sutherland and SA Garrett Bowman, on the one hand, and the USAO, on the other.  See, for example, this excerpt from Special Agent Sutherland's *Jencks* disclosure:

> AUSA is cool with Gav going to look at it. He wants
> YENER to control most of the direction with the
> audio message/script. make it very him. and then
> lastly he would like to push away from the RC truck
> just becasue thats another thing we would have to
> get him... but idk how we can do that

11.     This communication memorializes a clear direction from the USAO to the FBI regarding how the proactive operation against Mr. Yener should proceed. Yet, the initial communication (from the AUSA to Sutherland) has not been produced.

12.     Consider also this communication from Special Agent Bowman's *Jencks* disclosure:

> "Yea, we discussed what tehy did that addresses some of the concerns that
> your SSA and AUSA had, and a few things we could do differently here"

13.     Consider also this communication from Special Agent Bowman's *Jencks* disclosure, in which Bowman is texting with who appears to be former-AUSA Michael Thakur:

| | | |
|---|---|---|
| 2024-11-11T10:50:51.000-0500 | 17033864667  17033864668 | On phone with him now |
| 2024-11-11T10:48:19.000-0500 | 17033864668  17033864667 | Okay thanks |
| 2024-11-11T10:46:29.000-0500 | 17033864667  17033864668 | Mike didn't answer, will let you know when he calls back |
| 2024-11-11T10:46:13.000-0500 | 17033864667  19178461062 | Hey Mike, looks like we are going to have a UC op this evening and I have a few questions in anticipation--can you give me a call when you get a chance |

14.     The government's representation also seemed curious for a second reason, which is the testimony that has been elicited thus far in trial. Because during the cross-examination of Mason Miller, undersigned counsel asked Confidential Informant Miller if he had ever exchanged text messages with his handlers, and he responded in the affirmative.

5

15.     No text messages from Mason Miller have been produced, despite the government's representation that it has completed its search for materials this Court ordered to be disclosed.

16.     Based on concerns regarding the thoroughness of the search the government conducted in response to this Court's order, the defense, in good faith, reached out to former AUSA Michael Thakur and inquired as to whether he had been asked by the USAO to review his personal devices for any communications related to the instant matter at any time in the last two weeks.  He responded that he had not.

17.     Both the ongoing *Brady* issue and the ongoing *Giglio/Jencks* issue raise serious concerns regarding the fairness of this trial.  There is simply no excuse for withholding these plainly exculpatory documents from Mr. Yener for 18 months.  And merely introducing the documents and cross-examining the witnesses on them does not cure the error.  Mr. Yener's trial strategy was informed by the lack of such findings.

18.     As Justice Rehnquist wrote long ago, "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . ." *United States v. Russell,* 411 U.S. 423, 431–32 (1973).  This is that situation.  The government is currently presenting a case to the jury in which it has argued that Mr. Yener actually built a bomb, actually had the ability to build one, actually threatened law enforcement officers, and actually intended on traveling to New York to detonate it.  All the while, the government was fully aware that internal FBI memoranda drafted during the proactive operation of

6

the case concluded that Mr. Yener did not have the ability to effectuate any of those goals. This is conduct that goes beyond "that 'fundamental fairness, shocking to the universal sense of justice' mandated by the Due Process Clause of the Fifth Amendment." *Id.* (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960)).

19.     At the very least, this Court must order that (1) the *Brady* evidence be admitted; (2) that the defense be permitted to cross Special Agent Bowman on the evidence; (3) that the jury be instructed on the government's violation; and (4) that the government provide certifications from each of the AUSAs assigned to the case that they have completed a full review of their personal and professional devices for communications responsive to this Court's Order.

20.     On the issue of the certifications, it is simply inconceivable that there are no written communications between the USAO and the FBI regarding the operation against Mr. Yener beyond the few text messages that have been produced. From the *Jencks* already provided, it is clear that both Special Agents Bowman and Sutherland were in continuous communication with the USAO regarding how best to formulate the proactive operation against Mr. Yener to avoid the inevitable entrapment defense. The communications we have received make clear that *dozens* of agents were involved in this case. This Court must assure itself, given what has already been withheld, that Mr. Yener's right to a fair trial is honored by the government. And Mr. Yener has received *zero* communications between the USAO and any non-testifying witnesses. As this Court's order already made clear, any

7

written communication in which an attorney for the government is directing a law enforcement agent on how to elide an entrapment defense is hornbook *Brady*.

21.    On the issue of the adverse jury instruction, Courts give such instructions when *Brady* and *Giglio* violations are discovered in time to be used, but where the conduct falls short of mandating dismissal of the charges.

22.    *See United States v. Garrison*, 888 F.3d 1057, 1065 (9th Cir. 2018) ("There is no dispute here that the government failed to comply with the requirements of *Brady* and *Giglio* when it disclosed evidence late regarding Santiago and Shishalovsky falsifying records for Harris, and failed to timely disclose the side deal with Shishalovsky. All of the late disclosed evidence, however, was given to the jury. And the district court gave a jury instruction telling the jury that the government had disclosed evidence late and that the jury could draw adverse inferences from that late disclosure. From the instruction it is clear that the jury was empowered to exonerate Garrison because of the government's misconduct, if it chose to do so.").

23.    The instruction given in *Garrison* read: "Under the United States Constitution, in order for the defendant to receive a fair trial, the Government must inform the Defense of any information known to the Government that tends to suggest the defendant might not have committed the crimes or crime charged ... and any information that casts doubt on the credibility of the Government's own evidence. In this case, the Government violated those important Constitutional principles upon which the fair administration of our system of justice depends on multiple occasions. In evaluating the merits of this case, you can decide what weight, if any, to give to

8

the Government's violations of these Constitutional principles. The Government's actions standing alone or in combination with other facts presented in this case, may create a reasonable doubt in your mind about the defendant's guilt." *See id.* at 1063, n.3.

24.      *See also United States v. Burke*, 571 F.3d 1048, 1054–55 (10th Cir. 2009) ("At a minimum, therefore, we adopt as a holding this court's statement in *Young* that the belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an "earlier disclosure would have created a reasonable doubt of guilt." 45 F.3d at 1408. *See also United States v. Fallon,* 348 F.3d 248, 252 (7th Cir. 2003) (key inquiry is "whether earlier disclosure would have created a reasonable doubt of guilt"). Where the district court concludes that the government was dilatory in its compliance with *Brady,* to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony**, instructions to the jury**, or even mistrial. The choice of remedy is in the sound discretion of the district court. Fed. R. Crim. P. 16(d)(2) authorizes the district court in cases of non-compliance with discovery obligations to "permit the discovery or inspection," "grant a continuance," "prohibit the party from introducing the evidence not disclosed," or "enter any other order that is just under the circumstances." *See also United States v. Johnston,* 127 F.3d 380, 391 (5th Cir. 1997) (district court has "real latitude" to fashion appropriate remedy for alleged *Brady* errors following from delayed disclosure); *United States v. Josleyn,* 99 F.3d 1182, 1196 (1st Cir. 1996) ("The

district court has broad discretion to redress discovery violations in light of their seriousness and any prejudice occasioned the defendant.")"(emphasis added)).

25. This case is barreling towards its conclusion, and serious questions of constitutional import remain unanswered. What has been answered is perhaps even more troubling. Indisputable *Brady* evidence that speaks directly to Mr. Yener's innocence has been withheld. Two such documents slipped through a *Jencks* disclosure, and many more were produced only after a directive from the Court. If the Court is disinclined to grant dismissal at this time, at the very least an adverse jury instruction and sufficient *Giglio* disclosure must be provided.

WHEREFORE, Mr. Yener respectfully requests that this Court dismiss the indictment with prejudice or, in the alternative, (1) read to the jury an adverse jury instruction regarding the withheld *Brady* evidence and (2) order the government to provide certifications from each of the AUSAs who worked on this case regarding what measures were taken to search for communications responsive to your Honor's Order.

Respectfully submitted,

HECTOR DOPICO
FEDERAL PUBLIC DEFENDER

By:    */s/ Victor Van Dyke*
Victor Van Dyke
Assistant Federal Public Defender
Florida Special A No.: A5503021
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1555
Tel: (305) 530-7000
E-mail: victor_vandyke@fd.org

10

**CERTIFICATE OF SERVICE**

I HEREBY certify that on June 29, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


        /s/ *Victor Van Dyke*
        Victor Van Dyke